UNITED STATES BANKRUPCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

LIBERTY MUTUAL INSURANCE COMPANY,

      Plaintiff,

v.

UNITED STATES OF AMERICA, ROBERT FURR,
JOEL TABAS and SONEET KAPILA,

      Defendants.

_____/

Adv. No. 11-01994

(Consolidated with Pros. Nos.
10-03653-BKC-JKO,
10-03627-BKC-JKO,
10-03720-BKC-JKO,
10-03626-BKC-JKO, and
10-03610-BKC-JKO)

## MIAMI CENTER LIMITED PARTNERSHIP'S MOTION TO INTERVENE

Pursuant to 11 U.S.C. § 105(a), Federal Rule of Bankruptcy Procedure (the "Bankruptcy

Rules") 2010(b), and Bankruptcy Rule 7024, Theodore B. Gould, as General Partner of the

Miami Center Limited Partnership (hereafter "MCLP") hereby moves to intervene as a defendant

in this action and as a plaintiff in the adversary proceeding styled *United States of America v.*

*Furr*, Adv. No. 10-03653-BKC-JKO (Bankr. S.D. Fla.) (the "Driscoll Adversary Proceeding").

MCLP seeks to intervene to bring claims on behalf of the United States of America (the

"United States") against Marika Tolz and against the bond issued by Liberty Mutual Insurance

Company ("Liberty Mutual"), as surety for Marika Tolz, in favor of the estate of James P.

Driscoll ("Driscoll"). In support of this motion, MCLP respectfully states as follows:

### Preliminary Statement

1.    MCLP seeks to intervene in this proceeding to protect its interest in the assets in the

case styled *In re James P. Driscoll*, Case No. 06-12420-BKC-JKO (Bankr. S.D. Fla.) (the

"Driscoll Case"). MCLP is by far the largest creditor of the Driscoll estate. MCLP's interests

will be best served by obtaining reimbursement for the estate for all damages caused by Tolz's

breaches of fiduciary duty and by expeditiously resolving as many outstanding issues as possible in order to avoid unnecessary expense and delay. Accordingly, MCLP seeks permission to intervene in this action and the Driscoll Adversary Proceeding to seek relief against Marika Tolz ("Tolz") and Liberty Mutual for Tolz's malfeasance on behalf of the Driscoll estate. If permitted to intervene, MCLP would promptly move for partial summary judgment against Liberty Mutual.[1]

2.     MCLP holds a final money judgment in the amount of $8,000,000 against Driscoll and the Patrick Power Corporation ("PPC") jointly and severally. This judgment is based on findings that (1) PPC was a mere continuance of James P. Driscoll, Inc. ("JPDI"), a predecessor to PPC against which MCLP held a money judgment arising from fraudulent transfers, and (2) PPC was dominated by Driscoll and was his alter ego.

3.     Pursuant to a court-approved settlement between the trustees of *In re Patrick Power Corporation*, Case No. 06-12423-BKC-JKO (Bankr. S.D. Fla.) (the "PPC Case") and the Driscoll Case, the PPC estate has an allowed unsecured claim of $1,000,000 against the Driscoll estate. MCLP and the PPC estate are the only remaining material creditors of the Driscoll estate.

4.     Accordingly, MCLP holds nearly 90% of the claims against the Driscoll estate. As MCLP is also a major creditor in the PPC Case, its real interest in the Driscoll estate exceeds 90%. MCLP is clearly a key party in interest in the Driscoll estate and has a right to participate in a process that may dramatically affect its distribution.

5.     Marika Tolz is a former trustee for numerous bankruptcy cases in this District (including the Driscoll Case). Tolz has admitted to misappropriating more than $1,000,000 of

---

[1] Counsel for the successor trustee has represented to MCLP that he takes no position on this Motion to Intervene and does not intend to object. MCLP's proposed complaint (with exhibits) is attached hereto as Exhibit A. MCLP's proposed motion for partial summary judgment against Liberty Mutual is attached hereto as Exhibit B.

Driscoll estate funds and has pled guilty to misappropriating $967,856 from the U.S. Marshals Service to cover these missing funds. For four years, she kept the Driscoll Case open for her own benefit while needlessly depleting estate assets.

6.     In addition to taking $1,000,000 from the Driscoll estate outright, Tolz squandered nearly $700,000 of estate assets buying time to keep her fraud from collapsing. Among other things, Tolz (1) directed or permitted her attorneys to pursue fruitless lawsuits at great expense to the Driscoll estate and (2) ignored, failed to supervise, or misdirected her accountants, resulting in violations of federal tax laws and the failure to preserve millions of dollars in tax refunds.

7.     While MCLP has no reason to question the competence or integrity of the successor trustee in the Driscoll Case – to the contrary, Robert C. Furr, Esq. ("Furr"), the successor chapter 7 trustee, has cooperated with MCLP's efforts to date to maximize recoveries for the Driscoll estate – the economic realities of the situation make it plain that MCLP's interests will be best represented by permitting it to intervene as a party. Further, the law is clear that major creditors are permitted to intervene as of right in adversary proceedings concerning estate assets concurrent with the participation of the trustee.

8.     MCLP believes its intervention would minimize additional administrative expenses and aid in the recovery of assets. MCLP's participation would be at no cost to the estate. If permitted to intervene, MCLP would file a complaint against Tolz and her surety, Liberty Mutual, seeking damages for Tolz's breaches of her fiduciary duties to the Driscoll and PPC estates. MCLP would also move for partial summary judgment against Tolz's surety, Liberty Mutual, to replace misappropriated and squandered Driscoll estate assets and to restore the estate to where it would have been but for Tolz's confessed pattern of fraud. Since Tolz has confessed to misappropriating $1,000,000 from the Driscoll estate, there is no genuine issue of material fact

3

on certain issues with regard to liability and damages: Liberty Mutual should reimburse the

Driscoll estate for the $1,000,000 Tolz misappropriated, the $76,690 commission she paid

herself, and the approximately $610,000 spent on administrative expenses supporting the fraud,

plus other relief (i.e., prejudgment interest) set forth in MCLP's proposed motion for partial

summary judgment.

### Factual and Procedural Background

#### *Liberty Mutual Agrees to Act as Tolz's Surety and Tolz Begins Her Fraud*

9.     On December 13, 2002, Liberty Mutual bound itself as surety to the United States on

behalf of certain bankruptcy trustees serving in chapter 7 cases (and chapter 11 liquidation cases)

in this Court in the aggregate amount of $48,261,000. *See* Blanket Bond of Trustees,

#016027932 (the "Bond," attached to MCLP's Proposed Intervenor Complaint as Exhibit 1), Ex.

A, pp. 1-2. The Bond became effective on January 8, 2003. *Id.* at 2. Tolz was one of the

principals for whom Liberty Mutual agreed to act as surety. *See* Bond, Ex. A.

10.     From on or about March 24, 2003 through May 20, 2010, Tolz conspired to

misappropriate funds from, *inter alia*, bankruptcy estates in this District, by writing or causing to

be written checks from fiduciary accounts she was appointed to safeguard without legal

justification. Tolz used the misappropriated money for her own benefit as well as to conceal the

ongoing nature of her fraud. Tolz also filed false and fraudulent reports concerning bankruptcy

cases in this District. *See* Factual Basis Supporting Change of Plea (the "Admitted Facts,"

attached to the Proposed Intervenor Complaint as Exhibit 2), Case No. 1:11-cr-20160-JEM (S.D.

Fla.) (the "Criminal Case") D.E. 37, ¶¶ 7-9.

*Events Precipitating the Filing of the Driscoll and PPC Cases*

11.   In 2003 through 2006 (as well as preceding years), PPC distributed assets to members of Driscoll's family. These distributions totaled approximately $590,971 in 2003 (*see* PPC's 2003 Form 1120S, attached hereto as Exhibit C, at 3), $692,257 in 2004 (*see* PPC's 2004 Form 1120S, attached hereto as Exhibit D, at 3), $452,963 in 2005 (*see* PPC's 2005 Form 1120S, attached hereto as Exhibit E, at 3), and $810,806 in 2006 (*see* PPC's 2006 Form 1120S, attached hereto as Exhibit F, at 3.).

12.   On August 5, 2003, MCLP filed a motion for impleader of the Patrick Power Corporation in proceedings supplementary to MCLP's execution of a pre-existing judgment against JPDI, seeking (1) to hold PPC liable as the mere continuance and alter-ego of JPDI, and (2) to pierce PPC's corporate veil to hold Driscoll personally liable.[2]

13.   According to PPC's accountants, in 2003 PPC overbilled its general contractors by approximately $4,000,000. *See* Excerpts of the Report of Rachlin Cohen & Holtz LLP dated April 27, 2006 (the "Rachlin Report," attached hereto as Exhibit G), pg. 9.[3]  In 2004, PPC overbilled them by $3,100,000. *Id.* In addition, PPC's financial statements did not reflect that it was a defendant in the supplemental proceedings brought by MCLP. *See generally,* PPC Financial Report for 2003 and 2004, Exhibit H.

14.   On June 29, 2004, Travelers Casualty & Surety Company of America ("Travelers") entered into an Indemnity Agreement with PPC concerning four of PPC's contracts. Pursuant to

---

[2] The original judgment was issued in 1986 for fraud against JPDI, a company wholly-owned by Driscoll.  In 1987, judgment was entered against JPDI and Driscoll Industries, Inc. ("DII") for the fraudulent transfer of JPDI's assets to DII.  DII subsequently merged with PPC on October 1, 1988, and so PPC became liable to MCLP as of that date.

[3] The Rachlin Report was a financial analysis conducted of PPC and Driscoll individually to determine whether PPC would be able to continue as a going concern after a judgment (described in paragraph 15) was entered against them in 2006.

the Indemnity Agreement, PPC granted Travelers rights of subrogation in all of PPC's assets.[4]

Among other conditions, PPC would be in default under the Indemnity Agreement if PPC

(1) improperly diverted contract funds or PPC's assets to the detriment of PPC's contract

obligations, (2) actually became insolvent, or (3) furnished or caused to be furnished to Travelers

any materially false or misleading misrepresentation. *See* General Agreement of Indemnity (the

"Indemnity Agreement," Exhibit I), ¶ 2.

15.    On May 26, 2006, MCLP obtained a judgment in the supplementary proceedings

against Driscoll and PPC of $6,000,000 plus attorneys' fees and costs arising from fraud against

MCLP and subsequent fraudulent transfers that benefitted PPC.[5]  Driscoll Claims Register, 3-1,

pp. 9-17.  The court found that PPC was the mere continuation of a previous corporation

controlled by Driscoll and was Driscoll's alter ego. *Id.*  On May 31, 2006, PPC ceased business

operations, and on June 6, 2006, Driscoll and PPC each filed petitions for relief under chapter 7

of the Bankruptcy Code.

### Tolz's Trusteeship Over the Driscoll and PPC Cases

16.    Tolz was appointed trustee for the Driscoll Case and the PPC Case on June 7, 2006.

Driscoll Case D.E. 8; PPC Case D.E. 5.  On June 13, 2006, Tolz resigned as trustee for the PPC

estate and was replaced by Kenneth Welt ("Welt").  PPC Case D.E. 8.  Neither Tolz nor Welt

filed IRS Form 966 on behalf of PPC, which the Internal Revenue Code requires to be filed by a

corporation within 30 days after the resolution to wind down, dissolve or liquidate.

---

[4] On June 6, 2007, the PPC estate's attorneys represented to MCLP that PPC's accounts receivable were approximately $6,500,000, of which contractors were claiming setoff of $3,069,412 and Travelers was claiming $3,015,412 pursuant to its rights of subrogation.

[5] PPC subsequently appealed that judgment.  Its sole argument was that MCLP lacked standing to pursue the underlying judgment against PPC and Driscoll.  On October 17, 2007, the Florida Third District Court of Appeal affirmed the judgment.

17. From June 7, 2006 through June 14, 2006, John L. Heller ("Heller") served as lead accountant in the PPC Case. PPC Case D.E. 142. Heller was responsible for, among other things, analyzing the extent of the PPC estate's unencumbered assets. *Id.*

18. Heller resigned at approximately the same time as Tolz, allegedly due to potential conflicts between the two estates. *Id.* In the week that Heller investigated PPC's assets, his firm billed $17,547 in fees for 136.5 hours worked. *Id.* Heller did not prepare an IRS Form 966 for Tolz or Welt before his resignation.

19. During the time he served as accountant for the PPC estate, Heller had access to the Rachlin Report. The Rachlin Report concluded that PPC had engaged in overbillings for several years and that in the event of a liquidation its accounts receivable and inventory would be nearly worthless and subrogated to any claims by Travelers. *See* Rachlin Report at pp. 7-9.

20. On June 14, 2006, Tolz filed an *ex parte* application to employ John L. Heller as accountant to Driscoll's estate (Driscoll Case D.E. 14), which was granted on June 21, 2006. Driscoll Case D.E. 19.

### *Claims Against the Driscoll Estate*

21. On June 7, 2007, MCLP filed a second amended proof of claim in the amount of $8,016,602.20 after $2,000,000 in attorneys' fees and costs were added to its original judgment obtained in Florida state court. Driscoll Claims Register No. 3-3. No objections have been filed to this claim, which is based on a final money judgment.

22. On March 17, 2010, the Court entered an Order approving a compromise between the Driscoll and PPC estates allowing PPC an aggregate claim of $1,000,000 in full satisfaction of its claims against the Driscoll estate. Driscoll Case D.E. 752.

23. There are no other remaining material claims to the Driscoll estate.

7

### *Tolz's Mismanagement of and Theft from the Driscoll Estate*

24. During 2007 and 2008, Tolz filed Amended Individual Tax Returns prepared by
Heller for Driscoll and his wife for the 2003, 2004, and 2005 tax years. In the amended returns,
Tolz claimed refunds based on (i) the May 26, 2006 judgment that PPC was the alter ego of
Driscoll and (ii) the accrued interest on MCLP's judgment that PPC should have previously
reported. Despite claiming refunds, Tolz did not include IRS Forms 8082 (notices of
inconsistent treatment)[6] any of these returns; as a result, the IRS rejected the amended returns.

25. Throughout her trusteeship, Tolz caused adversary proceedings to be filed against
Driscoll's contract counterparties and others that ultimately resulted in nuisance settlements or
worthless recoveries while generating legal fees. For example, on February 19, 2009, Tolz filed
a motion seeking to approve a settlement with Driscoll's wife and other insiders of PPC in which
the Driscoll estate obtained, *inter alia*, shares in Driscoll Bahamas, which ultimately proved to
hold nothing but uncollectable claims. *See* Driscoll Case D.E. 686.

26. On June 6, 2007, Welt's attorneys represented to MCLP that PPC's accounts
receivable were approximately $6,500,000, of which contractors were claiming set off of
$3,069,412 and Travelers was claiming $3,015,412 pursuant to its rights of subrogation.[7]
Furthermore, Welt represented that PPC had no inventory of substantial value. Accordingly,
PPC was insolvent in light of the judgment that MCLP held against it.

27. On or about April 12, 2009, Tolz caused $1,000,000 to be transferred out of a
Driscoll estate account to her general trust account. Excerpts of Deposition of Marika Tolz dated
April 18, 2011 (the "Tolz Deposition", attached hereto as Exhibit J), pp. 7, 14-17. Subsequently,

---

[6] A Form 8082 is filed to explain why an S corporation shareholder has elected to treat taxable
events differently than the S corporation.

[7] PPC and Travelers reached this arrangement subject to a confidentiality agreement. The terms
of this arrangement have not been submitted to this Court for approval.

8

in order to cover this transfer, on May 18, 2010 Tolz transferred $967,856 being held for the U.S. Marshals Service from her general trust account into the Driscoll estate. Admitted Facts, pg. 4, ¶ 9(e).

28. At the same time Tolz was misappropriating estate assets, she was requesting compensation from this Court for "services" she claimed that she provided the estate. On December 17, 2009, her first interim fee application was approved and she was awarded and drew $76,690 in fees. Driscoll Case D.E. 737.

29. Tolz resigned as trustee in all of her cases on or about May 19, 2010, including the Driscoll Case. On June 16, 2010, Furr replaced Tolz as trustee of the Driscoll Case. Driscoll Case D.E. 763.

*The Adversary Proceedings Against Tolz and the Driscoll Estate*

30. On October 18, 2010, the United States commenced the Driscoll Adversary Proceeding against Furr seeking the return of the $967,856 misappropriated by Tolz from the U.S. Marshals Service and transferred into the Driscoll estate. Driscoll Adversary Proceeding ("Driscoll Adv.") D.E. 1. Furr answered the United States' complaint and filed a third party complaint against Tolz and Liberty Mutual as Tolz's surety on November 4, 2010, seeking damages resulting from Tolz's fraud and breaches of fiduciary duty. Driscoll Adv. D.E. 10. Liberty Mutual filed an amended answer to the third party complaint on January 27, 2011 and issue was joined. Driscoll Adv. D.E. 43.

31. On April 28, 2011, Tolz was deposed by attorneys for Furr in connection with the Driscoll Adversary Proceeding. Tolz admitted to taking $1,000,000 from the Driscoll estate and replacing it with approximately $967,856 misappropriated from the U.S. Marshals Service. Tolz

9

Deposition, pp. 54-55. Tolz subsequently pled guilty to conspiracy to commit wire fraud on May 5, 2011. *See* Plea Agreement.

32.     This proceeding was referred to this Court from the United States District Court for the Southern District of Florida on May 18, 2011, by the Hon. Federico A. Moreno, C.J. On June 29, 2011, this Court entered an Order consolidating the Driscoll Adversary Proceeding with this proceeding for procedural purposes. Driscoll Adv. D.E. 122.

33.     On June 16, 2011, the United States filed a motion for summary judgment in the Driscoll Adversary Proceeding seeking the return of the $967,856 that Tolz admittedly misappropriated from the U.S. Marshals Service and transferred into the Driscoll estate. Driscoll Adv. D.E. 108.

34.     On July 5, 2011, Liberty Mutual filed an amended unopposed motion for an extension until July 14, 2011 to file its response to the United States' motion for summary judgment in the Driscoll Adversary Proceeding. Liberty Mutual sought the extension because it had not received certain crucial discovery materials until July 5, 2011. *See* D.E. 9, ¶ 6. Shortly after receiving these materials, on July 15, 2011, Liberty Mutual agreed to a proposed settlement filed by the Driscoll estate that would resolve the United States' motion for summary judgment (but not the estate's claim against Liberty Mutual). Driscoll Case D.E. 787.

## Argument

## I.      MCLP SATISFIES ALL THE REQUIREMENTS FOR INTERVENTION AS OF RIGHT UNDER BANKRUPTCY RULE 7024(a)(2)

35.     The Federal Rules of Bankruptcy Procedure incorporate, without change, the provisions of Federal Rule of Civil Procedure 24. *See* Fed. R. Bankr. P. 7024 ("Rule 24 Fed. R. Civ. P. applies in adversary proceedings."). Rule 24(a) provides for intervention as of right on the following basis:

> Upon timely application anyone shall be permitted to intervene in
> an action (1) when a statute of the United States confers an
> unconditional right to intervene; or (2) when the applicant claims
> an interest relating to the property or transaction which is the
> subject of the action and the applicant is so situated that the
> disposition of the action may as a practical matter impair or
> impede the applicant's ability to protect that interest, unless the
> applicant's interest is adequately represented by existing parties.

36.    Under Rule 24(a)(2), "a party is entitled to intervention as a matter of right if the

party's interest in the subject matter of the litigation is direct, substantial and legally

protectable." *Georgia v. U.S. Army Corps of Engineers*, 302 F.3d 1242, 1249 (11th Cir. 2002).

"A party seeking to intervene need not demonstrate that he has standing in addition to meeting

the requirements of Rule 24 as long as there exists a justiciable case and controversy between the

parties already in the lawsuit." *Loyd v. Alabama Dept. of Corrections*, 176 F.3d 1336, 1339 (11th

Cir. 1999).

37.    The Eleventh Circuit has adopted a four-factor test to determine whether a party is

entitled to intervention as of right. The proposed intervenor "must show that (1) [its] application

is timely; (2) [it] has an interest relating to the property or transaction which is the subject of the

action; (3) [it] is so situated that disposition of the action, as a practical matter, may impede or

impair [its] ability to protect that interest; and (4) [its] interest is represented inadequately by the

existing parties to the suit." *Chiles v. Thornburgh,* 865 F.2d 1197, 1213 (11th Cir. 1989); *Golden

Glades Regional Med. Ctr., Ltd.*, 147 B.R. 813, 816 (Bankr. S.D. Fla. 1992). MCLP can show

all four of these factors and therefore meets the standard for intervention as of right.

A.    MCLP's Motion is Timely

38.    "Timeliness is not a word of exactitude or of precisely measureable dimensions. The

requirement of timeliness must have accommodating flexibility toward both the court and the

litigants if it is to be successfully employed to regulate intervention in the interest of justice."

11

*Chiles*, 865 F.2d at 1213. In determining whether a party's application is timely, a court is to consider (1) the length of time the party knew or reasonably should have known of their interest in the case before moving to intervene; (2) the extent of prejudice to the existing parties as a result of the party's failure to move for intervention as soon as it knew or reasonably should have known of its interest; (3) the extent of prejudice to the potential intervenor if its motion is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the proposed intervenor's motion is timely. *Id.* Courts in this Circuit frequently evaluate this four-factor test with a holistic approach that focuses on those factors most important in each case. *See Chiles,* 865 F.2d at 1213, *supra* (stressing need for flexibility in analysis).

39.     In general, the Courts of this Circuit and District have found a party's application to intervene to be timely where it is filed less than a year after a proceeding has been commenced so long as no party can demonstrate it will be prejudiced, even if discovery had begun or been completed. *See, e.g., Georgia,* 302 F.3d at 1259-60 (reversing district court and permitting intervention where proposed intervenor had copies of litigation papers and knew of proceeding for six months, after discovery was largely complete and the parties had agreed upon a briefing schedule; fact that intervention would not delay proceedings and court had yet to take significant action showed there would be no prejudice to other parties); *Diaz v. Southern Drilling Corp.,* 427 F.2d 1118, 1125-26 (5th Cir. 1970) (finding motion to intervene timely when filed more than a year after proceeding commenced where there had been no legally significant proceedings other than the completion of discovery and intervention would not delay overall litigation), *cert. denied,* 400 U.S. 878, 91 S.Ct. 118 (1970); *Chiles,* 865 F.2d at 1213 (granting motion to intervene filed seven months after action began and three months after responsive pleading filed where discovery had yet to begin); *Golden Glades*, 147 B.R. at 816 (holding motion of

12

unsecured creditor to intervene in adversary proceeding timely when filed "well before trial");

*8699 Biscayne, LLC v. Indigo Real Estate LLC (In re 8699 Biscayne, LLC)*, Case No. 08-22814-AJC, Adv. No. 08-01749-AJC, 2009 WL 3617456 (Bankr. S.D. Fla. Oct. 26, 2009) (motion to intervene timely when filed seven months after commencement of adversary proceeding and discovery was incomplete).

40. MCLP's motion to intervene is timely because the Driscoll Adversary Proceeding, which was filed 9 months ago (and at that time did not involve claims against Liberty Mutual), is still in its earliest stages. Discovery has not yet been completed; to the contrary, Liberty Mutual recently filed its unopposed motion for an extension of time to respond to the United States' motion for summary judgment on the grounds that it only received crucial discovery materials from other parties on July 5, 2011. The United States and the Driscoll estate filed a proposed settlement just two weeks ago, and no proposed accord between the estate and Liberty Mutual has been filed. This action was referred to the bankruptcy court just two months ago, and the underlying adversary proceedings were consolidated into this action only a few weeks ago.

B. MCLP Has a Direct and Substantial Interest
   In This Proceeding That Warrants Intervention

41. "As an unsecured creditor, [a proposed intervenor] has an undeniable interest in the funds which are sought to be recovered." *Golden Glades*, 147 B.R. at 816. MCLP is an unsecured creditor of the Driscoll estate. MCLP's objective is to maximize the distributions ultimately made by the Driscoll estate, in which it holds an overwhelming interest. If permitted to intervene, MCLP would seek to bring additional funds into the Driscoll estate and minimize additional expenditures on litigation. This interest, standing alone, satisfies the "subject matter interest" element of Rule 24(a)(2).

13

C. MCLP's Interests May Be Impaired if It is Not Permitted to Intervene

42. A potential intervenor must establish that disposition of the existing suit may impede the applicant's ability to protect its interests. *See Loyd*, 176 F.3d at 1340. Courts in the Eleventh Circuit have held that where a proposed intervenor demonstrates an interest in the property that is the subject of the main action, the impact of potential decisions adverse to the proposed intervenor is enough to establish an impaired ability to protect its interests absent intervention. *See, e.g., Chiles*, 865 F.2d at 1214 ("Where a party seeking to intervene in an action claims an interest in the very property and the very transaction that is the subject of the . . . action, the potential *stare decisis* effect [of any adverse ruling] may supply that practical disadvantage which warrants intervention as of right.").

43. In the context of an adversary proceeding, this Court has held that intervention is often the *only* way for an unsecured creditor to protect its rights. *See Golden Glades*, 147 B.R. at 816 ("Because it has no other security to protect its unsecured interest, [the proposed intervenor] has no other way to protect its unsecured interest other than to assist in recovering funds for the benefit of the unsecured creditors.").

44. The interest of MCLP in this proceeding is incontestable. More than ninety cents of every dollar spent on litigation will come out of MCLP's pocket, and MCLP is entitled to a proportionate share of every dollar recovered by the Driscoll estate. In light of these economic realities, MCLP is willing to hire its own attorneys at no cost to the estate.

45. This proceeding may result in a disposition adverse to MCLP that impairs or impedes its rights to the money at issue. For example, the Driscoll estate may seek to enter into a settlement that could negatively affect MCLP, or may adopt what MCLP considers to be an

14

unnecessarily costly approach to this litigation. Accordingly, MCLP's ability to protect its interest may be impaired if not permitted to intervene.

D. Intervention is Necessary to Ensure MCLP's Interest is Adequately Represented

46. MCLP should be permitted to intervene if there is any uncertainty whatsoever that it may be inadequately represented. "The proposed intervenor's burden to show that their interests *may be* inadequately represented is minimal." *Federal Sav. and Loan Ins. Corp. v. Falls Chase Special Taxing District*, 983 F.2d 211, 216 (11th Cir. 1993) (emphasis in original) (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)). "Any doubt concerning the propriety of allowing intervention should be resolved in favor of the proposed intervenors because it allows the court to resolve all related disputes in a single action." *Id.* The mere potential for prejudice is sufficient. *See, e.g., Falls Chase*, 983 F.2d at 216 (holding that the "burden to show that their interests *may be* inadequately represented is minimal.") (emphasis in original); *Golden Glades*, 147 B.R. at 816 (granting intervention where unsecured creditor "*may* not be adequately represented") (emphasis added).

47. Even if an existing party to a proceeding and a potential intervenor agree what the outcome of the proceeding should be, "agreement on that conclusion does not mean that the [existing party] and [the proposed intervenor] have identical positions or interests." *Georgia*, 302 F.3d at 1259. This Court has held that in the context of an adversary proceeding, where "the unsecured claim of [a proposed intervenor] is substantial, [the proposed intervenor] may not be adequately represented by existing parties." *Golden Glades*, 147 B.R. at 816 (granting unsecured creditor's motion to intervene and noting that a large unsecured claim is enough to satisfy the "minimal burden" even where trustee was party to the proceeding).

48. Accordingly, MCLP should be permitted to intervene as of right in this proceeding.

15

## II. IN THE ALTERNATIVE, PERMITTING MCLP TO INTERVENE PURSUANT TO BANKRUPTCY RULE 7024(b)(2) IS APPROPRIATE

49. Even if MCLP were not entitled to intervene as of right under Rule 24(a), permissive intervention would be appropriate under Rule 24(b)(2). An entity seeking to intervene under Rule 24(b)(2) must show that (1) its application to intervene is timely, (2) its claim or defense and the main action have a question of law or fact in common, and (3) the intervention will not unduly prejudice or delay the adjudication of the rights of the original parties. *Georgia*, 302 F.3d at 1250.

50. As described in paragraphs 38-40 above, MCLP's motion is timely.

51. MCLP's grounds for intervention indisputably present issues of fact and law in common with the proceedings involving Liberty Mutual, Tolz, the successor trustees, and the United States. If permitted to intervene in this proceeding, MCLP will seek to recover from Liberty Mutual on behalf of the Driscoll and PPC estates all damages that Tolz caused those estates. These issues are raised in Liberty Mutual's Amended Complaint for Interpleader and Injunctive Relief (the "Interpleader Complaint") and the Driscoll estate's third party complaint against Liberty Mutual.

52. For example, MCLP was seriously harmed by Tolz's failure to properly file the Driscoll estate's tax returns. *See* ¶¶ 20-23 (Driscoll estate lost tax refunds due to Tolz's failure to file notices of inconsistent treatment). As Tolz's position was that the Driscoll estate was entitled to the refund of taxes due to accrued interest from MCLP's judgment, the Driscoll estate also should have filed notices of inconsistent treatment explaining that (i) PPC effectively ceased to exist on May 26, 2006, when the judgment was entered in favor of MCLP finding that PPC was the mere alter ego of Driscoll, and (ii) a bankruptcy trustee is the party responsible for filing

16

tax returns and making any necessary payments on behalf of the bankrupt. *See Holywell Corp. v. Smith*, 503 U.S. 47, 52, 112 S.Ct. 1021, 1024 (1992).

53.     Furthermore, John L. Heller (who served briefly as accountant for the PPC estate and then later as accountant for the Driscoll estate) failed to file a plan of liquidation, as required by the Internal Revenue Code, despite the fact that the Rachlin Report clearly indicated that PPC was insolvent due to the existence of MCLP's judgment when MCLP commenced supplemental proceedings against PPC in 2003, at the latest.[8]  Had Tolz filed a Form 966 during her tenure as PPC trustee (or had Heller while accountant), PPC would have been immediately liquidated and its assets would have been treated as worthless.

54.     Both of these omissions by Tolz and/or her professionals constitute breaches of fiduciary duty consistent with the overall themes surrounding this interpleader action, and thus present issues of law and fact in common with the existing proceedings.

55.     Finally, there will be no prejudice to the existing parties.  The Driscoll estate will not be prejudiced because MCLP will be paying its own legal fees and the successor trustee has stated that he has not objection to MCLP's intervention.  Other existing parties will not be prejudiced because all parties to this interpleader action agreed that "consolidation of the [Tolz adversary proceedings] . . . is necessary to preserve judicial economy and to avoid costly and duplicative pre-trial procedures . . . [and to preserve] the limited resources of the various bankruptcy and probate estates involved in these proceedings."  Driscoll Adv. D.E. 107, ¶ 19 and pg. 6.

---

[8] *A fortiori*, if PPC was insolvent in 2003 owing to the outstanding MCLP judgment, it was also insolvent in 2004 when it signed the General Indemnity with Travelers, as it pledged all of PPC's assets to Travelers and an event of default was the insolvency of PPC.

56.   Similarly, Liberty Mutual's stated purpose for filing the Interpleader Complaint is to avoid the risk of inconsistent rulings and that "the only reasonable way to unravel [Tolz's] interrelated transfers . . . is through a consolidated action."   Interpleader Complaint, ¶ 23.

57.   In light of the existing parties' consensus that these actions should be resolved together, it is clear that permitting MCLP to intervene will prevent it from suffering the prejudice the existing parties agreed to avoid when they consented to consolidating these actions.

58.   Accordingly, granting MCLP's motion to intervene would further the interests of justice without unfairly prejudicing the existing parties to this proceeding.

## Conclusion

WHEREFORE, Miami Center Limited Partnership respectfully requests the Court grant its

Motion to Intervene and such other and further relief as it deems just and proper under the

circumstances.

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for

the Southern District of Florida and I am in compliance with the additional qualifications to

practice in this court set forth in Local Rule 2090-1(A).

Dated: August 4, 2011
Miami Beach, Florida

LALCHANDANI SIMON PL

By: _____

Danny Simon
Florida Bar No.: 0016244
danny@lalchandanisimon.com
Kubs Lalchandani
Florida Bar No.: 63966
kubs@lalchandanisimon.com
90 Alton Road, Suite 1803
Miami Beach, Florida 33139
Tel:    (305) 999-5291

-and-

PODHURST ORSECK, P.A.
Robert C. Josefsberg
Florida Bar No.: 40856
rjosefsberg@podhurst.com
City National Bank Building
25 West Flagler Street, Suite 800
Miami, Florida 33130
Tel:    (305) 358-2800

COHEN & GRESSER LLP
Donald M. Badaczewski
dbadaczewski@cohengresser.com
800 Third Avenue, 21st Floor
New York, New York 10022
Tel:    (212) 957-7600

*Attorneys for Proposed Intervenor*
*Miami Center Limited Partnership*

19

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of MIAMI CENTER LIMITED

PARTNERSHIP'S MOTION TO INTERVENE and the exhibits attached thereto was served on

all of those parties receiving electronic notification via the Court's CM/ECF electronic filing

system and by first class U.S. Mail, postage prepaid, to all other parties, as of August 4, 2011.


Danny Simon

20

# EXHIBIT A

UNITED STATES BANKRUPCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

LIBERTY MUTUAL INSURANCE COMPANY,

      Plaintiff,

v.

UNITED STATES OF AMERICA, ROBERT FURR,
JOEL TABAS and SONEET KAPILA,

      Defendants.

_____/

Adv. No. 11-01994

(Consolidated with Pros. Nos.
10-03653-BKC-JKO,
10-03627-BKC-JKO,
10-03720-BKC-JKO,
10-03626-BKC-JKO, and
10-03610-BKC-JKO)

## [PROPOSED] INTERVENOR COMPLAINT

Intervenor-Plaintiff THE UNITED STATES OF AMERICA *ex rel.* THEODORE B.

GOULD, AS GENERAL PARTNER OF THE MIAMI CENTER LIMITED PARTNERSHIP

(hereafter "MCLP") files this Intervenor Complaint against LIBERTY MUTUAL INSURANCE

COMPANY ("Liberty Mutual") and MARIKA TOLZ ("Tolz") and alleges:

    1.    MCLP seeks to intervene as a plaintiff in the adversary proceeding styled *United*

*States of America v. Furr*, No. 10-03653-BKC-JKO (Bankr. S.D. Fla.) to bring claims against

Tolz and Liberty Mutual.[1]  This adversary proceeding arises in the James P. Driscoll (the

"Debtor") bankruptcy proceeding filed under chapter 7 of the United States Bankruptcy Code,

11 U.S.C. § 101 *et seq.,* in the United States Bankruptcy Court for the Southern District of

Florida in which Tolz previously served as trustee.

---

[1] MCLP also seeks to intervene as a counterclaim-defendant in this interpleader action styled
*Liberty Mutual Insurance Company v. United States et al.*

1

## **Jurisdiction**

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334,

11 U.S.C. § 322, and Federal Rules of Bankruptcy Procedure 2010(b) and 9025.

3.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

## **Venue**

4.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## **Parties**

5.     MCLP is the Debtor's largest creditor.  MCLP brings this lawsuit pursuant to Federal

Rule of Bankruptcy Procedure 2010(b) on behalf of the United States of America and the

Debtor's bankruptcy estate against Liberty Mutual as a creditor and party in interest in the

Debtor's bankruptcy case.

6.     Tolz is the former chapter 7 trustee for the Debtor's bankruptcy estate.

7.     Liberty Mutual is, upon information and belief, an insurance company organized

under the laws of the State of Massachusetts.  Liberty Mutual has submitted to the jurisdiction of

the Court.  *See* Federal Rule of Bankruptcy Procedure 9025.

## **General Background**

8.     In or about August 1987, Tolz was appointed a member of the panel of private

bankruptcy trustees for cases under chapter 7 of the Bankruptcy Code in the Southern District of

Florida established by the United States Trustee pursuant to 28 U.S.C. § 586.

9.     Pursuant to 11 U.S.C. § 322, on or about December 13, 2002, Liberty Mutual issued

blanket bonds effective January 8, 2003 in favor of the United States conditioned on, *inter alia*,

the faithful performance of the official duties of Tolz and the other private trustees in this District

in cases in which those trustees, including Tolz, served as bankruptcy trustee.  Specifically,

2

Liberty Mutual issued a bond (Bond No. 016027932) (attached hereto as Exhibit 1) naming Tolz and other private trustees as principals, which was in full force and effect during all periods relevant to the claim asserted in this Intervenor Complaint.

10.   Beginning on or about March 24, 2003 through May 20, 2010, Tolz conspired to misappropriate funds from, *inter alia*, bankruptcy estates in this District, by writing or causing to be written unauthorized checks from fiduciary accounts she was appointed to safeguard, without authority or legal justification. Tolz used the misappropriated money for her own benefit as well as to conceal the ongoing nature of her fraud. Tolz also filed false and fraudulent reports concerning bankruptcy cases in this District. *See* Factual Basis Supporting Change of Plea (attached hereto as Exhibit 2), ¶¶ 7-9.

11.   On June 7, 2006, Tolz was appointed chapter 7 trustee of the Debtor's estate and the estate of the Patrick Power Corporation ("PPC"). On or about June 13, 2006, Tolz resigned as trustee for the PPC estate.

12.   On May 19, 2010, Tolz resigned as a panel member of the panel of private trustees and as trustee in all her existing cases.

13.   On May 10, 2011, Tolz filed a Statement of Acceptance of Responsibility in her criminal proceeding, Case No. 1:11-cr-20160-JEM (S.D. Fla.) (D.E. 40), wherein she admitted to misappropriating the funds of certain bankruptcy estates under her trusteeship. *See* Statement of Acceptance of Responsibility (attached hereto as Exhibit 3) . Tolz accepted full and complete responsibility for her knowing and intentional participation in conspiracy to commit wire fraud based on these actions. *Id*.

3

## Background Specific to Driscoll Case

14.    Tolz misappropriated various funds from the Debtor's estate and filed fraudulent reports with this Court concealing these misappropriations.

15.    Tolz paid herself and professionals hundreds of thousands of dollars and used the estate professionals for her own ends. The estate professionals furthered Tolz's fraud and any work they did conferred no benefit on the estate.

16.    Tolz negligently, knowingly or intentionally failed to properly administer the Debtor's estate and maximize its value, resulting in damages to the estate and its creditors.

### The $300,000 and $700,000 Misappropriations

17.    On April 12, 2009, Tolz transferred $300,000 from bankruptcy estate account 4428383321 at Bank of America ("3321") to the Tolz General Trust Account 110624401 at Sun American Bank ("4401 account"). *See* Answer and Third Party Complaint, Adversary Proceeding No. 10-03653-BKC-JKO (D.E. 10) (the "Third Party Complaint"), Composite Exhibit C.

18.    On April 12, 2009, Tolz transferred $700,000 from bankruptcy estate account 4428780542 at Bank of America ("0542") to the 4401 account. *See* Third Party Complaint, Composite Exhibit C.

19.    Tolz "accounted for" the whereabouts of the $300,000 and $700,000 by creating and filing with this Court a fraudulent Estate Cash Receipts and Disbursements Record ("Form 2") referencing the purchase of a high yield certificate of deposit for a fraudulent Bank of America account 4437109774 ("9774") and a false bank statement for the account. *See* Third Party Complaint, Composite Exhibit D.

20.    The Office of the United States Trustee verified with Bank of America that no such

4

account 9774 existed at Bank of America and that the Form 2 was false.

## The $112,000 Misappropriation

21. On January 11, 2010, Tolz issued check #2372 in the amount of $112,000 from the 4401 account that was deposited on January 12, 2010 in bankruptcy estate account 4428383334 at Bank of America ("3334"). *See* Third Party Complaint, Composite Exhibit E.

22. Tolz accounts for this transaction as a disbursement on the Form 2 of the fraudulent Bank of America account 9774. *See* Third Party Complaint, Composite Exhibit D.

## The $967,856 Misappropriation

23. On May 18, 2010, Tolz issued check #2485 in the amount of $967,856 from the 4401 account that was deposited on May 19, 2010 in bankruptcy estate account 4437444028 at Bank of America ("4028"). *See* Third Party Complaint, Composite Exhibit F.

24. To cover this check, Tolz used $1,000,000 of funds received into the 4401 account on May 20, 2010 via a wire from Buchanan Ingersol & Rooney PC/Attn US MA on behalf of the United States Marshal Service. *See* Third Party Complaint, Composite Exhibit F.

## The $500,000 Misappropriation

25. On July 16, 2008, Tolz transferred $500,000 of bankruptcy estate funds from bankruptcy estate account 4428780597 at Bank of America ("0597") to the 4401 account. *See* Third Party Complaint, Composite Exhibit G.

26. On September 19, 2008, a check in the amount of $501,468.50 issued from the 4401 account was deposited in bankruptcy estate account 0542. *See* Third Party Complaint, Composite Exhibit H.

27. Tolz "accounted for" the whereabouts of the funds during this period of time by creating a Form 2 for a non-existent Bank of America account. *See* Third Party Complaint,

5

Composite Exhibit L

**Amounts Paid to Settle Claims Arising From Tolz's Malfeasance**

28.     On October 18, 2010, the United States of America filed an Adversary Complaint against Robert C. Furr, in his capacity as successor chapter 7 trustee of the Debtor's estate ("Furr") seeking a judgment in its favor and against Furr in the amount of $967,856.00, plus reasonable fees and costs.

29.     On July 15, 2011, Furr filed a motion to approve a proposed agreed settlement resolving the United States' Adversary Complaint. Driscoll D.E. 787. The settlement was agreed to by Furr, the United States, and Liberty Mutual. If the settlement is approved, the estate would pay $866,600.48 to the United States and the United States would dismiss its claims against the estate under the Adversary Complaint with prejudice.

30.     Upon information and belief, Furr incurred administrative expenses defending the Debtor's estate against the United States' lawsuit, preparing and filing an answer and third party complaint against Tolz and Liberty Mutual, and negotiating a settlement with the United States.

**Amounts Paid to Estate Professionals**

31.     On February 7, 2007, this Court awarded Tolz's attorneys, Reggie David Sanger, P.A., interim fees and expenses of $59,245.20 (Driscoll D.E. 198), which were paid out of estate assets.

32.     On August 28, 2007, this Court awarded Tolz's accountant, Barbee & Associates, Inc., interim fees and expenses of $58,531.19 (Driscoll D.E. 360), which were paid out of estate assets.

33.     On March 26, 2008, this Court awarded Tolz's special counsel, Chapman Smith, Esq., interim fees and expenses of $42,514.93 (Driscoll D.E. 447-1), which were paid out of

6

estate assets.

34. On October 22, 2008, this Court awarded Tolz's special counsel, Samuel C. Ullman, Esq., interim fees and expenses of $94,299.89 (Driscoll D.E. 609), which were paid out of estate assets.

35. On November 12, 2008, this Court awarded Tolz's accountants, Barbee & Associates, Inc., interim fees and expenses of $18,007 (Driscoll D.E. 635), which were paid out of estate assets.

36. On December 17, 2008, this Court awarded Tolz's accountants, Rachlin LLP, interim fees and expenses of $61,734.56 (Driscoll D.E. 663), which were paid out of estate assets.

37. On January 14, 2009, this Court awarded Tolz's special counsel, Samuel C. Ullman, Esq., interim fees and expenses of $44,959.66 (Driscoll D.E. 670), which were paid out of estate assets.

38. On December 17, 2009, this Court awarded Tolz's counsel, Reggie David Sanger, P.A., interim fees and expenses of $218,862.65 (Driscoll D.E. 736), which were paid out of estate assets. Furthermore, on that date this Court awarded Tolz's special counsel, Samuel C. Ullman, Esq., interim fees and expenses of $32,938.51 (Driscoll D.E. 738), which were paid out of estate assets.

39. As a result of Tolz's breaches of fiduciary duty to the estate, the estate did not receive the benefit of the payments described in paragraphs 31-38.

**Tolz's Interim Compensation**

40. On November 17, 2009, Tolz filed her Trustee's Application for Interim Compensation (Driscoll D.E. 726) seeking payment of a maximum statutory fee in the amount of $76,690. *See* Third Party Complaint, Exhibit M.

7

41.    On December 17, 2009, the Court entered an Order Granting First Application for

Interim Compensation (Driscoll D.E. 737) awarding a first interim fee in the amount of $76,690.

*See* Third Party Complaint, Exhibit N.

**Other Malfeasance**

42.    Tolz negligently, knowingly or intentionally failed to properly administer the PPC

estate during her tenure as trustee and maximize its value, resulting in damages to the estate and

its creditors.

## Count I – Breach of Fiduciary Duty Against Tolz

43.    The allegations of paragraphs 1 through 42 of this Intervenor Complaint are

reincorporated as if set forth fully herein.

44.    Tolz breached her fiduciary duties as set forth in 11 U.S.C. § 704, including but not

limited to failing to appropriately:

a.    collect and reduce to money the property of the estate for which such trustee

serves, and close such estate as expeditiously as is compatible with the best interests of the

parties in interest; and

b.    be accountable for all property received.

45.    Tolz acted with actual intent to defraud the creditors of the Debtor's estate and

knowingly and intentionally made misrepresentations to the Court and the United States Trustee

by filing fraudulent trustee reports.

46.    Tolz negligently, knowingly or intentionally failed to properly administer the

Debtor's estate and maximize its value, resulting in damages to the estate and its creditors.

47.    Tolz negligently, knowingly intentionally failed to comply with the provisions of the

Internal Revenue Code, the Bankruptcy Code, and state law, resulting in a loss to the estate of

8

millions of dollars in tax refunds.

48.   In addition to other losses to the Debtor's estate, Tolz's actions appear likely to result in a loss of $866,600.48 to the Debtor's estate on account of the estate's proposed settlement with the United States.

49.   Tolz caused the estate to incur administrative expenses related to defending itself against the United States' lawsuit, pursuing third party claims, and negotiating a settlement.

50.   Tolz used her role as trustee for the Debtor's estate for her own personal benefit while expending approximately $610,000 in estate assets on administrative expenses.

51.   Tolz incurred administrative expenses in order to conceal and prolong her fraud, damaging the estate and leading to Tolz incurring additional administrative expenses without conferring benefit on the estate.

52.   Tolz received a commission of $76,690 despite intentionally breaching her fiduciary duties to the estate.

53.   Tolz negligently, knowingly or intentionally failed to properly administer the PPC estate during her tenure as trustee and maximize its value, resulting in damages to the estate and its creditors.

54.   Tolz is liable to the Debtor's estate for (i) any settlement approved by the Court that is paid to the United States to replace funds stolen by Tolz, (ii) all administrative expenses paid during her trusteeship of the Debtor's case,(iii) the return of her interim commission, (iv) all damages to the Debtor's estate arising from her negligence and breaches of fiduciary duty , (v) all administrative expenses incurred in connection with investigating and remedying the harms arising from her fraud, including without limitation accounting and attorneys' fees, and (vi) prejudgment interest at the statutory rate on these amounts.

9

55. Tolz is further liable for an additional unknown amount for breaching her fiduciary duties as trustee, and mismanaging the Debtor's estate and the PPC estate.

## Count II – Joint Liability of Liberty Mutual as Tolz's Surety

56. The allegations of paragraphs 1 through 54 of this Intervenor Complaint are reincorporated as if set forth fully herein.

57. During all periods relevant to the claims asserted in this Intervenor Complaint, Liberty Mutual had issued and maintained in full force and effect one or more bonds in favor of the United States naming Tolz as a principal.

58. In addition to the losses previously alleged in this Intervenor Complaint, MCLP will continue to incur expenses in connection with the investigation, ascertainment, and recovery of losses suffered by the PPC and the Debtor's estates. Those expenses include, without limitation, attorneys' fees, accounting fees and other administrative expenses.

59. As surety for Tolz's faithful performance of her official duties, Liberty Mutual is liable to Intervenor-Plaintiff up to the maximum amount for each bond for all losses to the PPC and the Debtor's estates, including interest, expenses, attorneys' fees, accounting fees and other administrative expenses.

## PRAYER FOR RELIEF

WHEREFORE, Intervenor-Plaintiff respectfully requests that this Court:

1. Enter a judgment in its favor on behalf of the Debtor's estate and against Tolz and Liberty Mutual for $866,600.48, or for any other sum that any entity or entities ultimately recover from the Debtor's estate as a result of Tolz misappropriating the assets of the U.S. Marshals;

2. Enter a judgment in its favor on behalf of the Debtor's estate and against Tolz and

10

Liberty Mutual for all fees and costs paid to Marika Tolz, totaling $76,690.00;

3.     Enter a judgment in its favor on behalf of the Debtor's estate and against Tolz and Liberty Mutual for all administrative expenses paid by Marika Tolz from the Debtor's estate, totaling approximately $610,000;

4.     Enter a judgment in its favor on behalf of the Debtor's estate and against Tolz and Liberty Mutual for other acts of negligence by Marika Tolz or breaches of her fiduciary duties and award damages to be subsequently determined;

5.     Enter a judgment in its favor on behalf of the PPC estate and against Tolz and Liberty Mutual for other breaches by Marika Tolz of her fiduciary duties and award damages to be subsequently determined;

6.     Award MCLP and the Debtor's estate (a) prejudgment interest from the dates of loss until judgment, (b) attorneys' fees, (c) accounting fees, (d) sanctions, and (e) all other costs, including investigative costs, to be paid by Tolz and Liberty Mutual;

7.     Award MCLP and the PPC estate (a) interest from the dates of loss until judgment, (b) attorneys' fees, (c) accountants' fees, (d) sanctions, and (e) all other costs, including investigative costs, to be paid by Tolz and Liberty Mutual; and

11

8.    Grant such other and further relief as the Court deems just and proper.

Dated: August ___, 2011
        Miami Beach, Florida

LALCHANDANI SIMON PL

By: _____

Danny Simon
Florida Bar No.:  0016244
danny@lalchandanisimon.com
Kubs Lalchandani
Florida Bar No.:  63966
kubs@lalchandanisimon.com
90 Alton Road, Suite 1803
Miami Beach, Florida 33139
Tel:    (305) 999-5291

-and-

PODHURST ORSECK, P.A.
Robert C. Josefsberg
Florida Bar No.:  40856
rjosefsberg@podhurst.com
City National Bank Building
25 West Flagler Street, Suite 800
Miami, Florida 33130
Tel:    (305) 358-2800

COHEN & GRESSER LLP
Donald M. Badaczewski
dbadaczewski@cohengresser.com
800 Third Avenue, 21st Floor
New York, New York 10022
Tel:    (212) 957-7600

*Attorneys for [Proposed] Intervenor*
*Miami Center Limited Partnership*

12

# EXHIBIT 1

BOND # 016027932

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

BLANKET BOND OF TRUSTEES IN CASES UNDER CHAPTER 7

AND CHAPTER 11, PROVIDED IT IS A LIQUIDATION

AND NOT A REORGANIZATION

UNITED STATES BANKRUPTCY CODE

KNOW ALL MEN BY THESE PRESENTS:

That we, the Principals listed in Schedule "A" attached hereto, and those who may from time to time be added to said schedule, by amendment, and LIBERTY MUTUAL INSURANCE COMPANY, a corporation duly licensed to do business in the state of Florida, as Surety, are held and firmly bound unto the United States of America in the amount of **FORTY-EIGHT MILLION, TWO HUNDRED AND SIXTY-ONE THOUSAND AND 00/100 DOLLARS, ($48,261,000.00)**, in lawful money of the United States, to be paid to the United States, for which payment, well and truly to be made, we bind ourselves and our heirs, executors, administrators and successors firmly by these presents. Each individual trustee shall be liable only for his/her individual acts.

**THE CONDITION OF THIS OBLIGATION IS SUCH THAT:**

**WHEREAS,** the United States Bankruptcy Court for the Southern District of Florida, has appointed Trustees in cases commenced under the Chapter 7 and Chapter 11, provided such proceedings under Chapter 11 are liquidation and not reorganization, of the United States Bankruptcy Code; and

**WHEREAS,** the United States Trustee for Region 21, or his/her designate, has or will appoint Trustees in cases commenced under Chapter 7 and Chapter 11, provided such proceeding under Chapter 11 is a liquidation and not a reorganization, of the United States Bankruptcy Code; and

**WHEREAS,** the said Principals listed in Schedule "A" attached or subsequently added thereto by amendment may have been appointed or may hereafter be appointed to serve as such Trustee in one or more of such cases;

**NOW THEREFORE,** if the said Principals listed in Schedule "A" attached or subsequently added thereto as Trustee as aforesaid shall obey such orders as the United States Bankruptcy Court of the United States District Court or any of the Judges of such court may make in relation to the trust undertaken by said Trustee, and shall faithfully and truly account for all moneys, assets and effects of the estate in each case in which he or she has been appointed or will be appointed, and shall in all respects faithfully perform all his or her official duties as Trustee, then this obligation to be void; otherwise, to remain in full force and effect.

The aggregate liability of the Surety hereunder shall not exceed the face amount of this bond, regardless of the number of years this bond is in effect, regardless of the number of cases involved and regardless of the number of trustees involved. The Surety's liability in each case covered by this bond shall become effective on the date of this bond.

This bond shall remain in full force and effect with respect to all cases pending in this court, in which the said Principals listed in Schedule "A" attached or subsequently added thereto have been appointed, until the Surety has terminated further liability after 30 days written notice filed with U. S. Trustee for Region 21 and with the Clerk of the Bankruptcy Court for the Southern District of Florida.

**SIGNED AND SEALED THIS 13TH DAY OF DECEMBER, 2002.**

· **THIS BOND IS EFFECTIVE THE 1st DAY OF JANUARY, 2003.**

**LIBERTY MUTUAL INSURANCE COMPANY**

*Eloise B. Farnsworth*

ELOISE B. FARNSWORTH
ATTORNEY-IN-FACT

The U.S. Trustee hereby approves the amount of the bond and the sufficiency of the surety.

Dated: 1/8/03                    Approved by: _____

## SCHEDULE "A"

This Schedule "A" is attached to and made a part of Chapter 7 Blanket Bond # 016027932 dated the 1ST day of January, 2003 and filed with the U. S. Trustee for Region 21 and the U. S. Bankruptcy Court for the Southern District of Florida.

**PRINCIPALS:**

DANIEL BAKST
JOHN P. BARBEE
JEFFREY BECK
MARCIA T. DUNN
PATRICIA DZIKOWSKI
JAMES S. FELTMAN
ROBERT C. FURR
IRVING E. GENNET
ALAN GOLDBERG
LAUREN P. GREENE
SONEET R. KAPILA
CORALI CASTRO-LOPEZ
ELENA M. MAGOLNICK
DEBORAH C. MENOTTE
SONYA L. SALKIN
JOEL L. TABAS
MARKIA TOLZ
KENNETH A. WELT

THIS POWER OF ATTORNEY IS NOT VAL... ILESS IT IS PRINTED ON RED BACKGROUND.

1096866

This Power of Attorney limits the acts of those named herein, and they have no authority to bind the Company except in the manner and to the extent herein stated.

**LIBERTY MUTUAL INSURANCE COMPANY**
**BOSTON, MASSACHUSETTS**

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS:

That Liberty Mutual Insurance Company (the "Company"), a Massachusetts mutual insurance company, pursuant to and by authority of the By-law and Authorization hereinafter set forth, does hereby name, constitute and appoint **CLARK P. FITZ-HUGH, R. TUCKER FITZ-HUGH, KATHERINE B. WERNER, ELOISE B. FARNSWORTH, DARLENE A. BORNT, LINDA A. BOURGEOIS, CATHERINE C. KEHO ELIZABETH C. LABAT, ALL OF THE CITY OF NEW ORLEANS, STATE OF LOUISIANA** ......................................................

...................................................................................................................................................................................................
, each individually if there be more than one named, its true and lawful attorney-in-fact to make, execute, seal, acknowledge and deliver, for and on its behalf as surety and as its act and deed, any and all undertakings, bonds, recognizances and other surety obligations in the penal sum not exceeding _____ **FIFTY MILLION AND 00/100\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* DOLLARS ($ 50,000,000.00\*\*\*\*\* )** each, and the execution of such undertakings, bonds, recognizances and other surety obligations, in pursuance of these presents, shall be as binding upon the Company as if they had been duly signed by the president and attested by the secretary of the Company in their own proper persons.

That this power is made and executed pursuant to and by authority of the following By-law and Authorization:

ARTICLE XVI - Execution of Contracts: Section 5. Surety Bonds and Undertakings.
Any officer or other official of the company authorized for that purpose in writing by the chairman or the president, and subject to such limitations as the chairman or the president may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact, subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the company by their signature and execution of any such instruments and to attach thereto the seal of the company. When so executed such instruments shall be as binding as if signed by the president and attested by the secretary.

By the following instrument the chairman or the president has authorized the officer or other official named therein to appoint attorneys-in-fact.

Pursuant to Article XVI, Section 5 of the By-laws, Timothy C. Mulloy, an official of Liberty Mutual Insurance Company, is hereby authorized to appoint such attorneys-in-fact as may be necessary to act in behalf of the company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. All Powers of Attorney attested to or executed by Timothy C. Mulloy in his capacity as an officer or official of Liberty Mutual Insurance Company, whether before, on or after the date of this Authorization, including without limitation Powers of Attorney attested to or executed as Assistant Secretary of Liberty Mutual Insurance Company, are hereby ratified and approved.

That the By-law and the Authorization set forth above are true copies thereof and are now in full force and effect.

IN WITNESS WHEREOF, this Power of Attorney has been subscribed by an authorized officer or official of the Company and the corporate seal of Liberty Mutual Insurance Company has been affixed thereto in Plymouth Meeting, Pennsylvania this ___29th___ day of _____August_____, 2002.

**LIBERTY MUTUAL INSURANCE COMPANY**

By _____
Timothy C. Mulloy, Assistant Secretary

COMMONWEALTH OF PENNSYLVANIA ss
COUNTY OF MONTGOMERY

On this ___29th___ day of _____August_____, 2002, before me, a Notary Public, personally came Timothy C. Mulloy, to me known, and acknowledged that he is an official of Liberty Mutual Insurance Company; that he knows the seal of said corporation; and that he executed the above Power of Attorney and affixed the corporate seal of Liberty Mutual Insurance Company thereto with the authority and at the direction of said corporation.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my notarial seal at Plymouth Meeting, Pennsylvania, on the day and year first above written.

Teresa Pastella
Notary Public

**CERTIFICATE**

I, the undersigned, Assistant Secretary of Liberty Mutual Insurance Company, do hereby certify that the original power of attorney of which the foregoing is a full, true and correct copy, is in full force and effect on the date of this certificate; and I do further certify that the officer or official who executed the said power of attorney was one of the officers or officials specially authorized by the chairman or the president to appoint attorneys-in-fact as provided in Article XVI, Section 5 of the By-laws of Liberty Mutual Insurance Company.

This certificate and the above power of attorney may be signed by facsimile or mechanically reproduced signatures under and by authority of the following vote of the board of directors of Liberty Mutual Insurance Company at a meeting duly called and held on the 12th day of March, 1980.

VOTED that the facsimile or mechanically reproduced signature of any assistant secretary of the company, wherever appearing upon a certified copy of any power of attorney issued by the company in connection with surety bonds, shall be valid and binding upon the company with the same force and effect as though manually affixed.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the said company, this _____ day of _____, _____.

_____
John F. X. Hee, Assistant Secretary

*(vertical text, left margin)* Not valid for mortgage, note, loan, letter of credit, bank deposit, currency rate, interest rate or residual value guarantees.

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**CASE NO. 11-20160-Cr-Martinez / Turnoff**

### UNITED STATES OF AMERICA

vs.

### MARIKA TOLZ,

**Defendant.**
_____/

## FACTUAL BASIS SUPPORTING CHANGE OF PLEA

Defendant **MARIKA TOLZ,** her counsel, and the United States, stipulate to and agree: not to contest the following facts; that these facts, in accordance with Rule 11(b)(3) of the Federal Rules of Criminal Procedure provide a sufficient factual basis for the plea of guilty in this case; and that had this case proceeded to trial, the United States would have established these facts beyond a reasonable doubt.

Beginning on or about March 24, 2003, through on or about May 20, 2010:

1. The defendant, **MARIKA TOLZ** was the President, Director and Registered Agent of Marika Tolz, Trustee, PA ("MTTPA") a Florida corporation, which maintained offices located at 1804 Sherman Street, Hollywood, Florida 33020. **MARIKA TOLZ** was frequently appointed as a "trustee", as a "receiver", and as a "personal representative." Once appointed by the United States Trustee Program as a trustee, or by a State of Florida judge as a receiver or personal representative, **MARIKA TOLZ** had a fiduciary duty to safeguard and protect all assets deposited into fiduciary bank accounts resulting from those appointments.

2. The United States Trustee Program is a component of the United States Department of Justice responsible for establishing, maintaining and supervising a panel of qualified individuals to

*Exhibit #2*

serve as private trustees to administer Chapter 7 (Liquidation) bankruptcy cases under the U.S. Bankruptcy Code, Title 28, United States Code, Section 586(a)(1).

3.      A "trustee" appointed by the United States Trustee Program is required to collect and reduce the property of a bankruptcy estate to cash, and to pay these funds to administrative expense claimants and creditors. A trustee is legally required to safeguard all assets, keep detailed and accurate financial records and accounting relating to all funds received and disbursed, give appropriate notice to parties of activities occurring in the administration of the estates, and create specific period reports detailing any financial action undertaken. A trustee is required to deposit estate funds in separate bank accounts for each bankruptcy case and deposit the funds as soon as received. A trustee is also obliged to deposit trustee estate funds at only certain banks that agreed to comply with the United States Trustee's requirements. A trustee is required to maintain a log accurately tracking all cash receipts and disbursements. All disbursements from estate bank accounts had to first be approved by the Bankruptcy Court with specified small dollar exceptions.

4.      As of October 2005, the U.S. Bankruptcy court filing system is known as Case Management - Electronic Case Files or CM-ECF and is utilized by trustees to file the aforementioned reports within the Southern District of Florida. In each filing, the system automatically creates a simultaneous duplicate filing which is electronically transmitted to a government server located outside the State of Florida.

5.      A "receiver" is a neutral fiduciary appointed by a court, state or federal, as a provisional remedy provided by statute or under the court's general equity powers, in a variety of legal circumstances, including civil enforcement actions involving alleged fraud. The receiver represents the appointing court and is the medium through which the court acts. Receivers appointed pursuant

2

to the court's equity powers are usually charged with locating, marshaling, and safeguarding assets for ultimate distribution to investors or consumers and determining whether the business for which the receiver is appointed can be operated legally and profitably. The term "receivership" is the legal term given to the situation where a court appoints a receiver.

6. A "personal representative" is a fiduciary under a duty to administer, settle and distribute the estate of a decedent as expeditiously and as efficiently as is consistent with the best interests of the estate and in accordance with the terms of the decedent's will and Florida State Law. A "personal representative" is similar to a bankruptcy trustee under federal law.

7. Beginning on or about March 24, 2003, through on or about May 20, 2010, **MARIKA TOLZ** and her co-conspirators conspired to misappropriate money from bankruptcy estates, receiverships, and other matters in which **MARIKA TOLZ** had been appointed as trustee, receiver or personal representative, by writing or causing the writing of unauthorized checks from various fiduciary accounts which contained funds she was appointed to safeguard, without authority or legal justification. **MARIKA TOLZ** and her co-conspirators then used the misappropriated money for her own benefit, as well as to conceal her previous misappropriations by using the money to subsequently restore the balance of other fiduciary accounts from which she had previously taken funds. Reports required by **MARIKA TOLZ's** appointments were produced such that they would not reflect these misappropriations and unauthorized disbursements. These false and fraudulent reports were electronically filed and transmitted in CM-ECF and other systems from within the State of Florida to outside the State of Florida.

8. In order to conceal the misappropriations and the writing of unauthorized checks from fiduciary accounts, **MARIKA TOLZ** falsified documents and used a fictitious bank account and

3

number.

9.      Unauthorized checks written, or caused to be written, by **MARIKA TOLZ**, included, but were not limited to, the following:

a.      On or about June 29, 2008, **MARIKA TOLZ** issued and caused others to issue, from the Bank of America Christensen fiduciary account, a check in the approximate amount of $500,000 which was deposited into the Marika Tolz General Trust account at Sun American Bank account number ending in 4401.

b.      On or about March 26, 2009, **MARIKA TOLZ** issued and caused others to issue, from the Bank of America Christensen fiduciary account, a check in the approximate amount of $305,002 which was deposited into the Bank of America Fuzion fiduciary account.

c.      On or about June 14, 2009, **MARIKA TOLZ** issued and caused others to issue, from the Bank of America Douglas fiduciary account, a check in the approximate amount of $456,000 which was deposited into the Bank of America Fuzion fiduciary account.

d.      On or about May 13, 2010, **MARIKA TOLZ** issued and caused others to issue, from the Bank of America Christiansen fiduciary account, a check in the approximate amount of $410,000 which was deposited into the Bank of America Fuzion fiduciary account.

e.      On or about May 20, 2010, **MARIKA TOLZ** caused a $1,000,000 wire transfer, from the Bank of America trust account of Buchanan, Ingersol and Rooney PC, into the Sun American Bank Marika Tolz General Trust Account with an account number ending in 4401, which funds were earmarked as forfeiture proceeds for the U.S. Marshal's Service in *United States v. Scott Rothstein*, Case No. 09-60331-CR-JIC (Cohn). The funds were instead used to satisfy a previously issued check in the amount of $967,856 and replace monies misappropriated from the Driscoll

4

bankruptcy estate by **MARIKA TOLZ**.

   f.  On or about May 20, 2010, **MARIKA TOLZ** issued checks from the

following commingled personal and corporate bank accounts to cover a supposed but nonexistent

shortage in the Wilkinson Hi-Rise Bankruptcy Estate as follows:

> i.  Bank of America account ending in -2063, in the name of Statewide Realty Corp., in the amount of $20,000;
> ii.  Bank of American account ending in -0137, in the name of Marika Tolz, Tr. Op. Acct, in the amount of $10,000;
> iii.  So.Sec. Bank account ending in -9101, in the name of Statewide Realty Sp.Tr.Acct., in the amount of $42,000;
> iv.  Regents Bank account ending in -1706, in the name of Marika Tolz, in the amount of $20,000; and
> v.  Bank Atlantic account ending in -6760, in the name of State Wide Financial, in the amount of $75,000.

10.  **MARIKA TOLZ,** directly or indirectly, utilized funds obtained through the fraudulent

scheme to purchase personal property.

11.  **MARIKA TOLZ,** directly or indirectly, utilized funds obtained through the fraudulent

scheme to purchase, maintain and improve real properties, including, but not limited to, the

following real properties:

a)    2344 North Federal Highway, Hollywood, Florida;
b)    1804 Sherman Street, Hollywood, Florida;
c)    704 SE 3rd Avenue, Hallandale, Florida;
d)    815 SW 30th Street, Ft. Lauderdale, Florida; and
e)    3031 North Ocean Blvd, Apartment 403, Fort Lauderdale, Florida 33308.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 4/25/11                     By: _____

Luis M. Pérez
ASSISTANT UNITED STATES ATTORNEY

Date: 4/15/11                     By: _____

Benedict P. Kuehne, Esq.
ATTORNEY FOR DEFENDANT

Date: 5/2/11                      By: _____

Alan E. Weinstein, Esq.
ATTORNEY FOR DEFENDANT

Date: 4/15/11                     By: _____

Marika Tolz
DEFENDANT

6

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 11-20160-Cr-MARTINEZ/TURNOFF

UNITED STATES OF AMERICA

v.

MARIKA TOLZ

_____/

## STATEMENT OF ACCEPTANCE OF RESPONSIBILITY BY DEFENDANT
## TOLZ

I, defendant Marika Tolz, submit this Statement of Acceptance of

Responsibility, fully acknowledging the conduct for my offense of conviction.

As detailed in the factual statement docketed as DE37, I accept full and

complete responsibility for my knowing and intentional participation in the

charged conspiracy to commit wire fraud.

I have executed this statement under penalty of perjury.

**MARIKA TOLZ**

*United States v. Tolz*
Case No. 11-20160-Cr-Martinez/Turnoff

Respectfully submitted,

*S/ Alan E. Weinstein*
**ALAN E. WEINSTEIN**
Florida Bar No. 113316
**LAW OFFICES OF ALAN E WEINSTEIN LLC**
4500 Biscayne Blvd Ste 203
Miami, FL 33137-3227
Tel: 305.576.8666
Fax: 305.576.8333
defense1@bellsouth.net

*S/ Benedict P. Kuehne*
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**SUSAN DMITROVSKY**
Florida Bar No. 0073296
**LAW OFFICE OF BENEDICT P. KUEHNE, P.A.**
Miami Tower, Suite 3550
100 S.E. 2nd St.
Miami, FL 33131-2154
Telephone: 305.789.5989
Fax: 305.789.5987
ben.kuehne@kuehnelaw.com
*Counsel for Tolz*

*United States v. Tolz*
Case No. 11-20160-Cr-Martinez/Turnoff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on May 9, 2011, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF. I also certify the

foregoing document is being served this day on all counsel of record identified

on the attached service list in the manner specified, either via transmission of

Notices of Electronic Filing generated by CM/ECF or in another authorized

manner for those counsel or parties not authorized to receive electronically

Notices of Electronic Filing.

By: *S/ Benedict P. Kuehne*
**BENEDICT P. KUEHNE**

## SERVICE LIST

Luis M Perez
Assistant U.S. Attorney
99 NE 4th Street, 4th Floor
Miami, FL 33132-2111
Tel: 305.961.9428
Fax: 305.530.6168
Luis.Perez@usdoj.gov

Evelyn Sheehan
Assistant U.S. Attorney
99 NE 4th Street, 4th Floor
Miami, FL 33132-2111
Tel: 305.961.9125
evelyn.sheehan@usdoj.gov

-3-

# EXHIBIT B

## UNITED STATES BANKRUPCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | Adv. No. 11-01994 |
| Plaintiff, | (Consolidated with Pros. Nos. 10-03653-BKC-JKO, |
| v. | 10-03627-BKC-JKO, 10-03720-BKC-JKO, |
| UNITED STATES OF AMERICA, ROBERT FURR, | 10-03626-BKC-JKO, and |
| JOEL TABAS and SONEET KAPILA, | 10-03610-BKC-JKO) |
| Defendants. | |

_____/

## MIAMI CENTER LIMITED PARTNERSHIP'S [PROPOSED] MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST LIBERTY MUTUAL INSURANCE COMPANY

Pursuant to Federal Rule of Civil Procedure 56, as made applicable to this proceeding by

Federal Rule of Bankruptcy Procedure 7056, Theodore B. Gould, as General Partner of

Intervenor Miami Center Limited Partnership (hereafter "MCLP") hereby moves for partial

summary judgment against third party defendant Liberty Mutual Insurance Company ("Liberty

Mutual"), as surety for Marika Tolz, seeking judgment as to liability and certain amounts of

damages in favor of the estate of James P. Driscoll ("Driscoll"). In support of the relief sought

herein, MCLP respectfully states as follows:

### Preliminary Statement

1.     In the wake of substantial frauds like that perpetrated by Marika Tolz, creditors

inevitably face the dismal necessity of retaining attorneys with multidisciplinary expertise to

protect their share of what little that remains. Such is often the case even when, like here, it is

beyond question that a fraud has occurred and the perpetrator is known with certainty.

Fortunately, the victims in the Driscoll estate need not suffer to the same degree that so many

other fraud victims recently have. Because of the bonding requirements promulgated by the

Office of the United States Trustee pursuant to Bankruptcy Code section 322, the trustees in this District paid Liberty Mutual to serve as surety to ensure any affected bankruptcy estates would be made whole in case a fraud just like Tolz's occurred.

2. Liberty Mutual is an extremely sophisticated insurance company that was paid to serve as surety in connection with thousands of bankruptcy cases in this District. Its skilled actuaries determined that Liberty Mutual would most likely profit if it accepted this District's trustees' insurance premiums along with risk. Indeed, the very business of insurance is to profit by accepting risks that others cannot afford to take. In the end, Liberty Mutual profits because even though it must promptly pay claims when it has promised to do so, most of its bets pay off.

3. Liberty Mutual was and is fully aware that it will not win every bet it makes; sometimes it must pay claims. This is one such situation. In light of the confession of Marika Tolz (a trustee covered by the bond), it is beyond question that Liberty Mutual is liable for any and all harm she caused the estates she managed (up to the limit of the bond).

4. While the full scope of Marika Tolz's criminal fraud and precise measure of total damages owed to the Driscoll estate is not ascertainable without additional discovery, the damages caused by some of her defalcations can be determined with certainty at this time. Accordingly, partial summary judgment against Liberty Mutual as to liability and damages on certain issues is appropriate.

## Undisputed Facts

### *Liberty Mutual Agrees to Act as Tolz's Surety and Tolz Begins Her Fraud*

5. On December 13, 2002, Liberty Mutual bound itself as surety to the United States on behalf of certain bankruptcy trustees serving in chapter 7 cases (and chapter 11 liquidation cases) in this Court in the aggregate amount of $48,261,000. *See* Blanket Bond of Trustees,

2

#016027932 (the "Bond," attached to MCLP's Intervenor Complaint as Exhibit 1), Ex. A, pp. 1-

2. The Bond became effective on January 8, 2003. *Id.* at 2. Marika Tolz ("Tolz") was one of

the principals for whom Liberty Mutual agreed to act as surety. *See* Bond, Ex. A.

　　6.　　Beginning on or about March 24, 2003 through May 20, 2010, Tolz conspired to

misappropriate funds from, *inter alia*, bankruptcy estates in this District, by writing or causing to

be written unauthorized checks from fiduciary accounts she was appointed to safeguard, without

authority or legal justification. Tolz used the misappropriated money for her own benefit, as

well as to conceal the ongoing nature of her fraud. Tolz also filed false and fraudulent reports

concerning bankruptcy cases in this District. *See* Factual Basis Supporting Change of Plea (the

"Admitted Facts", attached to the Intervenor Complaint as Exhibit 2), Case No. 1:11-cr-20160-

JEM (S.D. Fla.) (the "Criminal Case") D.E. 37, ¶¶ 7-9.

*MCLP Obtains Recognition of a Pre-Existing Judgment, Precipitating the Bankruptcy Filings*

　　7.　　On May 26, 2006, MCLP obtained a judgment against James P. Driscoll ("Driscoll")

and the Patrick Power Corporation ("PPC") of $6,000,000 plus attorneys' fees and costs arising

from fraud against MCLP and subsequent fraudulent transfers that benefitted PPC. Driscoll

Claims Register, 3-1, pp. 9-17. The Florida state court issuing the judgment found that PPC was

the alter ego of the underlying debtor, James P. Driscoll, Inc., and Driscoll individually, and

pierced the corporate veil to hold Driscoll individually liable for PPC's debt to MCLP. On May

31, 2006, PPC ceased business operations. On June 6, 2006, Driscoll and PPC each filed

petitions for relief under chapter 7 of the Bankruptcy Code.

*Tolz is Appointed Trustee of the Driscoll Estate, is Briefly Trustee of the PPC Estate,*
*And Criminally Mismanages the Driscoll Estate*

　　8.　　Tolz was appointed trustee for *In re James P. Driscoll*, Case No. 06-12420-BKC-

JKO (Bankr. S.D. Fla.) (the "Driscoll Case") and *In re Patrick Power Corporation*, Case No. 06-

3

12423-BKC-JKO (Bankr. S.D. Fla.) (the "PPC Case") on June 7, 2006. Driscoll Case D.E. 8;

PPC Case D.E. 5. On June 13, 2006, Tolz resigned as trustee for the estate of PPC and was

replaced by Kenneth Welt ("Welt"). PPC Case D.E. 8.

9. On or about April 12, 2009, Tolz caused $1,000,000 to be transferred out of a

Driscoll estate account to her general trust account. Excerpts of Deposition of Marika Tolz dated

April 18, 2011 (the "Tolz Deposition", attached as Exhibit J to MCLP's Motion to Intervene

dated July 21, 2011) (D.E. _____), pp. 7, 14-17.

10. On December 17, 2009, Tolz's first interim fee application was approved and she was

awarded and drew $76,690 in fees. Driscoll Case D.E. 737.

11. On May 18, 2010 Tolz transferred $967,856 being held for the U.S. Marshals Service

from her general trust account into the Driscoll estate. Admitted Facts, pg. 4, ¶ 9(e).

*Tolz Confesses After Her Fraud Collapses and Furr Assumes Trusteeship of the Driscoll Estate*

12. On or about May 19, 2010, Tolz resigned as trustee in all of her cases, including the

Driscoll Case. On June 16, 2010, Furr replaced Tolz as trustee of the Driscoll Case. Driscoll

Case D.E. 763.

13. During the four years Marika Tolz served as trustee in the Driscoll Case, Tolz paid

approximately $610,000 in professional fees and personally received a commission of $76,690.

14. On April 28, 2011, Tolz was deposed by attorneys for Furr. Tolz admitted to

fraudulently removing a net total of approximately $1,000,000 from the Driscoll estate. Tolz

Deposition, pp. 17-19.

15. On May 5, 2011, Tolz pled guilty to conspiracy to commit wire fraud by, *inter alia*,

misappropriating $1,000,000 from the U.S. Marshals Service to replace money previously

misappropriated from the Driscoll estate. *See* Admitted Facts, pg. 4, ¶ 9(e).

4

## Argument

### I. SUMMARY JUDGMENT IS APPROPRIATE AT THIS TIME AGAINST LIBERTY MUTUAL WITH REGARD TO LIABILITY

16. There can be no dispute that Tolz willfully violated her fiduciary duties to certain of her former estates and damaged them through acts of misappropriation. Indeed, following Tolz's admissions at her deposition of April 28, 2011, the acknowledgments in the Admitted Facts supporting her plea agreement dated May 5, 2011, and her Statement of Acceptance of Responsibility dated May 10, 2011, the only open issues are whether and to what extent Liberty Mutual is responsible to these estates for Tolz's intentional violations of 11 U.S.C. § 704 and other malfeasance.

17. In this case, Tolz's total abdication of her fiduciary duties of 11 U.S.C. § 704 and admission to a pattern of bankruptcy fraud that commenced in 2003 rendered her unfit to serve as trustee from the first day of the Driscoll Case. All of her actions during the case are tainted by the specter of fraud and faithlessness. As one example, Tolz employed professionals to perpetuate her fraud, not to benefit the estate. Even if the estate professionals were not co-conspirators, by providing services to Tolz they were instruments of her fraud and Liberty Mutual is liable to the estate for amounts paid to them.

18. As discussed below, the law is clear that a surety is responsible for the intentional and negligent breaches of fiduciary duty of a trustee. Tolz's faithless actions and violation of her fiduciary duties breached the terms of her bond from the first day of the case. But for Tolz's faithless actions, Tolz never would have had the opportunity to misappropriate estate assets, pay herself a commission, expend assets on professional fees, and otherwise allow the value of estate to diminish. Accordingly, Liberty Mutual as surety is pledged to make the estate whole and repay these losses. Indeed, equity dictates just such a result; once Liberty Mutual has restored

5

the estate, it may pursue its rights of subrogation and seek to make itself whole as it sees fit.

Liberty Mutual voluntarily undertook this duty when it accepted consideration to serve as surety

for Tolz, unlike the unsecured creditors who were unwilling victims of Tolz's plundering of the

estate.

### A. Standard for Summary Judgment

19. The Federal Rules of Bankruptcy Procedure incorporate, without change, the

provisions of Federal Rule of Civil Procedure 56. *See* Fed. R. Bankr. P. 7056 ("Rule 56 Fed. R.

Civ. P. applies in adversary proceedings."). Rule 56(c) provides that summary judgment shall be

rendered forthwith if the pleadings, admissions, affidavits, and evidence on file, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law. The mere existence of "*some* alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there will be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510 (1986).

### B. The Court Should Grant Summary Judgment Against Liberty Mutual on the Issue of Liability for Losses Caused by Tolz's Theft and Failure to Faithfully Perform Her Statutory Duties

20. The U.S. Supreme Court has held that a trustee is liable to the estate for any losses

caused by her breach of trust, whether directly caused by the trustee herself or by professionals

she employed. *See Mosser v. Darrow*, 341 U.S. 267, 271-74, 71 S.Ct. 680, 682-83 (1951). A

"loss" need not mean actual loss of money – failure to take advantage of opportunities to realize

maximum gain on behalf of the estate will also incur trustee liability. *Id.*; *see also Goldberger v.*

*Horan (In re Traffic Safety Company, Inc.)*, 21 B.R. 669, 673-74 (Bankr. E.D. Pa. 1982) (finding

trustee's surety liable where trustee intentionally suppressed sale price of estate assets at

auction). "It is equally true that parties of interest injured by the Trustee's breach of fiduciary

6

duty may also recover damages from the bonding company who issued the bond posted by the Trustee."

21. The Bond pledges Liberty Mutual to act as surety for a broad scope of trustee malfeasance. In a case involving a bond with language substantively identical to the one issued by Liberty Mutual, the Ninth Circuit Court of Appeals required the surety for a defalcating trustee to remedy numerous injuries inflicted upon the estate by its trustee, including (i) replacing estate property misappropriated by the trustee, (ii) repaying the interim fee paid to the trustee, and (iii) satisfying the administrative costs incurred by the estate in investigating the trustee's defalcation. *Compare Walsh v. Northwestern Nat'l Ins. Co. of Milwaukee (In re Ferrante)*, 51 F.3d 1473, 1477-79 (9th Cir. 1995) (surety ensured trustee would "faithfully perform all of his official duties," *with* Bond at 2 (trustee "shall in all respects faithfully perform all his or her official duties")).

      i. *Liberty Mutual is Responsible to the Driscoll Estate for the $1,000,000 Misappropriation by Tolz*

22. It is undisputed that on April 12, 2009, Tolz stole $1,000,000 from the estate's accounts. Tolz Deposition, pp. 7, 14-17. This money has not been returned. Therefore, Tolz breached her fiduciary duties set forth in 11 U.S.C. § 704 by, among other things, failing to account for all property received by the Driscoll estate.[1] *See United States of America ex rel. George Schumann Tire and Battery Co. v. Grant (In re George Schumann Tire and Battery Co., Inc.)*, 145 B.R. 104, 107-08 (Bankr. M.D. Fla. 1992) (trustee's unjustified refusal to return estate assets incurs liability to the estate). *A fortiori*, Tolz's defrauding the Driscoll estate by that amount and intentionally filing false report with the Court do not constitute faithful performance of her duties as a trustee.

---

[1] Additionally, MCLP reserves the right to seek summary judgment on as-yet-unknown claims identified during the course of discovery.

7

### ii.  *Liberty Mutual is Responsible to the Driscoll Estate For the Interim Fee Awarded to Tolz*

23.  Tolz's breaches of fiduciary duty preclude any award of compensation to her as trustee. *See In re Evangeline Refining Co.*, 890 F.2d 1312 (5th Cir. 1989) (misrepresenting facts to court is cause for denial of trustee or attorney fees); *In re Michael Poor*, 127 B.R. 787 (Bankr. M.D. La. 1991) (trustee's breach of fiduciary duty to estate "renders the notion of compensation inconceivable."). Here, Tolz filed false interim reports with this Court in order to conceal her fraud. *See* Admitted Facts, pg.3, ¶ 7. Accordingly, Liberty Mutual is liable for the interim fee previously awarded Tolz.

### iii.  *Liberty Mutual is Responsible to the Driscoll Estate For All Administrative Expenses Incurred During Tolz's Trusteeship*

24.  A trustee is personally liable for all amounts lost by the estate as a result of her breach of trust, including losses caused by estate professionals concurrently with her breach of trust. *See Mosser*, 341 U.S. at 271-74, 71 S.Ct. at 682-83. A trustee's surety is responsible for increased administrative expenses caused by her breaches of trust. *See, e.g., Ferrante,* 51 F.3d at 1477-79; *Traffic Safety*, 21 B.R. at 672; *Perelstine*, 44 F.2d at 64.

25.  The U.S. Supreme Court has held that trustees have a duty to comply with the provisions of the Internal Revenue Code, which means filing a return and paying any taxes due. *See Holywell Corp. v. Smith*, 503 U.S. 47, 52, 112 S.Ct. 1021, 1024 (1992).[2] Bankruptcy trustees have been held personally liable for damage to the estate caused by negligently failing to do so. *In re Moon*, 258 B.R. 828, 838 (Bankr. N.D. Fla. 2001). A trustee "who fails to make proper tax payments to the United States obligates himself and his surety to the United States for

---

[2] In *Holywell*, the Supreme Court held that a liquidating trustee appointed pursuant to a chapter 11 plan had a duty to pay taxes despite the lack of any language in the plan specifically requiring him to do so. "Returns of an estate, a trust, or an estate under chapter 7 or 11 of title 11 of the United States Code shall be made by the fiduciary thereof." *Holywell*, 503 U.S. at 54, 112 S.Ct. at 1025 (citing to 26 U.S.C. § 6012(b)(4)).

8

the dereliction of that duty." *United States v. Royal Globe Indemnity Corp. (In re Jack Lopez Wholesale Shirt Laundry, Inc.)*, 435 F. Supp. 1031, 1035 (E.D. Pa. 1977); *cf. Robbins v. Schuyler (In re United Equipment Sales Co.)*, 47 B.R. 818, 822 (Bankr. W.D. Mich. 1985) (where debtors in possession paid professional fees to further a breach of fiduciary duty, such fees could be surcharged to the debtor in possession).)

26.   Tolz's liability for professional fees is appropriate in this case, where the money Tolz spent on professional fees brought no benefit to the estate. To the contrary, Tolz repeatedly breached provisions of the Internal Revenue Code. In this instance, Tolz's errors, indifference or neglect were particularly egregious, as she failed to submit a proper return to the IRS despite having her returns rejected year after year for failure to include proper documentation, resulting in the loss of millions of dollars in tax refunds to the Driscoll estate.

27.   Accordingly, Liberty Mutual is responsible to the Driscoll estate for administrative expenses incurred in furtherance of Tolz's fraud in this case.

### iv. *Liberty Mutual is Responsible to the Driscoll Estate For Tolz's Other Breaches of Fiduciary Duty*

28.   "The primary duty of a Chapter 7 trustee is to collect and reduce to money the property of the estate as is compatible with the best interest of the parties at interest. While collecting and reducing to money the property of the estate, it is the trustee's main duty to do so as expeditiously as possible." *Moon*, 258 B.R. at 832 (internal citations and punctuation omitted). Failure to expeditiously close an estate constitutes a breach of a trustee's fiduciary duties. *In re Grubel*, 132 B.R. 242 (Bankr. E.D.N.Y. 1991). Moreover, a bankruptcy trustee may be held personally liable to the estate for her negligence. *See Red Carpet Corp. of Panama Beach v. Miller*, 708 F.2d 1576, 1578 (11th Cir. 1983). "A bankruptcy trustee is a fiduciary of the estate's creditors, and his duty to collect and conserve the assets of the estate and to

9

maximize distribution to the creditors is a fiduciary obligation. A bankruptcy trustee may be held personally liable for a breach of his fiduciary duty. Such liability may attach as a result of negligent violations of the fiduciary duties." *Moon*, 258 B.R. at 832. (internal citations and punctuation omitted).

29. "For example, it is the duty of a bankruptcy trustee to collect the assets of the debtor, and if he fails to do so, he may be charged with the value of the assets that never came into his possession." *Red Carpet*, 708 F.2d at 1578. Alternatively, the estate may recover from the trustee's surety for this failure. *See Tire and Battery*, 145 B.R. 107.

30. Tolz committed serious breaches of her fiduciary duty to the Driscoll estate that resulted in her pleading guilty to conspiracy to commit wire fraud. Given Tolz's admission that her pattern of fraud began in 2003, *see* Admitted Facts at ¶¶ 7-9, the entirety of Tolz's trusteeship over the Driscoll Case was faithless and tainted by her pervasive fraud.

31. In light of Tolz's testimony at her April 28 deposition, there can be no genuine dispute of material fact on these issues, and this court should grant summary judgment against Liberty Mutual and in favor of the Driscoll estate that Liberty Mutual is liable for Tolz's breaches of fiduciary duty.

> v. *Liberty Mutual is Responsible to the Driscoll Estate for*
> *All Administrative Expenses Incurred During the Investigation and*
> *Prosecution of Tolz's Defalcations, Including Attorneys' Fees*

32. A surety is responsible for interest due on amounts paid as a result of a trustee's malfeasance. *See Traffic Safety*, 21 B.R. at 673-74 (surety liable for interest at legal rate on sums owed by defalcating trustee); *accord In re Koch*, 195 B.R. 794, 795-96 (Bankr. M.D. Fla. 1996) (trustee personally liable for interest on uninvested estate funds).

33. A surety is also liable for administrative expenses, including accountants' and attorneys' fees, incurred by the successor trustee or other parties in interest while investigating

10

the trustee's defalcation. *See Traffic Safety*, 21 B.R. at 673-74 (holding surety responsible for

costs incurred by bankruptcy estate as a result of trustee's defalcation, including attorneys' fees);

*In re Perelstine*, 44 F.2d 62, 64 (W.D. Pa. 1930) (holding surety responsible for costs of auditing

estate following trustee's defalcation), *aff'd sub nom. Royal Indemnity Co. v. Sproul*, 46 F.2d

1019 (3d Cir. 1931).

34.     Furthermore, this Court has not hesitated to order repayment of professional fees

incurred by the estate as a result of a fiduciary's breach of duty. *See, e.g., In re Creative*

*Desperation, Inc.*, 415 B.R. 882 (Bankr. S.D. Fla. 2009) (granting Marika Tolz's motion for

sanctions against former attorney for chapter 11 estate with thirty years of bankruptcy experience

and holding attorney liable for more than $90,000 in legal fees caused by misrepresentations to

the Court and acting in a manner adverse to the estate); *see also In re Tran*, 427 B.R. 805, 808-

810 (Bankr. N.D. Cal. 2010) (bankruptcy attorney found grossly negligent in execution of his

duties ordered to fully disgorge fees to the estate and pay sanctions).

35.     Accordingly, Liberty Mutual is liable to the Driscoll estate for all expenses incurred

by parties in interest investigating and prosecuting Tolz's defalcations, including without

limitation administrative expenses and attorneys' fees.

C.      Liberty Mutual is Responsible for Tolz's Defalcations
        Up to a Total of $48,261,000

36.     In its Amended Answer filed January 27, 2011, Liberty Mutual's fourth affirmative

defense purports to limit Liberty Mutual's liability to the terms and provisions of the bond. *See*

Driscoll Adv. D.E. 43, p. 4. This affirmative defense is without merit to the extent it seeks to cap

Liberty Mutual's liability at less than the full amount of the bond (before the entire bond has

been exhausted).

11

37. Since at least June 6, 2006, Liberty Mutual has maintained the Bond for all losses suffered by, *inter alia*, chapter 7 estates for which Tolz served, including the Driscoll estate. *See* Bond at 1.

38. The Bond is a blanket bond that obliges Liberty Mutual to act as surety for each and every trustee in this District without limitation, up to the maximum aggregate amount of the bond. *See* Bond at 1 ("*[W]e, the [trustees], and LIBERTY MUTUAL INSURANCE COMPANY*, a corporation licensed to do business in the state of Florida, as Surety, are held and firmly bound unto the United States of America [up to $48,261,000], for which payment, well and truly to be made, *we* bind ourselves [] by these presents.") (emphasis added, capitalization in original).

39. The terms of the Bond limit each trustee's liability to his or her own individual acts. Bond at 1 ("Each individual trustee shall be liable only for his/her individual acts."). In contrast, the Bond contains no similar language limiting Liberty Mutual's liability on behalf of any one or more of the trustees. To the contrary, the Bond states that:

> The aggregate liability of Surety hereunder shall not exceed the face amount of this bond, regardless of the number of years this bond is in effect, regardless of the number of cases involved and regardless of the number of trustees involved.

Bond at 2.

40. The terms of the Bond (which Liberty Mutual drafted) indicate that while the parties and beneficiaries intended that each trustee would only be liable for their own acts, they also intended that Liberty Mutual would be liable up to the full amount of the Bond, regardless of whether one trustee was liable for the full amount or several trustees were each liable for portions of the amount. *Cf. In re Celotex Corp.*, 487 F.3d 1320, 1334 (11th Cir. 2007)

12

(employing doctrine of *expressio unius est exclusio alterius* as a principle of contract interpretation). Accordingly, Liberty Mutual's fourth affirmative defense should be stricken.

## II.   SUMMARY JUDGMENT IN A FIXED SUM IS APPROPRIATE WITH RESPECT TO DAMAGES TO THE ESTATE THAT CAN BE CALCULATED WITH PRECISION AT THIS TIME

41.   The amounts owed to the Driscoll estate on account of the $1,000,000 Tolz misappropriated from the Driscoll estate, the $76,690 she paid herself in trustee's commissions, and the approximately $610,000 in administrative expenses paid during the case can each be readily fixed. Furthermore, the estate lost each of these amounts because of Tolz's faithless performance as trustee: either she squandered them while administering the case for her own benefit, "earned" them under the same circumstances, or outright stole them. As (i) Tolz's testimony at her deposition eliminated any genuine disputes of material fact that she was using the Driscoll estate (among others) for her own personal benefit, (ii) all of these amounts can be readily fixed, and (iii) the law is clear that Tolz and her surety are responsible for restoring the estate to its condition but for Tolz's breach of fiduciary duties, this Court should grant MCLP partial summary judgment against Liberty Mutual and issue a judgment awarding the Driscoll estate approximately $1,686,690, plus prejudgment interest, attorneys' fees, accountants' fees, and investigative costs.

## Conclusion

WHEREFORE, Miami Center Limited Partnership respectfully requests the Court grant

partial summary judgment against Liberty Mutual (i) in the amount of approximately

$1,686,690, plus prejudgment interest, attorneys' fees, costs and such other amounts as the Court

deems appropriate and (ii) finding Liberty Mutual liable for Tolz's other faithless conduct and

breaches of fiduciary duty; and grant such other and further relief as the Court deems just and

proper under the circumstances.

Dated: August ___, 2011
Miami Beach, Florida

LALCHANDANI SIMON PL

By: _____

Danny Simon
Florida Bar No.: 0016244
danny@lalchandanisimon.com
Kubs Lalchandani
Florida Bar No.: 63966
kubs@lalchandanisimon.com
90 Alton Road, Suite 1803
Miami Beach, Florida 33139
Tel: (305) 999-5291

-and-

PODHURST ORSECK, P.A.
Robert C. Josefsberg
Florida Bar No.: 40856
rjosefsberg@podhurst.com
City National Bank Building
25 West Flagler Street, Suite 800
Miami, Florida 33130
Tel: (305) 358-2800

COHEN & GRESSER LLP
Donald M. Badaczewski
dbadaczewski@cohengresser.com
800 Third Avenue, 21st Floor
New York, New York 10022
Tel: (212) 957-7600

*Attorneys for [Proposed] Intervenor*
*Miami Center Limited Partnership*

14

| Form **1120S** | U.S. Income Tax Return for an S Corporation | OMB No. 1545-0130 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | ▶ Do not file this form unless the corporation has timely filed Form 2553 to elect to be an S corporation. ▶ See separate instructions. | **2003** |

For calendar year 2003, or tax year beginning _____, and ending _____

| **A** Effective date of election as an S corporation | **Name** | **C** Employer identification number |
|---|---|---|
| 01/01/2002 | PATRICK POWER CORP | 59-2339160 |
| **B** Business code number (see page 31-33 of the Instrs.) | Number, street, and room or suite no. (If a P.O. box, see page 12 of the instructions.) 5691 N.E. 14TH AVENUE | **D** Date incorporated 10/20/1983 |
| 235310 | City or town, state, and ZIP code FT. LAUDERDALE, FL                    33334 | **E** Total assets (see page 12 of instructions) 8,716,354. |

**F** Check applicable boxes: (1) ☐ Initial return  (2) ☐ Final return  (3) ☐ Name change  (4) ☐ Address change  (5) ☐ Amended return

**G** Enter number of shareholders in the corporation at end of the tax year .................................... ▶  4

Caution: Include only trade or business income and expenses on lines 1a through 21. See page 12 of the instructions for more information.

| | | | |
|---|---|---|---|
| **Income** | 1a Gross receipts or sales | 18,897,500. | b Less returns and allowances _____ c Bal ▶ **1c** | 18,897,500. |
| | 2 Cost of goods sold (Schedule A, line 8) .................................... | **2** | 15,879,941. |
| | 3 Gross profit. Subtract line 2 from line 1c .................................... | **3** | 3,017,559. |
| | 4 Net gain (loss) from Form 4797, Part II, line 18 (attach Form 4797) .............. | **4** | |
| | 5 Other income (loss) (attach schedule) .................................... | **5** | |
| | 6 Total income (loss). Combine lines 3 through 5 ............................. ▶ | **6** | 3,017,559. |
| **Deductions (see page 13 of the instructions for limitations)** | 7 Compensation of officers .................................... | **7** | 664,429. |
| | 8 Salaries and wages (less employment credits) ................................ | **8** | 618,588. |
| | 9 Repairs and maintenance .................................... | **9** | 17,895. |
| | 10 Bad debts .................................... | **10** | |
| | 11 Rents .................................... | **11** | 121,564. |
| | 12 Taxes and licenses ........................ SEE STATEMENT 1 | **12** | 105,268. |
| | 13 Interest .................................... | **13** | |
| | 14a Depreciation (Attach Form 4562) ......... | 14a | 50,953. | |
| | b Depreciation claimed on Schedule A and elsewhere on return .... | 14b | 22,209. | |
| | c Subtract line 14b from line 14a .................................... | **14c** | 28,744. |
| | 15 Depletion (Do not deduct oil and gas depletion.) ............................ | **15** | |
| | 16 Advertising .................................... | **16** | 983. |
| | 17 Pension, profit-sharing, etc., plans .................................... | **17** | 151,961. |
| | 18 Employee benefit programs .................................... | **18** | 121,018. |
| | 19 Other deductions (attach schedule) .................... SEE STATEMENT 1 | **19** | 585,022. |
| | 20 Total deductions. Add the amounts shown in the far right column for lines 7 through 19 ....... ▶ | **20** | 2,415,472. |
| | 21 Ordinary income (loss) from trade or business activities. Subtract line 20 from line 6 ......... | **21** | 602,087. |
| **Tax and Payments** | 22 Tax: a Excess net passive income tax (attach schedule) ...... | 22a | | |
| | b Tax from Schedule D (Form 1120S) ............ | 22b | | |
| | c Add lines 22a and 22b (see page 17 of the instructions for additional taxes) ............. | **22c** | |
| | 23 Payments: a 2003 estimated tax payments and amount applied from 2002 return | 23a | | |
| | b Tax deposited with Form 7004 .................. | 23b | NONE | |
| | c Credit for Federal tax paid on fuels (attach Form 4136) ...... | 23c | | |
| | d Add lines 23a through 23c .................................... | **23d** | NONE |
| | 24 Estimated tax penalty (See page 17 of instructions). Check if Form 2220 is attached ....... ▶ ☐ | **24** | |
| | 25 Tax due. If line 23d is smaller than the total of lines 22c and 24, enter amount owed. ......... | **25** | |
| | 26 Overpayment. If line 23d is larger than the total of lines 22c and 24, enter amount overpaid ...... | **26** | NONE |
| | 27 Enter amount of line 26 you want: Credited to 2004 estimated tax ▶ _____ Refunded ▶ | **27** | NONE |

**EXTENSION GRANTED** (watermark)

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| **Sign Here** | Signature of officer | Date | Title | May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No |
|---|---|---|---|---|

| **Paid Preparer's Use Only** | Preparer's signature | | Date 5/6/04 | Check if self-employed ☐ | Preparer's SSN or PTIN P00331800 |
|---|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code | MADSEN, SAPP, MENA, RODRIGUEZ & CO, PA 350 E. LAS OLAS BLVD., SUITE 1420 FORT LAUDERDALE, FL  33301 | | EIN 59-1623039 | |
| | | | | Phone no. 954-202-8600 | |

For Paperwork Reduction Act Notice, see the separate instructions.                                    Form **1120S** (2003)

JSA
3C1410 5.000

59-2339160

PATRICK POWEF `ORP                                                    59-2339160

Form 1120S (2003)                                                                   Page 2

| | Schedule A | Cost of Goods Sold (see page 18 of the instructions) | | |
|---|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | 72,150. |
| 2 | Purchases | 2 | 8,038,819. |
| 3 | Cost of labor | 3 | 6,676,765. |
| 4 | Additional section 263A costs (attach schedule) | 4 | |
| 5 | Other costs (attach schedule) ........ SEE STATEMENT 2. | 5 | 1,164,522. |
| 6 | Total. Add lines 1 through 5 | 6 | 15,952,256. |
| 7 | Inventory at end of year | 7 | 72,315. |
| 8 | Cost of goods sold. Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | 15,879,941. |

9a Check all methods used for valuing closing inventory:   (i) ⊠ Cost as described in Regulations section 1.471-3

   (ii) ☐ Lower of cost or market as described in Regulations section 1.471-4

   (iii) ☐ Other (specify method used and attach explanation) ▶ _____

b  Check if there was a writedown of subnormal goods as described in Regulations section 1.471-2(c) . . . . . . . . . . . . . . . ▶ ☐

c  Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) . . . . . . . . ▶ ☐

d  If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of closing
   inventory computed under LIFO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9d |

e  If property is produced or acquired for resale, do the rules of Section 263A apply to the corporation? . . . . . . . . . Yes ⊠ No

f  Was there any change in determining quantities, cost, or valuations between opening and closing inventory? . . . Yes ☐ No
   If "Yes," attach explanation.

| | Schedule B | Other Information (see page 19 of instructions) | | |
|---|---|---|---|---|

                                                                                            Yes | No

1 Check method of accounting:   (a) ☐ Cash   (b) ☐ Accrual   (c) ⊠ Other (specify) ▶ % COMPLETED _____

2 See pages 31 through 33 of the instructions and enter the:

  (a) Business activity ▶ CONTRACTOR _____   (b) Product or service ▶ ELECTRICAL _____

3 At the end of the tax year, did the corporation own, directly or indirectly, 50% or more of the voting stock of a domestic
  corporation? (For rules of attribution, see section 267(c).) If "Yes," attach a schedule showing: (a) name, address, and
  employer identification number and (b) percentage owned . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   X

4 Was the corporation a member of a controlled group subject to the provisions of section 1561? . . . . . . . . . . . .   X

5 Check this box if the corporation has filed or is required to file Form 8264, Application for Registration of a Tax Shelter ▶ ☐

6 Check this box if the corporation issued publicly offered debt instruments with original issue discount . . . . . ▶ ☐
  If checked, the corporation may have to file Form 8281, Information Return for Publicly Offered Original Issue Discount
  Instruments.

7 If the corporation: (a) was a C corporation before it elected to be an S corporation or the corporation acquired an
  asset with a basis determined by reference to its basis (or the basis of any other property) in the hands of a
  C corporation and (b) has net unrealized built-in gain (defined in section 1374(d)(1)) in excess of the net recognized
  built-in gain from prior years, enter the net unrealized built-in gain reduced by net recognized built-in gain from prior
  years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ $ _____

8 Check this box if the corporation had accumulated earnings and profits at the close of the tax year . . . . . . . ▶ ⊠

9 Are the corporation's total receipts (see page 19 of the instructions) for the tax year and its total assets at the end
  of the tax year less than $250,000? If "Yes", the corporation is not required to complete Schedules L and M-1.   X

Note: If the corporation had assets or operated a business in a foreign country or U.S. possession, it may be required to attach
Schedule N (Form 1120), Foreign Operations of U.S. Corporations, to this return. See Schedule N for details.

| | Schedule K | Shareholders' Shares of Income, Credits, Deductions, etc. | | |
|---|---|---|---|---|

| | | (a) Pro rata share items | | (b) Total amount |
|---|---|---|---|---|
| | 1 | Ordinary income (loss) from trade or business activities (page 1, line 21) | 1 | 602,087. |
| | 2 | Net income (loss) from rental real estate activities (attach Form 8825) | 2 | |
| | 3 a | Gross income from other rental activities | 3a | |
| | b | Expenses from other rental activities (attach schedule) | 3b | |
| | c | Net income (loss) from other rental activities. Subtract line 3b from line 3a | 3c | |
| Income (Loss) | 4 | Portfolio income (loss): | | |
| | a | Interest income | 4a | 14,171. |
| | b | Dividends: (1) Qualified dividends ▶ _____ (2) Total ordinary dividends ▶ | 4b(2) | |
| | c | Royalty income | 4c | |
| | d | Net short-term capital gain (loss): (1) Post-May 5, 2003 ▶ _____ (2) Entire year ▶ | 4d(2) | |
| | e | Net long-term capital gain (loss): (1) Post-May 5, 2003 ▶ _____ (2) Entire year ▶ | 4e(2) | |
| | f | Other portfolio income (loss) (attach schedule) | 4f | |
| | 5 | Net section 1231 gain (loss) (attach Form 4797): (a) Post-May 5, 2003 ▶ _____ (b) Entire year ▶ | 5b | |
| | 6 | Other income (loss) (attach schedule) | 6 | |

JSA
JC1420 2.000

Form 1120S (2003)

PATRICK POWE" CORP                                           59-2339160

Form 1120S (2003)                                                                Page 3

## Schedule K — Shareholders' Shares of Income, Credits, Deductions, etc. *(continued)*

| | | (a) Pro rata share items | | (b) Total amount |
|---|---|---|---|---|
| **Deductions** | 7 | Charitable contributions (attach schedule) | 7 | 37,380. |
| | 8 | Section 179 expense deduction (attach Form 4562) | 8 | 22,526. |
| | 9 | Deductions related to portfolio income (loss) (itemize) | 9 | |
| | 10 | Other deductions (attach schedule) | 10 | |
| **Investment interest** | 11a | Interest expense on investment debts | 11a | |
| | b (1) | Investment income included on lines 4a, 4b(2), 4c, and 4f on page 2 | 11b(1) | 14,171. |
| | (2) | Investment expenses included on line 9 above | 11b(2) | |
| **Credits** | 12a | Credit for alcohol used as a fuel (attach Form 6478) | 12a | |
| | b | Low-income housing credit: | | |
| | (1) | From partnerships to which section 42(j)(5) applies | 12b(1) | |
| | (2) | Other than on line 12b(1) | 12b(2) | |
| | c | Qualified rehabilitation expenditures related to rental real estate activities (attach Form 3468) | 12c | |
| | d | Credits (other than credits shown on lines 12b and 12c) related to rental real estate activities | 12d | |
| | e | Credits related to other rental activities | 12e | |
| | 13 | Other credits | 13 | |
| **Adjustments and Tax Preference Items** | 14a | Depreciation adjustment on property placed in service after 1986 | 14a | |
| | b | Adjusted gain or loss | 14b | |
| | c | Depletion (other than oil and gas) | 14c | |
| | d (1) | Gross income from oil, gas, or geothermal properties | 14d(1) | |
| | (2) | Deductions allocable to oil, gas, or geothermal properties | 14d(2) | |
| | e | Other adjustments and tax preference items (attach schedule) | 14e | |
| **Foreign Taxes** | 15a | Name of foreign country or U.S. possession ▶ _____ | | |
| | b | Gross income from all sources | 15b | |
| | c | Gross income sourced at shareholder level | 15c | |
| | d | Foreign gross income sourced at corporate level: | | |
| | (1) | Passive | 15d(1) | |
| | (2) | Listed categories (attach schedule) | 15d(2) | |
| | (3) | General limitation | 15d(3) | |
| | e | Deductions allocated and apportioned at shareholder level: | | |
| | (1) | Interest expense | 15e(1) | |
| | (2) | Other | 15e(2) | |
| | f | Deductions allocated and apportioned at corporate level to foreign source income: | | |
| | (1) | Passive | 15f(1) | |
| | (2) | Listed categories (attach schedule) | 15f(2) | |
| | (3) | General limitation | 15f(3) | |
| | g | Total foreign taxes (check one): ▶ ☐ Paid ☐ Accrued | 15g | |
| | h | Reduction in taxes available for credit (attach schedule) | 15h | |
| **Other** | 16 | Section 59(e)(2) expenditures: a Type ▶ _____ b Amount ▶ | 16b | |
| | 17 | Tax-exempt interest income | 17 | |
| | 18 | Other tax-exempt income | 18 | |
| | 19 | Nondeductible expenses | 19 | 211,459. |
| | 20 | Total property distributions (including cash) other than dividends reported on line 22 below | 20 | 210,470. |
| | 21 | Other items and amounts required to be reported separately to shareholders (attach STMT 3 schedule) | | |
| | 22 | Total dividend distributions paid from accumulated earnings and profits | 22 | |
| | 23 | Income (loss). (Required only if Schedule M-1 must be completed.) Combine lines 1 through 6 in column (b). From the result, subtract the sum of lines 7 through 11a, 15g, and 16b | 23 | 556,352. |

Form **1120S** (2003)

59-2339160



Form **1120S**

Department of the Treasury
Internal Revenue Service

## U.S. Income Tax Return for an S Corporation

▶ Do not file this form unless the corporation has timely filed
Form 2553 to elect to be an S corporation.
▶ See separate instructions.

OMB No. 1545-0130

**2004**

For calendar year 2004, or tax year beginning _____, and ending _____

| | | |
|---|---|---|
| **A** Effective date of S election<br>**01/01/2002** | **Name**<br>PATRICK POWER CORP | **C** Employer identification number<br>59-2339160 |
| **B** Business code number (see pages 36-38 of the instrs)<br>**235310** | **Number, street, and room or suite no. (If a P.O. box, see page 12 of the instructions.)**<br>5691 N.E. 14TH AVENUE | **D** Date incorporated<br>10/20/1983 |
| | **City or town, state, and ZIP code**<br>FT. LAUDERDALE, FL                    33334 | **E** Total assets (see page 12 of instructions)<br>9,067,804. |

**F** Check applicable boxes: (1) ☐ Initial return  (2) ☐ Final return  (3) ☐ Name change  (4) ☐ Address change  (5) ☐ Amended return

**G** Enter number of shareholders in the corporation at end of the tax year ........................▶ 4

Caution: *Include only trade or business income and expenses on lines 1a through 21. See page 13 of the instructions for more information.*

### Income

| | | | | |
|---|---|---|---|---|
| **1a** Gross receipts or sales | 24,420,182. | **b** Less returns and allowances | | **c** Bal ▶ **1c** 24,420,182. |
| **2** Cost of goods sold (Schedule A, line 8) | | | **2** | 21,522,712. |
| **3** Gross profit. Subtract line 2 from line 1c | | | **3** | 2,897,470. |
| **4** Net gain (loss) from Form 4797, Part II, line 17 *(attach Form 4797)* | | | **4** | |
| **5** Other income (loss) *(attach schedule)* | | | **5** | |
| **6** Total income (loss). Add lines 3 through 5 .......................▶ | | | **6** | 2,897,470. |

### Deductions (see page 14 of the instructions for limitations)

| | | |
|---|---|---|
| **7** Compensation of officers | **7** | 516,351. |
| **8** Salaries and wages (less employment credits) | **8** | 515,686. |
| **9** Repairs and maintenance | **9** | 13,351. |
| **10** Bad debts | **10** | |
| **11** Rents | **11** | 145,946. |
| **12** Taxes and licenses          SEE STATEMENT 1. | **12** | 110,333. |
| **13** Interest | **13** | |
| **14a** Depreciation *(attach Form 4562)* ........... **14a** 46,954. | | |
| **b** Depreciation claimed on Schedule A and elsewhere on return ... **14b** 29,472. | | |
| **c** Subtract line 14b from line 14a | **14c** | 17,482. |
| **15** Depletion (Do not deduct oil and gas depletion.) | **15** | |
| **16** Advertising | **16** | 5,530. |
| **17** Pension, profit-sharing, etc., plans | **17** | 171,421. |
| **18** Employee benefit programs | **18** | 135,175. |
| **19** Other deductions *(attach schedule)* ............ SEE STATEMENT 1. | **19** | 562,506. |
| **20** Total deductions. Add the amounts shown in the far right column for lines 7 through 19 ...▶ | **20** | 2,193,781. |
| **21** Ordinary business income (loss). Subtract line 20 from line 6 | **21** | 703,689. |

**EXTENSION GRANTED**

### Tax and Payments

| | | |
|---|---|---|
| **22** Tax: **a** Excess net passive income tax *(attach schedule)* ....... **22a** | | |
| **b** Tax from Schedule D (Form 1120S) ....... **22b** | | |
| **c** Add lines 22a and 22b (see page 16 of the instructions for additional taxes) | **22c** | |
| **23** Payments: **a** 2004 estimated tax payments and amount applied from 2003 return **23a** | | |
| **b** Tax deposited with Form 7004 .......... **23b** NONE | | |
| **c** Credit for Federal tax paid on fuels *(attach Form 4136)* .... **23c** | | |
| **d** Add lines 23a through 23c | **23d** | NONE |
| **24** Estimated tax penalty (see page 18 of instructions). Check if Form 2220 is attached ..... ▶ ☐ | **24** | |
| **25** Tax due. If line 23d is smaller than the total of lines 22c and 24, enter amount owed | **25** | |
| **26** Overpayment. If line 23d is larger than the total of lines 22c and 24, enter amount overpaid | **26** | NONE |
| **27** Enter amount of line 26 you want: Credited to 2005 estimated tax ▶ _____ Refunded ▶ | **27** | NONE |

**DEFENDANT'S EXHIBIT 65**

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Signature of officer | Date 1-14-05 | Title CFO | May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No |
|---|---|---|---|

**Paid Preparer's Use Only**

| Preparer's signature | Date 4/5/05 | Check if self-employed ☐ | Preparer's SSN or PTIN P00331800 |
|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP code | MADSEN SAPP MENA RODRIGUEZ & CO.<br>350 E. LAS OLAS BLVD., SUITE 1420<br>FORT LAUDERDALE, FL 33301 | | EIN 59-1623039<br>Phone no. 954-202-8600 |

For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.

Form **1120S** (2004)

PPC 00001

SA
C1410 3.000

Form 1120S (2004)  PATRICK POWER CORP

59-2339160

Page 2

## Schedule A    Cost of Goods Sold (see page 18 of the instructions)

| | | |
|---|---|---|
| 1 Inventory at beginning of year | 1 | 72,315. |
| 2 Purchases | 2 | 11,633,575. |
| 3 Cost of labor | 3 | 8,691,826. |
| 4 Additional section 263A costs (attach schedule) | 4 | |
| 5 Other costs (attach schedule) | 5 | 1,210,570. |
| 6 Total. Add lines 1 through 5 | 6 | 21,608,286. |
| 7 Inventory at end of year | 7 | 85,574. |
| 8 Cost of goods sold. Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | 21,522,712. |

SEE STATEMENT 2.

9a Check all methods used for valuing closing inventory:
(i) [X] Cost as described in Regulations section 1.471-3
(ii) ☐ Lower of cost or market as described in Regulations section 1.471-4
(iii) ☐ Other (specify method used and attach explanation) ▶
b Check if there was a writedown of subnormal goods as described in Regulations section 1.471-2(c) . . . . . ▶ ☐
c Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) . . . ▶ ☐
d If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of closing
inventory computed under LIFO . . . . . . . . . . . . . . | 9d | |
e If property is produced or acquired for resale, do the rules of Section 263A apply to the corporation? . . . Yes [X] No
f Was there any change in determining quantities, cost, or valuations between opening and closing inventory? . Yes [X] No
If "Yes," attach explanation.

## Schedule B    Other Information (see page 19 of instructions)

| | Yes | No |
|---|---|---|
| 1 Check method of accounting: (a) ☐ Cash (b) ☐ Accrual (c) [X] Other (specify) ▶ % COMPLETED | | |
| 2 See pages 36 through 38 of the instructions and enter the: (a) Business activity ▶ CONTRACTOR (b) Product or service ▶ ELECTRICAL | | |
| 3 At the end of the tax year, did the corporation own, directly or indirectly, 50% or more of the voting stock of a domestic corporation? (For rules of attribution, see section 267(c).) If "Yes," attach a schedule showing: (a) name, address, and employer identification number and (b) percentage owned | | X |
| 4 Was the corporation a member of a controlled group subject to the provisions of section 1561? . . . . . | | X |
| 5 Check this box if the corporation has filed or is required to file Form 8264, Application for Registration of a Tax Shelter ▶ ☐ | | |
| 6 Check this box if the corporation issued publicly offered debt instruments with original issue discount . . . ▶ ☐ If checked, the corporation may have to file Form 8281, Information Return for Publicly Offered Original Issue Discount Instruments. | | |
| 7 If the corporation: (a) was a C corporation before it elected to be an S corporation or the corporation acquired an asset with a basis determined by reference to its basis (or the basis of any other property) in the hands of a C corporation and (b) has net unrealized built-in gain (defined in section 1374(d)(1)) in excess of the net recognized built-in gain from prior years, enter the net unrealized built-in gain reduced by net recognized built-in gain from prior years . . . . . . . . . . . . ▶ | | |
| 8 Check this box if the corporation had accumulated earnings and profits at the close of the tax year . . . ▶ ☐ | | |
| Are the corporation's total receipts (see page 19 of the instructions) for the tax year and its total assets at the end of the tax year less than $250,000? If "Yes," the corporation is not required to complete Schedules L and M-1. ▶ ☐ | | |
| Note: If the corporation had assets or operated a business in a foreign country or U.S. possession, it may be required to attach Schedule N (Form 1120), Foreign Operations of U.S. Corporations, to this return. See Schedule N for details. | | X |

## Schedule K    Shareholders' Shares of Income, Deductions, Credits, etc.

| | Shareholders' Pro Rata Share Items | | | Total amount |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) (page 1, line 21) | | 1 | 703,689. |
| 2 | Net rental real estate income (loss) (attach Form 8825) | | 2 | |
| 3a | Other gross rental income (loss) | 3a | | |
| b | Expenses from other rental activities (attach schedule) | 3b | | |
| c | Other net rental income (loss). Subtract line 3b from line 3a | | 3c | |
| 4 | Interest income | | 4 | 15,864. |
| 5 | Dividends: a Ordinary dividends | | 5a | |
| | b Qualified dividends | 5b | | |
| 6 | Royalties | | 6 | |
| 7 | Net short-term capital gain (loss) | | 7 | |
| 8a | Net long-term capital gain (loss) | | 8a | |
| b | Collectibles (28%) gain (loss) | 8b | | |
| c | Unrecaptured section 1250 gain (loss) (attach schedule) | 8c | | |
| 9 | Net section 1231 gain (loss) (attach Form 4797) | | 9 | |
| 10 | Other income (loss) (attach schedule) | | 10 | |

PPC 00002

PATRICK POWER CORP                                    59-2339160    Page 3

Form 1120S (2004)

| | | Shareholders' Pro Rata Share Items (continued) | | | Total amount |
|---|---|---|---|---|---|
| **Deductions** | 11 | Section 179 deduction (attach Form 4562) | | 11 | 73,141. |
| | 12a | Contributions                                              STMT 3 | | 12a | 15,305. |
| | b | Deductions related to portfolio income (attach schedule) | | 12b | |
| | c | Investment interest expense | | 12c | |
| | d | Section 59(e)(2) expenditures    (1) Type ►_____ (2) Amount ► | | 12d(2) | |
| | e | Other deductions (attach schedule) | | 12e | |
| **Credits & Credit Recapture** | 13a | Low-income housing credit (section 42(j)(5)) | | 13a | |
| | b | Low-income housing credit (other) | | 13b | |
| | c | Qualified rehabilitation expenditures (rental real estate) (attach Form 3468) | | 13c | |
| | d | Other rental real estate credits | | 13d | |
| | e | Other rental credits | | 13e | |
| | f | Credit for alcohol used as fuel (attach form 6478) | | 13f | |
| | g | Other credits and credit recapture (attach schedule) | | 13g | |
| **Foreign Transactions** | 14a | Name of country or U.S. possession ►_____ | | | |
| | b | Gross income from all sources | | 14b | |
| | c | Gross income sourced at shareholder level | | 14c | |
| | | Foreign gross income sourced at corporate level: | | | |
| | d | Passive | | 14d | |
| | e | Listed categories (attach schedule) | | 14e | |
| | f | General limitation | | 14f | |
| | | Deductions allocated and apportioned at shareholder level: | | | |
| | g | Interest expense | | 14g | |
| | h | Other | | 14h | |
| | | Deductions allocated and apportioned at corporate level to foreign source income: | | | |
| | i | Passive | | 14i | |
| | j | Listed categories (attach schedule) | | 14j | |
| | k | General limitation | | 14k | |
| | | Other information: | | | |
| | l | Foreign taxes paid | | 14l | |
| | m | Foreign taxes accrued | | 14m | |
| | n | Reduction in taxes available for credit (attach schedule) | | 14n | |
| **Alternative Minimum Tax (AMT) Items** | 15a | Post-1986 depreciation adjustment | | 15a | |
| | b | Adjusted gain or loss | | 15b | |
| | c | Depletion (other than oil and gas) | | 15c | |
| | d | Oil, gas, and geothermal properties - gross income | | 15d | |
| | e | Oil, gas, and geothermal properties - deductions | | 15e | |
| | f | Other AMT items (attach schedule) | | 15f | |
| **Shareholder Basis** | 16a | Tax-exempt interest income | | 16a | |
| | b | Other tax-exempt income | | 16b | |
| | c | Nondeductible expenses                                     STMT 3 | | 16c | 190,203. |
| | d | Property distributions | | 16d | 591,357. |
| | e | Repayment of loans from shareholders | | 16e | |
| | 17a | Investment income | | 17a | 15,864. |
| | b | Investment expenses | | 17b | |
| | c | Dividend distributions paid from accumulated earnings and profits | | 17c | |
| | d | Other items and amounts (attach schedule)                  STMT 3 | | 17d | |
| | e | Income/loss reconciliation. (Required only if Schedule M-1 must be completed.) Combine the amounts on lines 1 through 10 in the far right column. From the result, subtract the sum of the amounts on lines 11 through 12e and lines 14l or 14m, whichever applies | | 17e | 631,107. |

Form **1120S** (2004)

$\mathcal{E}$

**Form 1120S**

Department of the Treasury
Internal Revenue Service

**U.S. Income Tax Return for an S Corporation**

► Do not file this form unless the corporation has filed Form 2553 to elect to be an S corporation.
► See separate instructions.

OMB No. 1545-0130

**2005**

For calendar year 2005, or tax year beginning ____1/01____ , 2005, and ending ___12/31___ , 2005

| A | Effective date of S election | | | C | Employer identification number |
|---|---|---|---|---|---|
| | 1/01/2002 | Use the IRS label. Other-wise, print or type. | PATRICK POWER CORP  C/O KENNETH A. WELT, TRUSTEE  3790 NORTH 28 TERRACE  HOLLYWOOD, FL 33020 | | 59-2339160 |
| B | Business code number (see instructions) | | | D | Date incorporated |
| | 235310 | | | | 10/20/1983 |
| | | | | E | Total assets (see instructions) |
| | | | | $ | 11,939,348. |

F  Check applicable boxes: (1) ☐ Initial return (2) ☐ Final return (3) ☐ Name change (4) ☒ Address change (5) ☐ Amended return

G  Enter number of shareholders in the corporation at end of the tax year..................................................... ► 4

Caution: Include only trade or business income and expenses on lines 1a through 21. See the instructions for more information.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **I N C O M E** | 1a | Gross receipts or sales | 23,732,967. | b Less returns and allowances | | c Bal ► | 1c | 23,732,967. |
| | 2 | Cost of goods sold (Schedule A, line 8)............................................................. | | | | | 2 | 20,660,825. |
| | 3 | Gross profit. Subtract line 2 from line 1c........................................................... | | | | | 3 | 3,072,142. |
| | 4 | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797)................................. | | | | | 4 | |
| | 5 | Other income (loss) (attach statement)........................................SEE STATEMENT 1 | | | | | 5 | 2,229. |
| | 6 | Total income (loss). Add lines 3 through 5.................................................. ► | | | | | 6 | 3,074,371. |
| **D E D U C T I O N S** | 7 | Compensation of officers............................................................................ | | | | | 7 | 561,957. |
| | 8 | Salaries and wages (less employment credits)....................................................... | | | | | 8 | 561,957. |
| | 9 | Repairs and maintenance........................................................................... | | | | | 9 | 24,539. |
| | 10 | Bad debts........................................................................................ | | | | | 10 | |
| | 11 | Rents............................................................................................ | | | | | 11 | 106,848. |
| | 12 | Taxes and licenses................................................................................ | | | | | 12 | 27,101. |
| | 13 | Interest......................................................................................... | | | | | 13 | |
| | 14a | Depreciation (attach Form 4562)........................................ | 14a | 33,259. | | | | |
| | b | Depreciation claimed on Schedule A and elsewhere on return............. | 14b | | | | | |
| | c | Subtract line 14b from line 14a............................................................. | | | | | 14c | 33,259. |
| | 15 | Depletion (Do not deduct oil and gas depletion.)..................................................... | | | | | 15 | |
| | 16 | Advertising...................................................................................... | | | | | 16 | 6,299. |
| | 17 | Pension, profit-sharing, etc, plans.................................................................. | | | | | 17 | 8,285. |
| | 18 | Employee benefit programs........................................................................ | | | | | 18 | 18,668. |
| | 19 | Other deductions (attach statement).......................................SEE STATEMENT 2 | | | | | 19 | 1,095,732. |
| | 20 | Total deductions. Add the amounts shown in the far right column for lines 7 through 19............... ► | | | | | 20 | 2,444,645. |
| | 21 | Ordinary business income (loss). Subtract line 20 from line 6...................................... | | | | | 21 | 629,726. |

| **T A X** | 22 | Tax: a Excess net passive income tax (attach statement)........................ | 22a | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | b Tax from Schedule D (Form 1120S).............................. | 22b | | | | | |
| | | c Add lines 22a and 22b (see the instructions for additional taxes)................................. | | | | | 22c | |
| **A N D** | 23 | Payments: a 2005 estimated tax payments and amount applied from 2004 return........ | 23a | | | | | |
| | | b Tax deposited with Form 7004............................... | 23b | | | | | |
| **P A Y M E N T S** | | c Credit for Federal tax paid on fuels (attach Form 4136)................ | 23c | | | | | |
| | | d Add lines 23a through 23c.................................................................. | | | | | 23d | |
| | 24 | Estimated tax penalty (see instructions). Check if Form 2220 is attached....................... ► ☐ | | | | | 24 | |
| | 25 | Tax due. If line 23d is smaller than the total of lines 22c and 24, enter amount owed................. | | | | | 25 | 0. |
| | 26 | Overpayment. If line 23d is larger than the total of lines 22c and 24, enter amount overpaid............ | | | | | 26 | |
| | 27 | Enter amount of line 26 you want: Credited to 2006 estimated tax .. ► | | Refunded | | | 27 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| ► | | | ► | | May the IRS discuss this return with the preparer shown below (see instructions)? |
|---|---|---|---|---|---|
| Signature of officer | | Date | Title | | ☒ Yes ☐ No |

| **Paid Preparer's Use Only** | Preparer's signature | ► LESLEY J. JOHNSON | Date | Check if self-employed ☐ | Preparer's SSN or PTIN  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 |
|---|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code | KAPILA & COMPANY  ► 1000 S. FEDERAL HIGHWAY, #200  FORT LAUDERDALE, FL 33316 | | EIN 65-0311031  Phone no. (954) 761-1011 | |

BAA For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.       SPSA0105L 12/08/05       Form 1120S (2005)

Form 1120S (2005)   PATRICK POWER CORP   59-2339160                                                    Page 2

## Schedule A   Cost of Goods Sold (see instructions)

| | | | |
|---|---|---|---:|
| 1 | Inventory at beginning of year | 1 | 85,574. |
| 2 | Purchases | 2 | 10,070,979. |
| 3 | Cost of labor | 3 | 9,062,088. |
| 4 | Additional section 263A costs (attach statement) | 4 | |
| 5 | Other costs (attach statement) ............ SEE STATEMENT 3 | 5 | 1,496,399. |
| 6 | Total. Add lines 1 through 5 | 6 | 20,715,040. |
| 7 | Inventory at end of year | 7 | 54,215. |
| 8 | Cost of goods sold. Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | 20,660,825. |

**9a** Check all methods used for valuing closing inventory:

(i) [X] Cost as described in Regulations section 1.471-3

(ii) [ ] Lower of cost or market as described in Regulations section 1.471-4

(iii) [ ] Other (specify method used and attach explanation)
_____

**b** Check if there was a writedown of subnormal goods as described in Regulations section 1.471-2(c) ........................... ►[ ]

**c** Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) ........................... ►[ ]

**d** If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of closing inventory computed under LIFO ............... | 9d | |

**e** If property is produced or acquired for resale, do the rules of Section 263A apply to the corporation? ................ [ ] Yes [X] No

**f** Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If 'Yes,' attach explanation ........................... [ ] Yes [X] No

## Schedule B   Other Information (see instructions)

| | | Yes | No |
|---|---|---|---|
| 1 | Check method of accounting:   (a) [ ] Cash  (b) [ ] Accrual  (c) [X] Other (specify) ► % COMPLETED _____ | | |
| 2 | See the instructions and enter the: | | |
| | (a) Business activity ► CONTRACTOR _____ (b) Product or service . ► ELECTRICAL _____ | | |
| 3 | At the end of the tax year, did the corporation own, directly or indirectly, 50% or more of the voting stock of a domestic corporation? (For rules of attribution, see section 267(c).) If 'Yes,' attach a statement showing: (a) name, address, and employer identification number and (b) percentage owned | | X |
| 4 | Was the corporation a member of a controlled group subject to the provisions of section 1561? | | X |
| 5 | Has this corporation filed, or is it required to file, a return under section 6111 to provide information on any reportable transaction? | | X |
| 6 | Check this box if the corporation issued publicly offered debt instruments with original issue discount. ............. ►[ ] If checked, the corporation may have to file Form 8281, Information Return for Publicly Offered Original Issue Discount Instruments. | | |
| 7 | If the corporation: (a) was a C corporation before it elected to be an S corporation or the corporation acquired an asset with a basis determined by reference to its basis (or the basis of any other property) in the hands of a C corporation and (b) has net unrealized built-in gain (defined in section 1374(d)(1)) in excess of the net recognized built-in gain from prior years, enter the net unrealized built-in gain reduced by net recognized built-in gain from prior years ............................................................. ► $ _____ | | |
| 8 | Check this box if the corporation had accumulated earnings and profits at the close of the tax year.............. ►[ ] | | |
| 9 | Are the corporation's total receipts (see instructions) for the tax year and its total assets at the end of the tax year less than $250,000? If 'Yes,' the corporation is not required to complete Schedules L and M-1 | | X |

**Note:** If the corporation had assets or operated a business in a foreign country or U.S. possession, it may be required to attach Schedule N (Form 1120), Foreign Operations of U.S. Corporations, to this return. See Schedule N for details.

## Schedule K   Shareholders' Shares of Income, Deductions, Credits, etc

| | Shareholders' Pro Rata Share Items | | | Total amount |
|---|---|---|---|---:|
| | 1 Ordinary business income (loss) (page 1, line 21) | | 1 | 629,726. |
| | 2 Net rental real estate income (loss) (attach Form 8825) | | 2 | |
| I N C O M E | 3a Other gross rental income (loss) | 3a | | |
| | b Expenses from other rental activities (attach statement) | 3b | | |
| | c Other net rental income (loss). Subtract line 3b from line 3a | | 3c | |
| | 4 Interest income | | 4 | 68,585. |
| | 5 Dividends:  a Ordinary dividends | | 5a | |
| | b Qualified dividends | 5b | | |
| (L O S S) | 6 Royalties | | 6 | |
| | 7 Net short-term capital gain (loss) (attach Schedule D (Form 1120S)) | | 7 | |
| | 8a Net long-term capital gain (loss) (attach Schedule D (Form 1120S)) | | 8a | |
| | b Collectibles (28%) gain (loss) | 8b | | |
| | c Unrecaptured section 1250 gain (attach statement) | 8c | | |
| | 9 Net section 1231 gain (loss) (attach Form 4797) | | 9 | |
| | 10 Other income (loss) (see instructions) | | 10 | |

| | Shareholders' Pro Rata Share Items (continued) | | Total amount |
|---|---|---|---|
| **Deductions** | 11 Section 179 deduction *(attach Form 4562)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 | 46,238. |
| | 12a Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SEE STATEMENT 4 . . . . | 12a | 9,320. |
| | b Investment interest expense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12b | |
| | c Section 59(e)(2) expenditures (1) Type ▶ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ (2) Amount ▶ | 12c (2) | |
| | d Other deductions *(see instructions)* . . Type ▶ | 12d | |
| **Credits and Credit Recapture** | 13a Low-income housing credit (section 42(j)(5)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13a | |
| | b Low-income housing credit (other) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13b | |
| | c Qualified rehabilitation expenditures (rental real estate) *(attach Form 3468)* . . . . . . . . . . . . . . . . . . . . . . . . . | 13c | |
| | d Other rental real estate credits (see instrs) Type ▶ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 13d | |
| | e Other rental credits (see instrs) Type ▶ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 13e | |
| | f Credit for alcohol used as fuel *(attach Form 6478)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13f | |
| | g Other credits and credit recapture *(see instrs)* Type ▶ | 13g | |
| **Foreign Transactions** | 14a Name of country or U.S. possession . . . . . . ▶ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| | b Gross income from all sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14b | |
| | c Gross income sourced at shareholder level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14c | |
| | *Foreign gross income sourced at corporate level:* | | |
| | d Passive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14d | |
| | e Listed categories *(attach statement)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14e | |
| | f General limitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14f | |
| | *Deductions allocated and apportioned at shareholder level:* | | |
| | g Interest expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14g | |
| | h Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14h | |
| | *Deductions allocated and apportioned at corporate level to foreign source income:* | | |
| | i Passive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14i | |
| | j Listed categories *(attach statement)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14j | |
| | k General limitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14k | |
| | *Other information:* | | |
| | l Total foreign taxes (check one): ▶ ☐ Paid ☐ Accrued . . . . . . . . . . . . . . . . . . . . . | 14l | |
| | m Reduction in taxes available for credit | | |
| | *(attach statement)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14m | |
| | n Other foreign tax information *(attach statement)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| **Alternative Minimum Tax (AMT) Items** | 15a Post-1986 depreciation adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15a | -31,245. |
| | b Adjusted gain or loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15b | |
| | c Depletion (other than oil and gas) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15c | |
| | d Oil, gas, and geothermal properties — gross income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15d | |
| | e Oil, gas, and geothermal properties — deductions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15e | |
| | f Other AMT items *(attach statement)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15f | |
| **Items Affecting Shareholder Basis** | 16a Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16a | |
| | b Other tax-exempt income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16b | |
| | c Nondeductible expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16c | 101,563. |
| | d Property distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16d | 452,963. |
| | e Repayment of loans from shareholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16e | |
| **Other Information** | 17a Investment income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17a | 68,585. |
| | b Investment expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17b | |
| | c Dividend distributions paid from accumulated earnings and profits . . . . . . . . . . . . . . . . . . . . . | 17c | |
| | d Other items and amounts | | |
| | *(attach statement)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| | e **Income/loss reconciliation.** (Required only if Schedule M-1 must be completed.) Combine the amounts on lines 1 through 10 in the far right column. From the result, subtract the sum of the amounts on lines 11 through 12d and lines 14l . . . . . . . . . . . . . . . . . . . . . | 17e | 642,753. |

BAA                                                                 Form 1120S (2005)

3                                               S°PSA0134L  12/15/05

$\mathcal{F}$

# U.S. Income Tax Return for an S Corporation

**Form 1120S**

Department of the Treasury
Internal Revenue Service

► Do not file this form unless the corporation has filed Form 2553 to elect to be an S corporation.
► See separate instructions.

OMB No. 1545-0130

**2006**

For calendar year 2006 or tax year beginning _____ , 2006, ending _____ ,

| A Effective date of S election | 1/01/2002 | Use the IRS label. Otherwise, print or type. | PATRICK POWER CORP<br>C/O KENNETH A. WELT, TRUSTEE<br>3790 NORTH 28 TERRACE<br>HOLLYWOOD, FL 33020 | C Employer identification number 59-2339160 |
|---|---|---|---|---|
| B Business activity code number (see instructions) | 235310 | | | D Date incorporated 10/20/1983 |
| | | | | E Total assets (see instructions) $ 0. |

F Check if: (1) ☐ Initial return  (2) ☐ Final return  (3) ☐ Name change  (4) ☐ Address change  (5) ☐ Amended return

G Enter the number of shareholders in the corporation at the end of the tax year............................................ ► 4

H Check if Schedule M-3 is required (attach Schedule M-3).............................................................. ►

**Caution.** *Include only trade or business income and expenses on lines 1a through 21. See the instructions for more information.*

| | | | | | |
|---|---|---|---|---|---|
| **INCOME** | 1a | Gross receipts or sales | 6,601,668. | b Less returns and allowances | c Bal ► 1c 6,601,668. |
| | 2 | Cost of goods sold (Schedule A, line 8)....................................................... | | | 2 3,421,382. |
| | 3 | Gross profit. Subtract line 2 from line 1c.................................................... | | | 3 3,180,286. |
| | 4 | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797)............................. | | | 4 |
| | 5 | Other income (loss) (attach statement).........................SEE STATEMENT 1 | | | 5 67,342. |
| | 6 | Total income (loss). Add lines 3 through 5.................................................. ► | | | 6 3,247,628. |
| **DEDUCTIONS** | 7 | Compensation of officers.................................................................. | | | 7 |
| | 8 | Salaries and wages (less employment credits)................................................ | | | 8 456,914. |
| | 9 | Repairs and maintenance.................................................................. | | | 9 6,959. |
| | 10 | Bad debts............................................................................... | | | 10 |
| | 11 | Rents.................................................................................. | | | 11 63,907. |
| | 12 | Taxes and licenses....................................................................... | | | 12 |
| | 13 | Interest................................................................................ | | | 13 15,340. |
| | 14 | Depreciation not claimed on Schedule A or elsewhere on return (attach Form 4562)................ | | | 14 10,118. |
| | 15 | Depletion (Do not deduct oil and gas depletion.)............................................. | | | 15 |
| | 16 | Advertising............................................................................. | | | 16 2,125. |
| | 17 | Pension, profit-sharing, etc, plans......................................................... | | | 17 1,550. |
| | 18 | Employee benefit programs................................................................ | | | 18 4,050. |
| | 19 | Other deductions (attach statement).............................SEE STATEMENT 2 | | | 19 1,584,824. |
| | 20 | Total deductions. Add lines 7 through 19.................................................. ► | | | 20 2,145,787. |
| | 21 | Ordinary business income (loss). Subtract line 20 from line 6................................ | | | 21 1,101,841. |

| **TAX AND PAYMENTS** | | | | | |
|---|---|---|---|---|---|
| | 22a | Excess net passive income or LIFO recapture tax (see instructions)................. | 22a | | |
| | b | Tax from Schedule D (Form 1120S)..................................... | 22b | | |
| | c | Add lines 22a and 22b (see instructions for additional taxes)...................................... | | | 22c |
| | 23a | 2006 estimated tax payments and 2005 overpayment credited to 2006 ......... | 23a | | |
| | b | Tax deposited with Form 7004........................................ | 23b | | |
| | c | Credit for federal tax paid on fuels (attach Form 4136).................... | 23c | | |
| | d | Credit for federal telephone excise tax paid (attach Form 8913)............ | 23d | | |
| | e | Add lines 23a through 23d.............................................................. | | | 23e |
| | 24 | Estimated tax penalty (see instructions). Check if Form 2220 is attached..................... ► ☐ | | | 24 |
| | 25 | Amount owed. If line 23e is smaller than the total of lines 22c and 24, enter amount owed........... | | | 25 0. |
| | 26 | Overpayment. If line 23e is larger than the total of lines 22c and 24, enter amount overpaid............. | | | 26 |
| | 27 | Enter amount from line 26 Credited to 2007 estimated tax ►_____ Refunded | | | 27 |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

► Signature of officer _____  Date _____
► Title  BANKRUPTCY TRUSTEE

May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No

| Paid Preparer's Use Only | Preparer's signature ► LESLEY J. JOHNSON | Date | Check if self-employed ☐ | Preparer's SSN or PTIN 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 |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code ► KAPILA & COMPANY 1000 S. FEDERAL HIGHWAY, #200 FORT LAUDERDALE, FL 33316 | | EIN 65-0311031 | |
| | | | Phone no. (954) 761-1011 | |

BAA For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.    SPSA0105L 01/05/07    Form 1120S (2006)

**\*See Statement A**

Form 1120S (2006) PATRICK POWER CORP     59-2339160                                              Page 2

## Schedule A     Cost of Goods Sold (see instructions)

| | | |
|---|---|---:|
| 1 | Inventory at beginning of year | 1 | 54,215. |
| 2 | Purchases | 2 | 5,849,193. |
| 3 | Cost of labor | 3 | 1,523,513. |
| 4 | Additional section 263A costs (attach statement) | 4 | |
| 5 | Other costs (attach statement) . . . . . . . . . . . . . . . . . . . . . . . . SEE STATEMENT 3 | 5 | 242,411. |
| 6 | Total. Add lines 1 through 5 | 6 | 7,669,332. |
| 7 | Inventory at end of year | 7 | 4,247,950. |
| 8 | Cost of goods sold. Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | 3,421,382. |

9a Check all methods used for valuing closing inventory:

   (i) ☒ Cost as described in Regulations section 1.471-3

   (ii) ☐ Lower of cost or market as described in Regulations section 1.471-4

   (iii) ☐ Other (Specify method used and attach explanation.) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

  b Check if there was a writedown of subnormal goods as described in Regulations section 1.471-2(c). . . . . . . . . . . . . . . . . . . . . . . . ▶

  c Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970). . . . . . . . . . . . . . . . . . . . . . ▶

  d If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of closing
    inventory computed under LIFO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9d |

  e If property is produced or acquired for resale, do the rules of section 263A apply to the corporation? . . . . . . . . . . . . . . ☐ Yes ☒ No

  f Was there any change in determining quantities, cost, or valuations between opening
    and closing inventory? If 'Yes,' attach explanation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☒ No

## Schedule B     Other Information (see instructions)

| | | Yes | No |
|---|---|---|---|
| 1 | Check accounting method: a ☐ Cash  b ☐ Accrual  c ☒ Other (specify) ▶ % COMPLETED _ _ _ _ _ _ _ _ _ | | |
| 2 | See the instructions and enter the: | | |
| | a Business activity ▶ CONTRACTOR _ _ _ _ _ _ _ _ _ _ b Product or service. . . ▶ ELECTRICAL _ _ _ _ _ _ _ _ _ | | |
| 3 | At the end of the tax year, did the corporation own, directly or indirectly, 50% or more of the voting stock of a domestic corporation? (For rules of attribution, see section 267(c).) If 'Yes,' attach a statement showing: (a) name and employer identification number (EIN), (b) percentage owned, and (c) if 100% owned, was a QSub election made?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| 4 | Was the corporation a member of a controlled group subject to the provisions of section 1561?. . . . . . . . . . . . . . . . . . . . . . | | X |
| 5 | Has this corporation filed, or is it required to file, a return under section 6111 to provide information on any reportable transaction?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| 6 | Check this box if the corporation issued publicly offered debt instruments with original issue discount. . . . . . . . . . . . . . ▶ ☐ If checked, the corporation may have to file Form 8281, Information Return for Publicly Offered Original Issue Discount Instruments. | | |
| 7 | If the corporation: (a) was a C corporation before it elected to be an S corporation or the corporation acquired an asset with a basis determined by reference to its basis (or the basis of any other property) in the hands of a C corporation and (b) has net unrealized built-in gain (defined in section 1374(d)(1)) in excess of the net recognized built-in gain from prior years, enter the net unrealized built-in gain reduced by net recognized built-in gain from prior years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ $ _ _ _ _ _ _ _ _ _ _ | | |
| 8 | Enter the accumulated earnings and profits of the corporation at the end of the tax year. . . . . . . . . $ _ _ _ _ _ _ _ | | |
| 9 | Are the corporation's total receipts (see instructions) for the tax year and its total assets at the end of the tax year less than $250,000? If 'Yes,' the corporation is not required to complete Schedules L and M-1. . . . . . . . . . . . . . . . . . . . . . . . . . | | X |

Note: If the corporation, at any time during the tax year, had assets or operated a business in a foreign country or U.S. possession, it may be required to attach Schedule N (Form 1120), Foreign Operations of U.S. Corporations, to this return. See Schedule N for details.

## Schedule K     Shareholders' Pro Rata Share Items

| | | | Total amount |
|---|---|---|---:|
| 1 | Ordinary business income (loss) (page 1, line 21). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 1,101,841. |
| 2 | Net rental real estate income (loss) (attach Form 8825). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | |
| 3a | Other gross rental income (loss). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3a | 103,625. | | |
| | b Expenses from other rental activities (attach statement). . . . . . . . . SEE RENTAL SCH | 3b | 18,439. | | |
| | c Other net rental income (loss). Subtract line 3b from line 3a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3c | 85,186. |
| 4 | Interest income. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 30,265. |
| 5 | Dividends:  a Ordinary dividends. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5a | |
| | b Qualified dividends. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5b | | | |
| 6 | Royalties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | |
| 7 | Net short-term capital gain (loss) (attach Schedule D (Form 1120S)). . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | |
| 8a | Net long-term capital gain (loss) (attach Schedule D (Form 1120S)) . . . . . . . . . . . . . . . . . . . . . . . . | 8a | |
| | b Collectibles (28%) gain (loss). . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8b | | | |
| | c Unrecaptured section 1250 gain (attach statement) . . . . . . . . . . . . . . . . . . . . | 8c | | | |
| 9 | Net section 1231 gain (loss) (attach Form 4797) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | -477,668. |
| 10 | Other income (loss) (see instructions). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 | |

Left margin label: I N C O M E (L O S S)

SPSA0112L  01/05/07                                                                          Form 1120S (2006)

2

**\*See Statement A**

Form 1120S (2006)   PATRICK POWER CORP      59-2339160                                    Page 3

| | Shareholders' Pro Rata Share Items (continued) | | Total amount |
|---|---|---|---|
| **Deductions** | 11  Section 179 deduction (attach Form 4562) | 11 | |
| | 12a Contributions ............................ SEE STATEMENT 4 | 12a | 11,545. |
| | b Investment interest expense............................................ | 12b | |
| | c Section 59(e)(2) expenditures (1) Type ► _ _ _ _ _ _ _ _ _ _ _ (2) Amount ► | 12c (2) | |
| | d Other deductions (see instructions) .. Type ► | 12d | |
| **Credits** | 13a Low-income housing credit (section 42(j)(5)) ......................... | 13a | |
| | b Low-income housing credit (other) ..................................... | 13b | |
| | c Qualified rehabilitation expenditures (rental real estate) (attach Form 3468)........... | 13c | |
| | d Other rental real estate credits (see instrs)   Type ► _ _ _ _ _ _ _ _ _ _ _ _ | 13d | |
| | e Other rental credits (see instrs)   Type ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 13e | |
| | f Credit for alcohol used as fuel (attach Form 6478)........................... | 13f | |
| | g Other credits (see instructions) ...... Type ► | 13g | |
| **Foreign Trans-actions** | 14a Name of country or U.S. possession ...... ► _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| | b Gross income from all sources ........................................ | 14b | |
| | c Gross income sourced at shareholder level ............................. | 14c | |
| | Foreign gross income sourced at corporate level | | |
| | d Passive............................................................ | 14d | |
| | e Listed categories (attach statement)................................... | 14e | |
| | f General limitation .................................................. | 14f | |
| | Deductions allocated and apportioned at shareholder level | | |
| | g Interest expense ................................................... | 14g | |
| | h Other.............................................................. | 14h | |
| | Deductions allocated and apportioned at corporate level to foreign source income | | |
| | i Passive............................................................ | 14i | |
| | j Listed categories (attach statement).................................... | 14j | |
| | k General limitation ................................................. | 14k | |
| | Other information | | |
| | l Total foreign taxes (check one): ► ☐ Paid   ☐ Accrued .............. | 14l | |
| | m Reduction in taxes available for credit | | |
| | (attach statement)................................................... | 14m | |
| | n Other foreign tax information (attach statement)........................ | | |
| **Alternative Minimum Tax (AMT) Items** | 15a Post-1986 depreciation adjustment..................................... | 15a | -5,216. |
| | b Adjusted gain or loss............................................... | 15b | |
| | c Depletion (other than oil and gas)..................................... | 15c | |
| | d Oil, gas, and geothermal properties — gross income..................... | 15d | |
| | e Oil, gas, and geothermal properties — deductions ...................... | 15e | |
| | f Other AMT items (attach statement)................................... | 15f | |
| **Items Affecting Shareholder Basis** | 16a Tax-exempt interest income........................................... | 16a | |
| | b Other tax-exempt income ............................................ | 16b | |
| | c Nondeductible expenses............................................. | 16c | 13,906. |
| | d Property distributions............................................... | 16d | 810,806. |
| | e Repayment of loans from shareholders................................. | 16e | |
| **Other Information** | 17a Investment income .................................................. | 17a | 30,265. |
| | b Investment expenses ................................................ | 17b | |
| | c Dividend distributions paid from accumulated earnings and profits.......... | 17c | |
| | d Other items and amounts | | |
| | (attach statement)........................... SEE STATEMENT 5 | | |
| **Reconciliation** | 18  Income/loss reconciliation. Combine the amounts on lines 1 through 10 in the far right column. From the result, subtract the sum of the amounts on lines 11 through 12d and lines 14l ... | 18 | 728,079. |

BAA                                                                       Form 1120S (2006)

SPSA0134L  09/27/06      *See Statement A



*Cohen*
*&Holtz*
Accountants Advisors

April 27, 2006

Thomas Tew, Esquire
Tew Cardenas LLP
1441 Brickell Ave Ste 1500
Miami, FL 33131-3407

**Re:   Patrick Power Corp. et al.**

Dear Mr. Tew:

The Corporate Recovery and Capital Advisory consulting division of Rachlin Cohen & Holtz LLP ("Rachlin") has been engaged by Patrick Power Corp. ("PPC") to review the business operations and financial condition of PPC, as well as other business and personal interests of James P. Driscoll including entities known as International Marinas-Chub, Ltd., Driscoll Bahamas Limited, and China Light LTD. (collectively, "Driscoll" or "Driscoll Interests"). As an advisor to PPC, our review places particular focus on normalizing the ongoing operations of PPC and its related entities, all in their capacity as electrical contracting and engineering service firms. Our review further focuses on determining where certain assets of PPC and Driscoll may be leveraged or liquidated to satisfy, on a negotiated basis, a \$5.9 million  unrecorded judgment, dated March 7, 2006 (before interest and fees) in favor of  Theodore B. Gould and Miami Center Corp. as Partners of Miami Center Limited Partnership ("Miami Center") **(Tab 1)**[1] As the judgment threatens the going concern integrity of PPC and Driscoll, Rachlin has been asked to make recommendations regarding the prospect of settling the judgment, or alternatively, guiding PPC and James P. Driscoll through a bankruptcy proceeding.

On April 21, 2006 we issued a Summary Advisory Report to preview our material findings and suggested therein a financial framework for settlement based on the analyses undertaken to that date. Respectfully, we have completed our evaluation of PPC, the Driscoll Interests, and the personal financial statement of James P. Driscoll, and we confidentially submit our final observations on the issues identified and analyzed from our limited review of same in the following sections of this letter report.

## A.    BACKGROUND

The primary business of our Corporate Recovery and Capital Advisory Division is the evaluation and management of troubled corporations, restructuring of underperforming debt, and repositioning businesses either through bankruptcy or an out-of-court process. Our clients have included many local and national financial institutions, insurance companies, regulatory agencies, and corporations in the retail, aviation, manufacturing, healthcare, automobile, food service and real estate industries, among others.

---

[1]   Order on Proceedings Supplementary To Execution in  Case No.:83-10899 CA 32, Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida styled: *Theodore B. Gould and Miami Center Corp. no (sic) Individually but as General Partners of Miami Center Limited Partnership v. JPDI and Patrick Power Corp., a Florida Corporation and James P. Driscoll, individually.*



**Rachlin Cohen & Holtz LLP**

450 East Las Olas Boulevard ■ Suite 950 ■ Fort Lauderdale, Florida 33301 ■ **Phone** 954.525.1040 ■ **Fax** 954.525.2004 ■ **www.rachlin.com**

*An Independent Member of Baker Tilly International*

MIAMI  ■  FORT  LAUDERDALE  ■  WEST  PALM  BEACH  ■  STUART

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 2

The key members of our consulting team are recognized by the Florida courts for their receivership and trustee accomplishments, as well as their work on behalf of FSLIC, FDIC, FHLBB and RTC. Their assignments have included the evaluation, management, disposition and securitization analyses of more than 13,000 underperforming loans; loan underwriting; forensic investigation; asset management; recapitalization consulting services to officers and directors of some 75 troubled commercial banks and thrifts and investment underwriting services provided to a variety of investment banks including Goldman Sachs, Credit Suisse Group and Salomon Brothers, among others.

Similar to the PPC engagement, we have assisted numerous companies in restructuring their liabilities, recapitalizing their businesses and executing plans to revitalize operations. Alternatively, we, with appropriate legal counsel, have provided guidance to firms entering bankruptcy, often directing a successful reorganization, yet at other times, an orderly liquidation.

## B.   PATRICK POWER CORP. OPERATIONS

Incorporated in October, 1983, PPC is an electrical contracting and engineering services firm serving commercial, institutional and industrial markets primarily throughout the Southeastern United States. PPC has extensive experience in the design and installation of power distribution systems for industrial facilities, wastewater and sewage treatment plants, hospitals, office buildings and hotels. Business is conducted from a leased facility located at 5691 NE 14th Avenue, Fort Lauderdale, Florida. Table I summarizes operating performance since 2003 in condensed format ($00s).

| Table 1 | | | |
|---|---|---|---|
| | 2003[2] | 2004[2] | 2005[3] |
| Construction Revenues | $18,889 | $24,430 | $23,733 |
| Cost of Construction | 16,391 | 21,755 | 20,267 |
| Gross Margin | 2,498 | 2,675 | 3,466 |
| G & A Expenses | 2,177 | 2,214 | 3,100 |
| Income from Operations | 321 | 461 | 366 |
| Other Income, net | 14 | 16 | 71 |
| **Net Income** | $ 335 | $ 477 | $ 437 |
| Net Income as a % of Revenues | 1.8% | 2.0% | 1.8% |

[2]   Condensed from audited financial statements for the years ended 12/31/04 and 12/31/03 (Tab 2).

[3]   Results are unaudited as of the date of this report and before Rachlin's adjustments to calculate normalized net income. The unaudited 2005 financial statements are at Tab 3. A schedule of General & Administrative expenses is at Tab 4.

PPC accounts for contracts under the percentage of completion method, using costs incurred to date in relation to estimated costs of their contracts to gauge the stage of completion. Management believes costs incurred to be the best available measure of progress on their contracts. Provisions for loss, if any, are recorded in the period such loss is known.

As PPC has borne extraordinary legal expenses to defend its enterprise in the Miami Center litigation, Rachlin reviewed such expenditures in the interest of determining PPC's normalized net income ("NNI")

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 3

for the years 2004 and 2005. As part of this process, Rachlin also reviewed certain expenses of PPC which may have personally benefited PPC's shareholders outside of the normal course of business. The items reviewed included expenses otherwise defined on PPC's income statements as (i) airplane, (ii) employee activities, (iii) entertainment, (iv) insurance, (v) meals, (vi) professional fees – accounting, (vii) professional fees – legal, and (viii) office labor. Rachlin was told by management that the Beechcraft C90 airplane is not essential to the business. As such, Rachlin removed $100,000 of operational costs associated with the airplane in the form of plane rental costs. Rachlin also removed the airplane pilot's salary and benefits, as well as salary and benefits of a Driscoll family member who is not active in the business. Finally, extraordinary legal fees are added back to arrive at NNI for 2004 and 2005.

The following table (**Table 2**) reflects Rachlin's adjustments to reported income, resulting in NNI of $605,000 in 2004 and $1,046,000 in 2005.

| Table 2 | | |
|---|---|---|
| | **2004** | **2005** |
| Net Income | $477,000 | $ 437,000 |
| Adjustments: | | |
| Airplane | - | 100,000 [4] |
| Professional Fees - Legal | 14,000 | 395,000 [5] |
| Office Labor & Benefits | 114,000 | 114,000 [6] |
| Normalized Net Income (NNI) | $ 605,000 | $1,046,000 |
| NNI as a % of Revenues | 2.5% | 4.4% |

[4] Add-back operational expenses attributable to Beechcraft C90 Aircraft

[5] Add-back extraordinary legal fees attendant to Miami Center litigation in 2005 and other professional expenses in 2004 for which we are awaiting additional information.

[6] Add-back salary and benefits for the airplane pilot and for a member of the Driscoll family who resides in California and is not involved in day-to-day operations of the business. Details of this adjustment in 2004 are awaiting additional information from PPC.

To assess PPC's level of performance against its industry peers, Rachlin obtained a five year industry report of same-sized electrical contractors (616) from Integra Information, Inc. ("Integra"), a leading provider of benchmarking and valuation data.[7] A common sized condensed income statement of PPC's peer group for the four most recent years available is summarized in **Table 3**.

---

[7] See Integra five-year industry report at **Tab 5** and three-year industry report at **Tab 6**

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 4

| Table 3 | | | | |
|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** |
| Construction Revenue | $18,442 | $17,583 | $17,689 | $19,945 |
| Cost of Construction | 14,579 | 13,926 | 14,036 | 15,856 |
| Gross Margin | 3,863 | 3,657 | 3,653 | 4,089 |
| Operating Expenses | 3,117 | 2,942 | 2,929 | 3,265 |
| Interest Expense, net | 98 | 91 | 90 | 102 |
| Pre-tax Income | $ 648 | $ 624 | $ 634 | $ 722 |
| Pre-tax Income as a % of Revenues | 3.5% | 3.5% | 3.6% | 3.6% |

PPC's NNI for the 2004 and 2005 period averaged $825,500 and 3.5% of revenue, placing it reasonably on-par with its peers with respect to the most meaningful indicator, that being pre-tax income as a % of Revenues.

Integra's report further reflects that contractors of PPC's size maintain $1 million in cash and cash equivalents in order to sustain operations and carry approximately $1.5 million in debt. PPC statistics at 3/31/06 align with this data as PPC, Driscoll Limited, Driscoll Building and Driscoll Electric collectively held approximately $495,000 in available cash and cash equivalents[8] and $800,000 in debt (**Tab 7**). This cash asset is without consideration of $202,000 of hurricane insurance proceeds also held by the company.

Recent significant events after January 31, 2006, affecting NNI this year include the purchase by PPC of all of the outstanding shares of Driscoll Aviation for $670,000 cash. PPC financed the stock purchase through draws from PPC's revolving line of credit with Standard Bank and Trust Co. Additionally, PPC made distributions to shareholders of $517,000 to meet their tax obligations from S Corp. profits. Another $78,000 was distributed to shareholders for various expenses. Detail is provided in the schedule at **Tab 8**.

For a 2006 pro-forma projection, management provided Rachlin with forecasted revenue and cost of construction on open jobs. Detail is provided at **Tab 31**. From such data, Rachlin estimated NNI for 2006 of $316,000. The calculation appears in **Table 4** below. Gross Margin is based on historical performance. G & A expenses are based on historical normalized performance after making adjustments using the methodology employed for prior years (as shown in **Table 2**). Other Income is similarly based on historical performance. The consequent normalized net income of $814,000 was reduced for legal costs actually paid in 2006 ($294,000) and other adjustments of approximately $90,000 for Airplane expense and Office Labor & Benefits expense ratably paid in the first five months of 2006. Interest on revolver is comprised of debt service on the outstanding principal balance of $800,000 plus imputed debt service on an additional $500,000 of revolving borrowings needed to improve the Company's liquidity to safe operating levels, as reflected in the Integra report. The latter assumption is further explained in the subsection titled Liquidity Analysis which follows immediately hereafter.

[Table 4 follows immediately on the next page]

---

[8] Our Summary Advisory Report had reflected that PPC held approximately $495,000. Based on further due diligence, this amount in cash was comprised of the following: PPC ($426,974); Driscoll Limited ($10,153); Driscoll Electric ($43,321) and Driscoll Building ($14,547).

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 5

| Table 4 | |
|---|---|
| **2006** | |
| **Condensed Income Statement** | |
| **Normalized Pro-forma($000)** | |
| Construction Revenue | $ 24,944 |
| Cost of Construction | 21,763 |
| Gross Margin | 3,181 |
| G & A Expenses | 2,412 |
| Income from operations | 769 |
| Other income, net | 45 |
| Net Income | 814 |
| Adjustments: | |
| 2006 Increase in Building Rent | (14) |
| Depreciation | 84 |
| Legal costs paid in 2006 | (294) |
| Normalized expenses not yet achieved | (90) |
| Interest on revolver($1,300,000) | (114) |
| Normalized cash flow, as adjusted and available for new term debt | $ 386 |

### Liquidity Analysis

As PPC currently holds $426,974 in available cash and cash equivalents, its level of liquidity is well below the level required to maintain a job site work force exceeding 200 laborers. Its debt of $800,000 is below the $1.5 million level of its peer group, thus providing PPC with the ability to access cash quickly through additional revolving debt funding when shortages arise in the ordinary course of business.

For the purpose of determining whether PPC might assume additional revolving or term debt to fund, in whole or in part, a global settlement with Miami Center., it is important to consider PPC's past performance, troubled operational/financial condition, normalized operating income, 2006 pro-forma outlook, and the performance of its peer group from a banking institution's perspective. Having prepared countless institutional credit requests and considering additional input from select local banking institutions, the underwriting criteria which lenders would likely consider in evaluating PPC request for additional credit are as follows:

(1)  PPC must maintain cash or open credit of at least $1 million to assure sustained operations.

(2)  Although normalized net operating income averages $825,500 for the 2004/2005 tracking period, banks will likely undercut this underwriting benchmark, as 2005 NNI was 73% higher than 2004 levels. It is our opinion that banks will underwrite new debt by considering 2004 NNI of $605,000, less debt service associated with the revolving line of credit, and pro-forma income for 2006. As 2006 NNI can only be forecast at $316,000 demonstratively reflective of PPC's inability

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 6

> to procure new jobs due to its non-bondable condition, lenders will gravitate to the 2006 pro-forma as the sole underwriting benchmark.

(3) Despite PPC's favorable track record, lenders will likely cap total debt at approximately $1.7 million (13% above the average debt for peer group contractors).

(4) Term loans will likely have to be retired within two years, given tenuous conditions within the construction industry, not the least of which are rapidly rising costs for both labor and materials.

(5) A segment of bankers reviewing any term loan request will likely provide an early rejection, given the erratic nature of PPC's net income during the 2003-2005 period and its recent litigation record.

Considering these underwriting criteria, while assuming the cloud of the Miami Center LTD. judgment is lifted, Rachlin believes that Standard Bank and/or a new banking institution would consider: (i) a revolving loan of $1.3 million, inclusive of the $800,000 existing revolving debt, providing future funding up to $500,000 to increase PPC's cash reserves to $1,000,000[9], and (ii) a two-year term loan of $389,000, fully amortized at a rate of 7.75% (prime). Each loan would require the unconditional personal guaranty of James P. Driscoll. Basic underwriting would include the following criteria/calculations:

| | |
|---|---|
| Cash Available for Debt Service | $386,000[10] |
| Debt Coverage Ratio | 1.5:1 |
| Cash Available for Debt Service | $257,000 |
| Loan Constant (7.75% over 2 years) | .5343 |
| Available Loan | $475,000 |
| Net Cash (after 2% closing costs on $1.8 MM) | $439,000 |

Notwithstanding the foregoing, before incurring any new debt, either through the existing Standard Bank relationship or a new institution, Rachlin strongly recommends that PPC management assure itself that its future bonding capacity will not be impaired by the events surrounding the adverse Miami Center LTD. decision. As the underwriting for future bonding requirements would mirror loan underwriting standards, burdening PPC with combined debt above $1.7 million would, in Rachlin's assessment, constitute potentially fatal impediments to PPC's ability to procure new contracts, survive as a going concern and fund additional cash monies for a consensual settlement through increased borrowings.

## C.   PATRICK POWER- BALANCE SHEET

As the Miami Center unrecorded judgment threatens the future viability of PPC as a going concern, we reviewed PPC's most recent balance sheet to assess the potential liquidation value of PPC's assets if PPC was compelled to liquidate either through a bankruptcy proceeding or through post judgment collection efforts by Miami Center. PPC's balance sheet of January 31, 2006 is included at **Tab 9**. Our comments on the liquidation value of the assets assume that the assets are sold within a typical 120-150 day period.

---

[9] Adding $500,000 to the cash in banks of $427,000 equals $927,000. The difference is presumed to be available through related party corporate advances, if needed for cash flow.

[10] Forecasted NNI for 2006. See Table 4.

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 7

**1)   Assets – PPC Excluding Driscoll Aviation**

As of January 31, 2006, PPC reported Current Assets of $10,194,000 and fixed assets, net of depreciation, of $546,000. Rachlin's comments on each category of assets are summarized below.

(a) Cash and Cash Equivalents: These assets are reported at $1.6M. Cash and Cash Equivalents was $426,974 at March 31, 2006. This decline in the company's cash position was traced to the transactions itemized below, per information furnished by management.

| Table 5 | |
| --- | --- |
| **Reconciliation of Cash** | |
| Cash, as reported January 31, 2006 | $   1,574,000 |
| Revolver draws | 800,000 |
| Insurance proceeds, Wilma damage | 202,000 |
| Shareholders distributions | (595,000) |
| Purchase - Driscoll Aviation | (670,000) |
| Plane engine recertification | (112,000) |
| Legal invoices, paid 2/1 - 3/31 | (283,000) |
| Roof repair holdback | (202,000) |
| Cash consumed in operations | (287,026) |
| Estimate cash and cash equivalents at 3/31/06 | $      426,974 |

(b) Accounts Receivables: The financial statement at 1/31/06 states Accounts Receivable of $7.2M (inclusive of approximately $1.7 million retainage) with a negligible allowance for offsets. The Accounts Receivable over 90 days, amounting to $1.1M, were reviewed with Karen Damiani, the CFO (See Accounts Receivable Aging Schedule at **Tab 10**). Other than one contested receivable subsequently resolved, the balance of over 90 days represent time and material billings awaiting change orders from customers. PPC believes these will be paid in full. The most current schedule (at 3/31/06) reports Accounts Receivable of $5,688,059 **(Tab 10)**. Of this amount, approximately $1.7 million is construction related retainage, the collection of which would be highly suspect if PPC enters bankruptcy.[11] Accordingly, we have adjusted the value of Accounts Receivable to $3.9 million in a bankruptcy liquidation scenario.

The recovery value of the Accounts Receivable could be significantly reduced if payment is delayed or denied in anticipation that PPC will not be able to complete the balance of the respective contract during a liquidation process. Rachlin can readily envision that such sums due PPC would be subject to set off for contract damages and delay damages if PPC is unable to timely complete the balance of the contract work.

---
[11] This depends on whether jobs can be completed timely in accordance with their terms to entitle PCC to the full amounts.

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 8

(c) <u>Other Receivables</u>: At 1/31/06, Inter-company receivable of $1.4M existed that represented the amount due from Driscoll Bahamas Limited ("DBL") relating to PPC's advance of labor and materials for the Chub Cay development project. The costs of the materials purchased for this project are recorded as a trade payable owed to Hughes Supply ("Hughes"). The inter-company balance (between PPC and DBL) was settled after January 31, 2006, through an understanding with Hughes by which various investors in DBL (unrelated to the Driscolls) guaranteed the payable to Hughes. As Rachlin understands the resolution, PPC is no longer obligated to Hughes and PPC's receivable was extinguished. Consequently, the value of the receivable is now $0.

(d) <u>Inventory</u>: At 1/31/06, Inventory was recorded at $34,000, representing excess materials from prior contracts. Updated information is not available in the absence of an updated balance sheet. For liquidation purposes, such inventory would have *de minimis* value. Consequently, the ascribed liquidation value is $0.

(e) <u>Costs and Estimated Earnings in Excess of Billings</u>: Costs and Estimated Earnings in Excess of Billings amount to $28,000 and represent unbilled receivables to various contractors. The full value of $28,000 is presumed collectible for purposes of this analysis.

(f) <u>Other Current Assets</u>: As Reported at 1/31/06, Other Current Assets encompasses miscellaneous assets including employee advances and prepaid expenses awaiting the passage of time. For liquidation purposes, these assets should be valued at no more than 15% of book value. Consequently, a value of $9,900 is placed on these assets.

(g) <u>Fixed Assets</u>: At 1/31/06, Fixed Assets, are stated at $545,000. Fixed Assets are comprised of trucks and autos, leasehold improvements in the Driscoll Building and office and computer equipment. Under a liquidation scenario, the leasehold improvements of $310,000 are thought to have $0 value. Vehicles used in the Bahamas are projected to sell at their book value of $12,000. The other Fixed Assets are of the type that typically sell for no more than 20% of book value. Consequently, it is projected that the liquidation of Fixed Assets would realize $67,000 (Fixed Assets at 20%, excluding the leasehold improvements, plus $12,000 for the vehicles in the Bahamas).

## 2) Driscoll Aviation

On February 27, 2006, PPC acquired all of the issued and outstanding shares of Driscoll Aviation from James P. Driscoll for $670,000 cash (See **Tab 11**). Funding for the purchase was provided by draws from PPC revolving credit line and totaled $800,000. The plane has market value ranging from $624,000 to $690,000 according to independent appraisals by three parties over the past 12 months. Pursuant to Rachlin's review of these appraisals and assuming a cost of sale ranging from 3% - 5%, Rachlin estimates that the aircraft has a net value of approximately $600,000 if the aircraft was immediately surrendered or sold in partial settlement of the judgment.

As a caveat, Rachlin does not opine on whether PPC's existing secured lender or the judgment holder has a perfected security interest or other legal or equitable claim to the proceeds from sale of this asset. While the asset may effectively be unencumbered at the present time, and Rachlin will presume so for purposes of our report, Rachlin recommends that the client seek advice from counsel on this issue.

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 9

In sum, it is projected that the liquidation value of PPC's assets would not exceed $5,130,000.
**Table 6** recaps the analysis. Individual values may be significantly less for the reasons explained
above.

| Table 6 | | |
|---|---|---|
| | **PPC REPORTED VALUES** | **ESTIMATED LIQUIDATION VALUES** |
| Cash and Cash Equivalents | $ 1,547,000 | $ 427,000 |
| Accounts Receivable, net | 7,140,000 | 3,998,000 |
| Amounts due from Driscoll Bahamas | 1,379,000 | - |
| Beechcraft C90 | 670,000 | 600,000 |
| Inventory | 34,000 | - |
| Costs in Excess of Billings | 28,000 | 28,000 |
| Other current assets | 66,000 | 10,000 |
| Fixed assets, net | 546,000 | 67,000 |
| **TOTAL ASSET VALUES** | **$ 11,410,000** | **$ 5,130,000** |

**3)** **Liabilities**

PPC's balance sheet of January 31, 2006 reported liabilities of $8,273,000, all of which were
current liabilities. These consist of $4,173,000 in trade payables, $38,000 in inter-company
payables, accrued expenses of $112,000, $3,589,000 in billings in excess of costs and estimated
earnings, and other current liabilities of $361,000.

The largest vendor balance included in trade payables is Hughes Supply at $1.8M. This amount
includes material purchased on behalf of DBL ($1.6M). The amount of the payable was
subsequently guaranteed by unrelated parties and, as a result, PPC is no longer liable for payment.
Accordingly, PPC offset this payable to Hughes against its receivable from DBL (as explained in
the earlier discussion on Other Receivables) and $1.6 M of the $1.8M payable was reduced to $0
along with the corresponding receivable. As a consequence, and in the normal course of
operations, trade payables were reduced to $1,664,000 at March 31, 2006 (**Tab 10**).

Our limited inspection of the company's current and historical financial statements indicates that
PPC has used a consistent and aggressive method of receipting advanced billings in excess of
costs and earnings. The dollar volumes of advanced billings for the periods 2003-1/31/06 are
summarized below.

| Table 7 | | | | |
|---|---|---|---|---|
| | **1/31/06** | **12/31/05** | **12/31/04** | **12/31/03** |
| Billings in excess of costs and estimated earnings on contracts in progress | $3.6M | $3.7MM | $3.1MM | $4.0MM |

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 10

> This practice essentially finances PPC operations. In order for PPC to realize the revenue and profit potential on open contracts, PPC's work under its contracts must continue or these Excess Billings could be subject to claims for cash recovery or offset against outstanding receivables. Since the corresponding asset to this liability has already been realized either in Cash or in Accounts Receivable, liquidating PPC would necessarily result in diminished cash or collections of accounts receivable to reduce the liquidated values suggested by Rachlin's analysis on Assets above.

> Accrued Expenses and Other Current Liabilities represent typical obligations from normal business operations such as payroll, payroll taxes, other employee benefits, and accruals for property taxes, insurance and the like.

> In further updating reported liabilities at 1/31/06, one must add the $800,000 outstanding balance on the revolving credit line. Accounting for this additional liability and the adjustments noted above, estimated total liabilities are reduced to $6,564,000 in the absence of a more current balance sheet.

| Table 8 |
|---|
| **Reconciliation of Liabilities** |

| | |
|---|---|
| Liabilities at January 31, 2006, as reported | $8,273,000 |
| Draws under Standard Bank Revolver | 800,000 |
| Hughes Supply obligation settlement | (1,600,000) |
| Decline in balance of trade payables | |
| ($4,173,000 -$1,600,000 - $1,664,000) | (909,000) |
| Liabilities estimated at March 31, 2006 | $6,564,000 |

> Consequently, PPC's estimated liabilities exceed the estimated liquidated value of its assets by $1,434,000. Rachlin's cautionary comments above on some of these assets and liabilities should not be overlooked in further assessing PPC's financial profile especially under a liquidation scenario.

## D.   DRISCOLL BAHAMIAN INTERESTS

Previously defined as the Driscoll Interests, the offshore entities studied by Rachlin for purposes of this report were International Marinas – Chub, LTD., Driscoll Bahamas Limited, and China Light LTD. Our findings with respect to each of these entities are as follows:

(i)   International Marinas – Chub LTD. ("IMC")

> From information contained in a Notice of Mandatory Capital Call issued by IMC to James P. Driscoll on March 17, 2006, IMC was formed on July 21, 2004, for the purpose of developing an 870 acre land parcel on Chub Cay, Berry Islands, Bahamas. Generally, the development plan calls for improvements including road/water/sewer infrastructure, boat slips, villas, single family lots, and related recreational amenities including a community clubhouse. A confidential roster of 51

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 11

IMC shareholders was provided to Rachlin, indicating that James P. Driscoll received a 2.06% ownership share in IMC in exchange for a $250,000 cash investment.

Pursuant to the Notice of Mandatory Capital Call, Mr. Driscoll is required to invest an additional $196,480, as his portion of an overall capital call totaling $7,832,961 (**Tab 12**). The notice from IMC demanded that payment be made no later than April 17, 2006. Pursuant to a letter from James P. Driscoll to IMC on April 14, 2006, Mr. Driscoll refused to make his capital investment citing that IMC's accompanying documentation was grossly deficient. The Capital Call letter recites that failure to make the capital call contributions will result in Driscoll's forfeiture of his equity interest.

Rachlin reviewed the supporting pro-formas, schedules and project sales material supporting IMC's capital call.[12] Rachlin concurs with Mr. Driscoll's opinion that the documentation is grossly deficient. More specifically, Rachlin observed the following:

1.  The project is severely underfunded as infrastructure and project improvements reportedly stopped late in 2005.

2.  The aggregate capital call of $7,832,961 will be inadequate to rejuvenate the project from a cash flow standpoint and is insufficient to place subcontractors and materialmen back on the job.

3.  Three layers of debt have been placed upon the project by otherwise unidentified parties. The priority of these loans is unknown. Further, the willingness of these parties to subordinate their loans to new financing is unknown.

4.  The project appears to need upward of $50,000,000 of new debt and equity to get back on track. However, documentation necessary to request such funding is very poor, and if submitted in a manner consistent with the way the capital call was supported, would be insufficient to document to the underwriting standards of institutional lenders or sophisticated investors who would be approached to fund the required $50 million in debt or equity.

Based upon the unstable financial position of IMC, complicated by what appears to be its management's inability to properly plan for the cash needs of this highly complex off-shore project, Mr. Driscoll's $250,000 equity position appears to have minimal value, if any, should it be placed on the open market for disposition.

(ii)    Driscoll Bahamas Limited ("DBL")

DBL is a Bahamian entity, formed on or about July 29, 2005 for the purpose of providing electrical and mechanical installations to IMC. Pursuant to a stock certificate provided to Rachlin, James P. Driscoll owns 1% of DBL and it is reported that his spouse owns 99%. Unaudited financial statements for the year 2005 indicate net operating income of $769,408. This, however, is not without a cloud in that DBL owes PPC some $1,568,653 for labor and material for installations on the IMC project. In turn, PPC is indebted to Hughes Supply ("Hughes"), as Hughes provided materials through PPC to DBL to furnish materials to IMC's Chub Cay project. In the interest of eliminating the liability of PPC to Hughes, unidentified shareholders of IMC have provided guarantees to Hughes for the $1,568,653 owed to it by PPC. (**Tab 18**)

[12] The roster of IMC shareholders, Driscoll's April 14, 2006 refusal letter, and IMC's supporting pro formas are found at Tabs 13, 14 and 15, respectively.

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 12

Notwithstanding the reported $769,408 profit for 2005, all generated from installations provided to IMC, the IMC job remains underfunded and financially stressed. Presently, Rachlin has no foundation from which to forecast profit for DBL in 2006 and thereafter. Further, as James P. Driscoll holds only a 1% interest in DBL, this asset is considered inconsequential and without recovery value to the judgment holder.

(iii)    China Light LTD. ("CLL")

CLL is a Bahamian entity formed in early 2005. According to stock certificates dated July 29, 2005 and reviewed by Rachlin, the shares are held 50% by James P. Driscoll and 50% by Joan C. Driscoll. On or about July 11, 2005, CLL contracted to purchase Lot 41 in the Chub Cay Club for $250,000. The seller, per the Lot Purchase Agreement, is Chub Cay Club Associates Limited, whose address is Fort Lauderdale (the street address is that of IMC). A deposit of $25,000 was placed with the seller at the time of contract execution. Simultaneous with the execution of the Lot Purchase Agreement, CLL entered into a Residence Construction Agreement with the seller, under which the seller will construct a residence on lot 41. The price of the home to be built is $950,000 and the home is to be delivered no later than July 10, 2007. Mr. Driscoll reports that the home will contain approximately 2,700 square feet of living area. CLL tendered a $95,000 earnest money deposit upon entering into the Residence Construction Agreement. Combining the lot and construction deposits, CLL appears to have $120,000 invested in Lot 41 of the Club Cay Club.

Under the Lot Purchase Agreement, the lot will be conveyed to CLL at closing for $225,000 plus closing costs of at least $30,000. Construction draws are scheduled in a manner consistent with U.S. construction draw methodologies as follows:

1.   $190,000 upon seller's notice that construction will commence within 6 months
2.   $285,000 due at "Dry-In"
3.   $190,000 due at "Power-On"
4.   $190,000 due at Certificate of Occupancy

As construction has yet to commence, no notices for construction funds have been submitted to Mr. Driscoll. It is not clear, however, when construction will commence. The seller has, however, requested that CLL close on its lot purchase and tender the remaining $225,000 of the purchase price. On behalf of CLL, Mr. Driscoll reports that he has not tendered such funds. With respect to using the CLL asset of $120,000 to help satisfy the Miami Center LTD. judgment, we place no value on this asset in a Chapter 7 liquidation scenario as Mr. Driscoll holds only a partial interest in CLL.

**E.    JAMES P. DRISCOLL – PERSONAL FINANCIAL STATEMENT**

We reviewed a schedule of assets owned by James P. Driscoll at March 23, 2006 along with his estimates of fair market value and outstanding liabilities (**Tab 22**). Our review focused on the nature and the potential liquidation value of those assets reported ("Comparative Review"). We accessed various websites to obtain indications of fair market value for the real estate related assets. In the course of Rachlin's due diligence, we discovered (i) that the interest in the cooperative at 1750 S. Ocean Drive #303, Fort Lauderdale was not scheduled and (ii) the Driscoll Interests were mis-classified as Driscoll Property & Equipment and Bahamas Investment capital (sic). After receiving clarification from Mr. Driscoll that he had not reported the cooperative because it was partially owned, he provided additional information from which we gained a better understanding that:

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 13

1) The Driscoll Property & Equipment valued at $188,564 relates to Driscoll Bahamas Limited ($68,564) and China Light LTD. ($120,000).

2) The Bahamas Investment capital recorded at $250,000 relates to International Marina-Chub, LTD.

The Comparative Review of Mr. Driscoll's personally owned assets is summarized below in **Table 9**. Estimated values are based on the limited information that Rachlin reviewed. Values of real estate are not intended nor should they be used in substitution of certified appraisals. Estimated values of Corporate Holdings upon liquidation are not intended nor should they be used in substitution of business valuations in accordance with the standards for estimating a company's fair market value, or of fractionally owned interests therein established by the Appraisal Foundation in its Uniform Standards of Professional Appraisal Practice, the American Society of Appraisers, or the Institute of Business Appraisers. If a full business valuation had been performed according to those standards, our determination of value may be different.

[Table 9 follows immediately hereafter on the next page]

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 14

| Table 9 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **REAL ESTATE HOLDINGS** | **REPORTED VALUE PER STATEMENT** | **ESTIMATED VALUES** EXEMPT[13] | NON-EXEMPT | | **% OWNERSHIP** | **DRISCOLL'S SHARE ESTIMATED VALUES** EXEMPT | NON-EXEMPT | |
| 711 Cordova, Fort Lauderdale(Homestead) | $ 375,000 | $ 1,026,000 | | [13] | 50% | $ 513,000 | $ - | |
| 1750 S. Ocean Dr., #303, Fort Lauderdale | - | 179,000 | | [13, 14] | 50% | 89,500 | | |
| Subtotal | 375,000 | 1,205,000 | - | | | 602,500 | - | |
| **CORPORATE HOLDINGS** | | | | | | | | |
| Patrick Power Corp. | 1,118,000 | - | 2,467,175 | [15] | 52% | - | 1,282,931 | |
| Driscoll Building Company | 800,000 | - | 791,547 | [13, 16] | 100% | - | 791,547 | |
| Driscoll Limited | 10,435 | - | 10,153 | [17] | 100% | - | 10,153 | |
| Driscoll Electric | 43,326 | - | 43,326 | [17] | 100% | - | 43,326 | |
| Driscoll Bahamas Property and Equipment[25] | 188,564 | | | | | | | |
| Bahamas Investment Capital[26] | 250,000 | | | | | | | |
| Driscoll Bahamas Limited | - | - | 68,564 | | 1% | - | - | [21] |
| China Light LTD (Lot & Construction Draw) | - | - | 120,000 | [18] | 50% | - | 60,000 | |
| International Marina - Chub LTD. | - | - | 250,000 | [19] | 2.06% | - | - | [21] |
| Subtotal | 2,410,325 | - | 3,750,765 | | | - | 2,187,957 | |
| **CASH, 401k, PERSONAL PROPERTY** | | | | | | | | |
| Cash in Banks | 500,000 | - | 500,000 | [20] | 100% | - | 500,000 | |
| 401k | 122,000 | 132,000 | - | [22] | 100% | 132,000 | - | |
| Car & Jewelry | 25,000 | - | 25,000 | [20] | 100% | - | 25,000 | |
| Household Furniture & Furnishings | 20,000 | - | 20,000 | [20] | 50% | - | 10,000 | |
| Subtotal | 667,000 | 132,000 | 545,000 | | | 132,000 | 535,000 | |
| Total Assets | $ 3,452,325 | $ 1,337,000 | $ 4,295,765 | | | $ 734,500 | $ 2,722,957 | |

[13]  Broward County Property Appraiser's website - 2006 Property Assessment Values;(Tab 23).

[14]  Rachlin's estimate of 550 s.f. efficiency co-op unit would approach $325 s.f. or $179,000.

[15]  Book Value of PPC as recorded by internal financial statements of PPC @ 1/31/06. At total value of $2,467,175, a business valuation multiple of 3.0 times normalized cash flow is generated, using average cash flow for the 2004/2005 period. This multiple is a valid indicator of the value of PPC which would likely sell in a multiple range of 3.0 to 3.75 on the open market, if sold (i) as a going concern and (ii) its financial condition was not already impacted by the Miami Center judgment.

[16]  Rachlin estimated real estate value of $1,250,000 arrived by capitalizing cash flow from the PPC lease, less sales tax, at a 9% rate less . The value was reduced by the outstanding mortgage of $350,000 (Tab 25). It also assumes necessary "Wilma" repairs of $325,000 are made and funded by insuance proceeds of $202,000 already collected by PPC(Tab 26) with the remaining $123,000 paid by proceeds of a refinanced mortgage loan. The value also includes $14,547 cash in the company per bank statement at 3/31/06.

[17]  Cash balance per bank statements at 3/31/06 (Tab 7)

[18]  The amount agreed to deposit and draw amounts reflected in Driscoll's Lot Purchase and Construction Agreements.

[19]  Capital and ownership positions obtained from Attachment 1 to International Marinas - Chub LTD.'s Notice of Mandatory Capital Call Letter of 3/17/06.

[20]  Per James Driscoll's personal financial statement.

[21]  Estimated value due to minor ownership interest.

[22]  Per CFO of PPC, James Driscoll's 401k balance as 4/7/06 is $132,000.

[24]  For this report, exempt assets include those exempt from creditor's process under State or Bankruptcy law or assets jointly held with Mr. Driscoll's wife who is not a judgment debtor.

[25]  Rachlin reclassified the value to Driscoll Bahamas Ltd. ($68,564) and China Light LTD. ($120,000). Neither of these entities were listed in the financial statement.

[26]  Rachlin reclassifed the value to International Marina-Chub, LTD. as this limited partnership was not listed in the financial statement.

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 15

Having reviewed and updated Mr. Driscoll's asset schedule, we suggest that his liquid assets are limited to Cash in Banks (\$500,000), projected cashed-out equity by refinancing the Driscoll Building[23] (\$445,750) and additional Cash in Banks that he controls through his sole ownership of Driscoll Building, Driscoll Limited and Driscoll Electric (\$68,026), for total liquidity of \$1,013,776. His other assets have little, if any, liquidation value, are exempt from creditor's process or held jointly with his wife, who is not a judgment debtor.

## F.     PPC AS A GOING CONCERN

PPC's continuation as a going concern with franchise value is predicated on the company's continued ability to (i) satisfy its existing contracting obligations, ii) collect corresponding accounts receivable and contract balances, (iii) obtain new contracts at dollar volumes consistent with or exceeding historical levels, (iv) maintain its existing bonding/surety capabilities, (v) retain competent and experienced employees and (vi) access existing or new working capital funding sources. In all such respects, PPC's ability to survive as a going concern is now unequivocally impaired, absent a consensual or bankruptcy workout of the Miami Center judgment. Each corporate attribute necessary for the company's survival is discussed below.

(i)     Bonding and Surety Capacity

PPC's bonding and surety coverage by Travelers Casualty is threatened by real or imminent breaches of the company's General Agreement of Indemnity (**Tab 28**).   The applicable section provides as follows:

*2. **Default:**  Any of the following shall constitute a Default: (a) a declaration of Contract default by the oblige or entity for whom a Contract is performed; (b) actual breach or abandonment of any Contract; (c) a breach of any provision of this Agreement; (d) failure to make payment of a properly due and owing bill  in connection with any Contract; (e) the Company's good faith establishment of a reserve; (f) improper diversion of Contract funds or Indemnitors' assets to the detriment of Contract obligations; (g) Indemnitors become the subject of any proceeding or agreement of bankruptcy receivership, insolvency, creditor assignment or actually becomes insolvent; (h) Indemnitors die, become legally incompetent, are imprisoned, are convicted of a felony, or disappear and cannot be located; (i) any representation furnished to the Company by or on behalf of any of the Indemnitors proves to have been materially false or misleading when made.*

(ii)     Funding Sources for Working Capital

Similarly, PPC's capability to obtain future advances on its line of credit with Standard Bank & Trust Co. (the "Bank") under its Business Loan Agreement (**Tab 29**) and related documents is in immediate jeopardy on various possible grounds. As one may expect under standard loan provisions, the existence and enforcement of Miami Center's judgment may, (i) trigger an event of default (ii) provide grounds to terminate future funding  or (iii) accelerate payment of the outstanding loan balance, if the Bank so elects.  Applicable provisions pertain to (i) continuing representations and warranties relating to financial information, litigation and claims; (ii) affirmative covenants regarding notices of claims and litigation; (iii) restrictions on the use of loan proceeds; (iv) the bank's right to cease advances, and  (v) events of default that include insolvency and adverse changes in the borrower's financial condition.  Such provisions are as follows:

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 16

*Representations and Warranties.* Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

> *Financial Information.* Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

> *Litigation and Claims.* No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

*Affirmative Covenants.* Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

> *Notices of Claims and Litigation.* Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

> *Loan Proceeds.* Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

*Cessation of Advances.* If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

*Default.* Each of the following shall constitute an Event of Default under this Agreement:

> *Insolvency.* The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

> *Adverse Change. A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.*

(iii) Inability of Management to Focus on Its Core Business

Management has been and remains distracted due to the executive manpower and financial resources necessary to manage the Miami Center litigation. Accordingly, management has severely limited its efforts to promote new contractor relationships, foster and safeguard the retention of its human resources to complete current jobs while sustaining its competitive market position and otherwise provide effective oversight to its operations. As Rachlin regularly observes in its capacity as court-appointed receiver and bankruptcy trustee, "crisis management" is the order of the day, as opposed to normal operations.

(iv) Inability to Procure New Jobs

Rachlin reviewed a detailed spreadsheet, listing the status of 17 on-going construction jobs. This review revealed that eight (8) of such jobs are at or above 90% completed (**Tab 30**). Further inquiries of management revealed that PPC has stopped bidding new contracts in the likelihood that it would not be able to submit a conforming bid because of a lack of bonding capacity.

(v) Retention of Competent and Experienced Staff

It would not be surprising if the general contracting community has already noticed that PPC has altered its normal business practice in refraining from submitting quotes or bids for upcoming electrical contract engagements. Respectfully submitted, we perceive an urgent need for the company to return to normalcy with respect to bidding for contracts before the best and most able of PPC's human resources leave the organization to find a more stable workplace. PPC's long standing reputation in the construction industry stems in significant degree from the performance reputation and skill levels of its employment force. Loss of such employees with the attendant diminution of corporate memory and job continuity will undoubtedly exacerbate and accelerate the risk that PPC will be unable to remain viable to workout the judgment debt.

(vi) Contract Balances

As previously discussed in Section C, PPC has historically made use of advanced billings in excess of costs as additional work capital. Cessation of work under such existing contracts (i) could make the company susceptible to claims of recoupment and (ii) interrupt if not eliminate the sole source for future revenue in the short term to meet operating obligations.

## G.   CONCLUSION:

Failing settlement in the subject matter, there is a high likelihood that PPC will be liquidated in a Chapter 7 Bankruptcy proceeding. As PPC's liabilities materially exceed assets in a liquidation scenario, all of its creditors, which now include Miami Center, would expect to receive significantly discounted recoveries on their respective claims. Such percentages of recovery would require a full claims analysis, which Rachlin cannot perform in the absence of additional information and input from PPC's counsel.

Noting the PPC's efforts to maintain itself as a going concern, it appears that the maximum amount which might be offered in settlement of the Miami Center judgment is $1,968,776, the components of which are:

Thomas Tew, Esquire
Tew Cardenas
April 27, 2006
Page 18

| | |
|---|---|
| Proceeds of PPC Term Loan | $ 439,000 |
| Proceeds of Airplane Sale | 600,000 |
| Proceeds of Building Refinance[27] | 445,750 |
| Personal Cash Accounts | 568,026 |
| | $2,052,776 |

We hope this evaluation of PPC's position is helpful as you attempt to resolve the Miami Center, LTD. matter.

Sincerely,

Richard K. Hollowell (Rg)

Richard K. Hollowell
Partner
Corporate Recovery and Capital Advisory Group

---

[27] Assumes a new loan at 75% loan of $937,500 to value, less 2% closing costs, out of pocket roof repair expenses of $123,000 and payoff of existing mortgage loan at $350,000.

# PATRICK POWER CORP.

**FINANCIAL REPORT**
(With supplemental information)

**December 31, 2004 and 2003**

# MSMR

## MADSEN SAPP MENA RODRIGUEZ & Co.
CERTIFIED PUBLIC ACCOUNTANTS & ADVISORS

Independent Auditors' Report

February 28, 2005

To the Board of Directors and Stockholders
Patrick Power Corp.
Fort Lauderdale, Florida

We have audited the accompanying balance sheets of Patrick Power Corp. as of December 31, 2004 and 2003 and the related statements of income and retained earnings and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Patrick Power Corp. as of December 31, 2004 and 2003 and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Madsen Sapp Mena Rodriguez & Co.*

MADSEN SAPP MENA RODRIGUEZ & CO.

- 1 -

## PATRICK POWER CORP.
### BALANCE SHEETS
December 31, 2004 and 2003

| ASSETS | 2004 | 2003 |
|---|---|---|
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 506,114 | $ 2,479,322 |
| Accounts receivable, net | 7,235,448 | 5,133,416 |
| Inventories | 85,574 | 72,315 |
| Costs and estimated earnings in excess of billings | | |
| on contracts in progress | 82,350 | 266,091 |
| Prepaid expenses | 159,374 | 235,437 |
| Other receivables | 19,375 | 2,050 |
| Total current assets | 8,088,235 | 8,188,631 |
| PROPERTY AND EQUIPMENT, NET | 295,547 | 255,026 |
| LEASEHOLD IMPROVEMENTS, NET | 264,754 | 272,697 |
| ACCOUNTS RECEIVABLE – NON-CURRENT | 419,268 | - |
| Total assets | $ 9,067,804 | $ 8,716,354 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| CURRENT LIABILITIES | | |
| Accounts payable | $ 2,807,018 | $ 1,683,672 |
| Billings in excess of costs and estimated | | |
| earnings on contracts in progress | 3,083,070 | 3,978,282 |
| Accrued expenses | 398,989 | 160,663 |
| Total current liabilities | 6,289,077 | 5,822,617 |
| COMMITMENTS AND CONTINGENCIES | | |
| Total liabilities | 6,289,077 | 5,822,617 |
| STOCKHOLDERS' EQUITY | | |
| Common stock, $1 par value, 7,500 shares | | |
| authorized, 100 shares issued and outstanding | 100 | 100 |
| Additional paid-in capital | 573,617 | 573,617 |
| Retained earnings | 2,205,010 | 2,320,020 |
| Total stockholders' equity | 2,778,727 | 2,893,737 |
| Total liabilities and stockholders' equity | $ 9,067,804 | $ 8,716,354 |

### PATRICK POWER CORP.
### STATEMENTS OF INCOME AND RETAINED EARNINGS
Years Ended December 31, 2004 and 2003

|                                         | 2004          | 2003          |
|-----------------------------------------|---------------|---------------|
| Construction revenues                   | $ 24,430,093  | $ 18,889,047  |
| Costs of construction                   | 21,755,245    | 16,391,332    |
| Gross margin                            | 2,674,848     | 2,497,715     |
| General and administrative expenses     | 2,214,365     | 2,177,486     |
| Income from operations                  | 460,483       | 320,229       |
| Other income                            | 15,864        | 14,171        |
| Net income                              | 476,347       | 334,400       |
| Retained earnings – beginning of year   | 2,320,020     | 2,196,090     |
| Distributions                           | (591,357)     | (210,470)     |
| Retained earnings – end of year         | $ 2,205,010   | $ 2,320,020   |

See accompanying notes.
- 3 -

**PATRICK POWER CORP.**
STATEMENTS OF CASH FLOWS
Years Ended December 31, 2004 and 2003

| CASH FLOWS FROM OPERATING ACTIVITIES: | 2004 | 2003 |
|---|---|---|
| Net income | $ 476,347 | $ 334,400 |
| Adjustments to reconcile net income to net cash (used in) provided by operating activities: | | |
| Depreciation and amortization | 94,563 | 75,519 |
| Decrease in income tax receivable | - | 22,680 |
| Increase in accounts receivable | (2,521,300) | (1,059,741) |
| Increase in accounts payable | 1,123,346 | 828,247 |
| Increase in accrued expenses | 238,326 | 10,873 |
| Decrease (increase) in costs and estimated earnings in excess of billings on contracts in progress | 183,741 | (96,665) |
| (Decrease) increase in billings in excess of costs and estimated earnings on contracts in progress | (895,212) | 1,207,010 |
| Decrease in prepaid expenses | 76,063 | 633 |
| Increase in inventories | (13,259) | (164) |
| Decrease in accrued distributions | - | (184,800) |
| Increase in other receivables | (17,325) | - |
| Total adjustments | (1,731,057) | 803,592 |
| Net cash (used in) provided by operating activities | (1,254,710) | 1,137,992 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Purchase of property and equipment | (127,141) | (145,286) |
| Repayments of advances to affiliate | - | 500,000 |
| Net cash (used in) provided by investing activities | (127,141) | 354,714 |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Distributions | (591,357) | (210,470) |
| Net cash used in financing activities | (591,357) | (210,470) |
| NET (DECREASE) INCREASE IN CASH AND CASH EQUIVALENTS | (1,973,208) | 1,282,236 |
| CASH AND CASH EQUIVALENTS – BEGINNING OF YEAR | 2,479,322 | 1,197,086 |
| CASH AND CASH EQUIVALENTS – END OF YEAR | $ 506,114 | $ 2,479,322 |

See accompanying notes.
- 4 -

PATRICK POWER CORP.
NOTES TO FINANCIAL STATEMENTS
Years Ended December 31, 2004 and 2003

**Note 1.    Summary of Significant Accounting Policies**

Operations:

Patrick Power Corp. (the "Company") is an electrical contracting and engineering services firm serving commercial, institutional, and industrial markets primarily throughout the Southeast United States and the Caribbean. The Company has extensive experience performing design and installations of power distribution systems at industrial facilities, wastewater and sewage treatment plants, hospitals, large retail/office buildings, and hotels. New construction work is performed primarily under fixed-price contracts. Maintenance and renovation work is performed under lump sum or time and material contracts.

The Company's majority stockholder is also the owner of other construction entities.

Method of Accounting for Contracts:

The Company accounts for contracts under the percentage-of-completion method, using costs incurred to date in relation to estimated total costs of the contracts to measure the stage of completion. This method is used because management considers costs incurred to be the best available measure of progress on these contracts. Provisions for any estimated losses on uncompleted contracts are made in the period in which such losses are determined.

Contract costs include all direct material, labor and equipment costs and those indirect costs related to contract performance such as indirect labor, supplies, and tool costs. Selling, general and administrative costs are charged to expense as incurred. Changes in job performance, job conditions, estimated profitability, and final contract settlements may result in revisions to costs and income and are recognized in the period in which revisions are determined. Change orders are reflected at estimated recoverable amounts. Profit incentives are included in contract revenues when their realization is reasonably assured. Claims are included in contract revenues when realization is probable and the amount can be reliably estimated.

The asset "Costs and estimated earnings in excess of billings on contracts in progress," represents costs incurred and revenue recognized in advance of amounts billed. The liability "Billings in excess of costs and estimated earnings on contracts in progress" represents billings in advance of costs incurred and revenue recognized.

Use of Estimates:

Management uses estimates and assumptions in preparing financial statements. Those estimates and assumptions affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities, and reported revenues and expenses. Significant estimates used in preparing these financial statements include those assumed in computing revenue earned under the percentage-of-completion revenue recognition method and those assumed in computing the allowance for doubtful accounts. It is at least reasonably possible that the significant estimates used will change within the next year.

**PATRICK POWER CORP.**
NOTES TO FINANCIAL STATEMENTS
Years Ended December 31, 2004 and 2003

**Note 1.**     **Summary of Significant Accounting Policies** (continued)

Reclassifications:

Certain accounts in the December 31, 2003 financial statements have been reclassified for comparative purposes to conform with the presentation in the current period financial statements.

Cash Equivalents:

For purposes of the statement of cash flows, the Company considers all highly liquid investments with an original maturity of three months or less and money market funds to be cash equivalents.

Accounts Receivable:

The Company estimates an allowance for doubtful accounts based on the creditworthiness of its customers as well as general economic conditions. Consequently, an adverse change in those factors could affect the Company's estimate of its bad debts.

Inventories:

Inventories consist of construction materials and supplies that have not been assigned and charged to specific contracts and are stated at the lower of cost or market.

Income Taxes:

The Company elected S corporation status effective January 1, 2002. Earnings and losses after that date will be included in the personal income tax returns of the stockholders and taxed depending on their personal tax strategies. Accordingly, the Company will not incur additional income tax obligations, and future financial statements will not include a provision for income taxes.

Property and Equipment and Leasehold Improvements:

Property and equipment and leasehold improvements are carried at cost and depreciation and amortization is provided using the straight-line method over the estimated useful lives of the various classes of assets as follows:

| | |
|---|---|
| Furniture and fixtures | 5 years |
| Automobiles | 5 years |
| Office equipment | 5 years |
| Computer equipment | 5 years |
| Leasehold improvements | 39 years |

Expenditures for maintenance and repairs are charged against operations as incurred. Renewals and betterments that materially extend the life of an asset are capitalized.

**PATRICK POWER CORP.**
NOTES TO FINANCIAL STATEMENTS
Years Ended December 31, 2004 and 2003

### Note 2. Concentrations and Credit Risk

Financial instruments that potentially subject the Company to concentrations of credit risk are primarily cash and cash equivalents and accounts receivable. At December 31, 2004 and 2003, concentrations of credit risk were as follows:

Cash and Cash Equivalents:

The Company maintains its cash and cash equivalents in bank deposit, overnight investment, and brokerage accounts, which at times, may exceed federally insured limits. The Company has not experienced any losses in such accounts and believes it was not exposed to any significant credit risk on cash and cash equivalents.

Accounts Receivable:

The Company's customers consist primarily of commercial, institutional and industrial organizations. The Company generally has recourse for nonpayment under applicable lien laws. The Company monitors the requirement for an allowance for doubtful accounts based on the credit risk of specific customers, payment trends, historical experience, and other information.

Accounts receivable are summarized as follows as of December 31, 2004 and 2003:

|  | 2004 | 2003 |
|---|---|---|
| Accounts receivable - current | $ 4,715,394 | $ 3,405,160 |
| Retainage | 2,533,687 | 1,741,889 |
|  | 7,249,081 | 5,147,049 |
| Less: allowance for doubtful accounts | (13,633) | (13,633) |
|  | $ 7,235,448 | $ 5,133,416 |

Approximately 88% of the Company's receivables as of December 31, 2004 and 2003 were due from three (one of which represents 50%) and four companies, respectively.

Accounts Receivable – Non-Current:

Accounts receivable – non-current as of December 31, 2004 represents the amount due from one customer. The amount due is classified as non-current as management does not expect the amount to be collected within a year. No allowance has been provided against the receivable, as the Company believes the amount to be fully collectible.

Revenue:

Approximately 78% and 82% of revenues were from three and four customers for the years ended December 31, 2004 and 2003, respectively.

PATRICK POWER CORP.
NOTES TO FINANCIAL STATEMENTS
Years Ended December 31, 2004 and 2003

**Note 3.    Property and Equipment**

Property and equipment consist of the following at December 31:

|  | 2004 | 2003 |
|---|---|---|
| Furniture and fixtures | $ 47,462 | $ 47,462 |
| Automobiles | 381,150 | 291,125 |
| Computer equipment | 100,165 | 63,049 |
| Office equipment | 6,248 | 6,248 |
| Total property and equipment | 535,025 | 407,884 |
| Accumulated depreciation | (239,478) | (152,858) |
| Total property and equipment, net | $ 295,547 | $ 255,026 |

Depreciation expense was $86,620 and $67,576 for 2004 and 2003, respectively.

**Note 4.    Leasehold Improvements**

Leasehold improvements consist of the following at December 31:

|  | 2004 | 2003 |
|---|---|---|
| Office/warehouse | $ 309,762 | $ 309,762 |
| Accumulated amortization | (45,008) | (37,065) |
| Total leasehold improvements, net | $ 264,754 | $ 272,697 |

Amortization expense was $7,943 for 2004 and 2003.

**Note 5.    Lease Commitments**

In 2004 and 2003, the Company leased its office, warehouse, and yard facilities from a related party under the terms of a twelve-month lease that automatically renews annually on December 15, unless the Company gives notice that it wishes to terminate the lease. The lease requires monthly rent of $8,798 (see Note 9).

The Company leases vehicles and equipment under a number of operating lease agreements that require monthly payments of approximately $7,903 and expiring at various dates through 2008.

Minimum lease payments under the above lease obligations are as follows (excludes month-to-month leases):

| Year Ending December 31 | |
|---|---|
| 2005 | $ 199,211 |
| 2006 | 60,789 |
| 2007 | 54,558 |
| 2008 | 21,034 |
| | $ 335,592 |

-8-

**PATRICK POWER CORP.**
NOTES TO FINANCIAL STATEMENTS
Years Ended December 31, 2004 and 2003

**Note 5.     Lease Commitments** (continued)

Rent expense totaled approximately $246,300 (of which approximately $105,600 was paid to a related party) and $153,200 (of which approximately $80,800 was paid to a related party) for the years ended December 31, 2004 and 2003, respectively (see Note 9).

**Note 6.     Costs, Estimated Earnings and Billings on Contracts in Progress**

Costs, estimated earnings and billings on contracts in progress consist of the following at December 31:

|  | 2004 | 2003 |
|---|---|---|
| Costs incurred on contracts in progress | $ 37,719,653 | $ 23,384,197 |
| Estimated earnings to date | 4,025,264 | 1,553,381 |
|  | 41,744,917 | 24,937,578 |
| Less: billings to date | 44,745,637 | 28,649,769 |
|  | $ (3,000,720) | $ (3,712,191) |

Included in the accompanying balance sheets under the following captions:

|  | 2004 | 2003 |
|---|---|---|
| Costs and estimated earnings in excess of billings on contracts in progress | $ 82,350 | $ 266,091 |
| Billings in excess of costs and estimated earnings on contracts in progress | (3,083,070) | (3,978,282) |
|  | $ (3,000,720) | $ (3,712,191) |

**Note 7.     Backlog**

Following is a reconciliation of the backlog of signed contracts in existence at December 31, 2004:

| Balance of signed but unperformed work at December 31, 2003 | $ 23,593,379 |
|---|---|
| New contracts and change orders in 2004 | 23,819,678 |
|  | 47,413,057 |
| Less contract revenues earned in 2004 | 24,430,093 |
| Balance, December 31, 2004 | $ 22,982,964 |

**Note 8.     Employee Benefit Plan**

Effective January 1, 1995, the Company, together with an affiliated company, adopted the Driscoll/PPC 401(k) Profit Sharing Plan (the "Plan"). On January 1, 2003 the Plan elected to be a safe harbor 401(k) plan. The election to be a safe harbor plan is determined by the Company on a yearly basis. Employees are eligible to participate in the Plan if their employment is not governed by a collective bargaining agreement and if they have attained 19 years of age and have completed one full year of service with the Company.

-9-

## PATRICK POWER CORP.
NOTES TO FINANCIAL STATEMENTS
Years Ended December 31, 2004 and 2003

#### Note 8.     Employee Benefit Plan (continued)

Eligible employees may elect to defer the maximum percentage of their salary allowable under the Internal Revenue Code. In 2004 and 2003, the Company made a safe harbor matching contribution equal to 100% of employee salary deferrals not to exceed 5% of employee compensation. The safe harbor matching contribution is fully vested at the date it is contributed. During 2004 and 2003, the Company contributed $171,421 and $151,961, respectively. Amounts contributed to the Plan are held in trust and invested by the Plan trustees.

#### Note 9.     Related Party Transactions

The Company entered into a twelve-month lease with an affiliate on December 15, 1998, for $5,780 per month, which increased during 2004 to $8,798 per month. The lease automatically renews each year. Total payments related to this lease were approximately $105,600 and $80,800 for 2004 and 2003, respectively.

A non-interest bearing advance to an affiliate totaling $500,000 was advanced for working capital needs in 2002 and the affiliate repaid the advance in full during 2003.

During 2004 and 2003, the Company rented tools and equipment from related entities in the amount of $230,000 and $200,000, respectively. In addition, they had a payable due from a related party of $12,000 at December 31, 2004.

During 2003, the Company purchased two vehicles from a related party for approximately $50,000.

#### Note 10.     Line of Credit

At December 31, 2004, the Company and two affiliates had a $2.5 million revolving line of credit with a bank that is collectively guaranteed by the Company, the affiliates and the Company's majority stockholder. The line bears interest at the prime rate (5.25% at December 31, 2004) and is payable on demand, and the current agreement matures September 2005. The debt is collateralized by substantially all the assets of the Companies and the majority stockholder. At December 31, 2004, the Company had no outstanding balance or contingent liability on the line and no amounts were borrowed against the line during 2004.

#### Note 11.     Related Party Guarantor

The Company serves as a guarantor on a mortgage held by a related party for an office, warehouse and yard facility where the Company rents space. The term of the guarantee is equal to the term of debt, which is through March 2012. The mortgage interest rate is fixed at 7.54%. The maximum potential amount of future payments the Company could be required to make under the guarantee at December 31, 2004 is $394,990 plus interest. The related office, warehouse, and yard facility was appraised on February 2001 at $800,000.

# SUPPLEMENTAL INFORMATION

# MSMR

MADSEN SAPP MENA RODRIGUEZ & Co.
CERTIFIED PUBLIC ACCOUNTANTS & ADVISORS

February 28, 2005

To the Board of Directors and Stockholders
Patrick Power Corp.
Fort Lauderdale, Florida

The financial statements for the year ended December 31, 2004 referred to in our opinion are set forth in the preceding pages of this report. Our audit was made primarily for the purpose of expressing an opinion on those basic financial statements for the year ended December 31, 2004 taken as a whole. The supplemental information included in Schedules I and II of this report, although not considered necessary for a fair presentation of financial position and results of operations, is presented primarily for supplementary analysis purposes. This additional information has been subjected to the audit procedures applied in the audit of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

*Madsen Sapp Mena Rodriguez & Co.*
MADSEN SAPP MENA RODRIGUEZ & CO.

-12-

PATI
SCHE
As c

| Job | Contract Name | Contract Revenue | Total Estimate | Anticipated Profit/(Loss) | Percent Complete | Revenue Earned | Revenue Prior Period |
|---|---|---|---|---|---|---|---|
| 01-006 | Gables Club | $ 3,192,063 | $ 2,907,369 | $ 284,694 | 100.00% | $ 3,192,063 | $ 3,121,79 |
| 02-002 | Acqualina Ocean Residences | 9,813,524 | 8,261,248 | 1,546,276 | 88.03% | 8,638,624 | 5,023,77 |
| 02-011 | La Piaz45 | 4,181,307 | 4,564,503 | (383,196) | 100.00% | 4,181,307 | 3,167.03 |
| 02-013 | Fountainbleau | 6,761,461 | 6,187,318 | 574,143 | 91.29% | 6,169,660 | 2,463,58 |
| 02-018 | Las Olas Grand | 6,764,818 | 6,358,135 | 406,683 | 84.77% | 5,734,543 | 2,747,68 |
| 03-010 | Soleil Residence | 609,281 | 534,438 | 74,823 | 74.32% | 452,807 | 77,66 |
| 03-011 | Bath Club | 6,043,376 | 5,279,389 | 763,987 | 63.76% | 3,854,274 | 609,28 |
| 03-012 | Peak Place at Brickell | 5,827,658 | 5,224,024 | 603,634 | 72.83% | 4,244,497 | 360,63 |
| 03-013 | Key West High Phase III | 1,083,810 | 965,949 | 117,861 | 99.09% | 1,073,940 | 311,58 |
| 01-015 | The Pare at Turnberry | 2,186,502 | 2,006,557 | 179,945 | 44.23% | 967,133 | 73,41 |
| 04-001 | Las Olas Grand Tenant Work | 200,000 | 150,000 | 50,000 | 51.69% | 107,387 | |
| 04-002 | Sawgrass Mdd Renovation | 1,736,708 | 1,346,378 | 410,330 | 99.17% | 1,742,144 | |
| 04-005 | Fountainbleau III Sales Center | 675,000 | 450,000 | 225,000 | 67.45% | 455,300 | |
| 04-005 '07 | Freeman Justice Center | 1,462,000 | 1,325,435 | 136,565 | 2.41% | 35,278 | |
| -.008 | Q Club | 3,584,819 | 3,397,912 | 186,907 | 9.33% | 341,365 | |
| 04-009 | Mediterranea Temp Only | 30,000 | 12,857 | 17,143 | 100.00% | 30,000 | |
| 04-010 | 360 Condo | 3,900,000 | 3,664,911 | 235,089 | 0.47% | 18,178 | |
| 04-011 | Turnberry Village | 4,994,800 | 4,484,773 | 510,027 | 3.44% | 171,388 | |
| 04-013 | The Carillon -- Temporary | 21,220 | 11,344 | 9,876 | 100.00% | 21,220 | |
| 04-014 | Tibury Charges @ Fountainbleau | 400,000 | 320,000 | 80,000 | 73.44% | 293,918 | |
| 04-016 | Colorade @ Sawgrass Mall | 1,097,534 | 909,444 | 188,090 | 0.46% | 5,076 | |
| 04-017 | Barcivay Penthouse | 140,000 | 120,943 | 19,055 | 10.07% | 14,093 | |
| | | $ 64,727,881 | $ 58,488,849 | $ 6,239,032 | | $ 41,744,917 | $ 17,956,312 |

PATF
SCHED
As o

| Job# | Contract Name | Contract Revenue | Total Estimate | Anticipated Profit/(Loss) | Percent Complete | Revenue Earned |
|------|------|------|------|------|------|------|
| 00-016 | Summit Brickell | $ 4,191,280 | $ 3,291,376 | $ 899,904 | 100.00% | $ 4,191,28 |
| 01-004 | Coral View Apartments | 2,295,215 | 1,674,911 | 620,304 | 100.00% | 2,295,21 |
| 01-010 | State School "HHH" | 3,679,904 | 3,946,260 | (266,356) | 100.00% | 3,679,9C |
| 02-010 | Key West High School | 1,573,407 | 1,127,680 | 445,727 | 100.00% | 1,573,4C |
| 02-014 | Esplanade Grande | 1,795,022 | 1,902,686 | (107,664) | 100.00% | 1,795,0: |
| 02-022 | Ocean Colony Temporary | 161,170 | 155,068 | 6,102 | 100.00% | 161,1: |
| 04-006 | Monroe County Schools | 368,308 | 259,714 | 108,594 | 100.00% | 368,3( |
| | Small Jobs | 47,646 | 32,037 | 15,609 | 100.00% | 47,6 |
| | | $ 14,111,952 | $ 12,389,732 | $ 1,722,220 | | $ 14,111,9! |

-14-

**General Agreement**
**Of Indemnity**

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA
Hartford, Connecticut 06183

e the undersigned, individually or jointly with others, or on behalf of any of our successors, assigns, heirs, executors, administrators, bsidiaries, parents, affiliates, partnerships, joint ventures, co-ventures and limited liability companies, whether in existence now or .ormed hereafter, individually and collectively referred to as "Indemnitors" enter into this General Agreement of Indemnity "Agreement" with Travelers Casualty and Surety Company of America, its affiliated companies, successors, assigns, partners and subsidiaries whether in existence now or formed hereafter, individually and collectively referred to as "Company", witnesseth:

**WHEREAS**, in the transaction of business, certain bonds, guarantees, undertakings and/or contractual obligations, including renewals, extensions thereof hereinafter referred to as "Bonds" including bonds and undertakings for which the Company has obligations as a result of an asset purchase, acquisition or like transaction have heretofore been and may hereafter be required by, for, or on behalf of any one or more of the Indemnitors. Application has been made and will hereafter be made to execute such Bonds. In connection with the execution, delivery and/or assumption of obligations of such Bonds, the Company requires complete indemnification.

**NOW, THEREFORE**, as an inducement to the Company and in consideration of the Company's execution of one or more Bonds, delivery of one or more Bonds, refraining from canceling one or more Bonds, and/or assumption of obligations by the Company of one or more Bonds, and for other good and valuable consideration, the Indemnitors, jointly and severally agree with the Company as follows:

1.    **Contract:** For purposes of this Agreement, "Contract" shall mean an agreement of the Indemnitors for which the Company executes a Bond, procures a Bond, assumed the obligations of a Bond, or has guaranteed performance.

2.    **Default:** Any of the following shall constitute a Default: (a) a declaration of Contract default by the obligee or entity for whom a Contract is performed; (b) actual breach or abandonment of any Contract; (c) a breach of any provision of this Agreement; (d) failure to make payment of a properly due and owing bill in connection with any Contract; (e) the Company's good faith establishment of a reserve; (f) improper diversion of Contract funds or Indemnitors' assets to the detriment of Contract obligations; (g) Indemnitors become the subject of any proceeding or agreement of bankruptcy, receivership, insolvency, creditor assignment or actually becomes insolvent; (h) Indemnitors die, become legally incompetent, are imprisoned, are convicted of a felony, or disappear and cannot be located; (i) any representation furnished to the Company by or on behalf of any of the Indemnitors proves to have been materially false or misleading when made.

3.    **Payment of Premium:** The Indemnitors shall pay to the Company all premiums for every Bond executed and all renewals extensions thereof, until the Company is discharged and fully released in writing from each such Bond.

**Indemnification and Hold Harmless:** The Indemnitors shall exonerate, indemnify and save the Company harmless from and .inst every claim, loss, damage, demand, liability, cost, charge, Bond premium, suit, judgment, attorney's fee, and expense which the Company incurs in consequence of having obligations in connection with such Bonds. Expense includes but is not limited to: the cost incurred by reason of making any investigation in connection herewith; the cost of procuring or attempting to procure release from liability including the defense of any action brought in connection herewith and the cost incurred in bringing suit to enforce this Agreement against any of the Indemnitors. Amounts due Company shall be payable upon demand.

5.    **Claim Settlement:** The Company shall have the right, in its sole discretion, to determine for itself and the Indemnitors whether any claim or suit brought against the Company or the Indemnitors upon any such Bond shall be paid, compromised, settled, defended or appealed, and its determination shall be final, binding and conclusive upon the Indemnitors. An itemized, sworn, statement by an employee of the Company or a copy of the voucher of payment shall be prima facie evidence of the propriety and existence of Indemnitors' liability. The Company shall be entitled to immediate reimbursement for any and all payments made by it under the belief it was necessary or expedient to make such payments.

6.    **Collateral Security:** Indemnitors agree to pay the Company, upon demand, an amount sufficient to discharge any claim or demand made against the Company on any Bond. Indemnitors further agree to pay the Company, upon demand, an amount equal to the value of any assets or Contract funds improperly diverted by Indemnitors. These sums may be used by the Company to pay such claim or be held by the Company as collateral security against any loss, claim, liability or unpaid premium on any Bond. The Company shall have no duty to invest, or provide interest on the deposit.

7.    **Remedies:** In the event of a Default, Indemnitors assign, convey, and transfer to the Company all of their rights and interest growing in any manner out of the Contracts and assign all rights, title, and interest of all Indemnitors' plants, tools, vehicles, machinery, hardware, software, equipment and materials, to be effective as of the date of such Contracts. In addition, in the event of a Default, the Company shall have a right in sole discretion to:

(a)    Take possession of the work under any Contract and to complete said Contract, or cause, or consent, to the completion thereof;

(b)    Take possession of the Indemnitors' equipment, tools, machinery, vehicles, materials, office equipment, books, records, documents, software, electronically stored information and supplies at the site of the work or elsewhere and utilize them for the completion of the work under the Contracts without payment for such use;

.c)    Assert or prosecute any right or claim in the name of the Indemnitors and to settle any such right or claim as the Company sees fit;

(d) Execute in the name of the Indemnitors, any instruments deemed necessary or desirable by the Company to: (a) provide the Company with title to assets, (b) take immediate possession of Contract funds whether earned or unearned, (c) collect such sums as may be due Indemnitors and to endorse in the name of the Indemnitors, and (d) collect on any negotiable instruments;

(e) Take possession of the Indemnitors' rights, title and interest in and to all Contracts, subcontracts let and insurance policies in connection therewith;

(f) Be subrogated to all the rights, remedies, properties, funds, securities and receivables of the Indemnitors on all Contracts or any other contract of Indemnitors and have the right to offset losses on any Contract or Bond against proceeds, funds, or property due from another Contract, Bond or other contract.

**8.     Joint and Several Liability:** The obligations of the Indemnitors hereunder are joint and several. The Company is authorized to settle with any one or more of the Indemnitors individually, and without reference to the others, and such settlement shall not bar or prejudice actions against or affect the liability of the others.

**9.     Decline Execution:** The Company has the right to refuse to provide any Bond, including final Bonds where the Company provided a bid Bond, without incurring any liability whatsoever to Indemnitors.

**10.     Trust Fund:** All payments due, received for or on account of any Contract shall be held in trust as trust funds by Indemnitors for the benefit and payment of all obligations for which the Company as beneficiary may be liable under any Bond issued by the Company. Company may open a trust account or accounts with a bank for the deposit of the trust funds. Upon demand, Indemnitors shall deposit therein all trust funds received. Withdrawals from such trust accounts shall require the express consent of the Company.

**11.     Books, Records and Credit:** Indemnitors shall furnish, and the Company shall have the right to free access, at reasonable times, to the records of the Indemnitors including but not limited to books, papers, records, documents, accounts and electronically stored information for the purpose of examining and copying them. Indemnitors expressly authorize Company access to their credit records including but not limited to access to account numbers and/or account balances from financial institutions.

**12.     Attorney in Fact:** Indemnitors constitute, appoint and designate the Company as their attorney in fact with the right, but not the obligation, to exercise all rights of the Indemnitors assigned or granted to the Company and to execute and deliver any other assignments or documents deemed necessary by the Company to exercise its rights under this Agreement in the name of the Indemnitors.

**13.     Security Interest:** As security, the Indemnitors hereby grant to Company a security interest in all of their equipment, machinery, vehicles, tools, and material, as well as sums due or to become due in connection with any Contract or other contract. This Agreement or a carbon, photographic, xerographic, facsimile, copy, or other reproduction of this Agreement shall constitute a Security Agreement and a Financing Statement for the benefit of the Company in accordance with the Uniform Commercial Code and all similar statutes. This Agreement a carbon, photographic, xerographic, facsimile, copy, or other reproduction may be filed by the Company 'iout notice to perfect the security interest granted herein. The Company may add schedules or other documents to this Agreement necessary to perfect its rights. The security interests are effective as of the date of each Contract for that Contract and for each .tract for that contract.

**14.     Termination:** This is a continuing Agreement, which remains in full force and effect until terminated. The sole method available to Indemnitors to terminate their participation in this Agreement is by giving written notice sent by certified or registered mail, to the Company of the Indemnitors' intent to terminate. The termination shall take effect no earlier than 30 days after the Company receives such notice ("Termination Date"). The obligation and liability of the Indemnitors giving such notice shall be limited to Bonds furnished before the Termination Date.

**15.     Other Sureties:** If the Company procures the execution of Bonds by other sureties, executes Bonds with cosureties or obtains reinsurance, the provisions of this Agreement inure to the benefit of such other surety, cosurety or reinsurer.

**16.     Competence of Indemnitors:** The Indemnitors acknowledge that the execution of this Agreement and the undertaking of Indemnity was not made in reliance upon any representation concerning the financial condition, viability or responsibility, of any of the Indemnitors or the competence of Indemnitors to perform.

**17.     Nature of Rights:** If any provision or portion of this Agreement shall be unenforceable, this Agreement shall not be void, but shall be construed and enforced with the same effect as though such provision or portion were omitted. Assent or refusal to assent to changes in any Contract or Bond by the Company shall not affect the obligations of the Indemnitors to the Company. The Company's rights under this Agreement are in addition to all other rights of the Company however derived. The rights and remedies afforded to the Company by the terms of this Agreement can only be modified by a rider in writing to this Agreement signed by an authorized representative of the Company. If any of the Indemnitors fail to execute or improperly execute this Agreement; such failure shall not affect the obligations of Indemnitors. The failure to sign or the improper execution of a Bond shall not affect the Company's rights under this Agreement. Termination and/or limitation of any Indemnitors' obligations under this Agreement shall in no way affect the obligations of any of the other Indemnitors whose obligations have not been terminated and/or limited. Indemnitors acknowledge this Agreement can be amended via rider to add another person, entity or entities as Indemnitor(s) to this Agreement and Indemnitors waive any and all notice in connection with the addition of additional Indemnitors and further acknowledge the rights and obligations provided herein shall apply to all Indemnitors whenever made a party to the Agreement.

1ᴿ.     **Corporate Resolution:** The Indemnitors have a substantial, material and beneficial interest (a) in the obtaining of Bonds by ɔf the Indemnitors; and (b) in the transaction(s) for which any other Indemnitor has applied or will apply to Company for Bonds ᴄ. .Juant to this Agreement. The Indemnitors have the full power and authority to execute, deliver and perform this Agreement and to out the obligations stated herein. The Indemnitors further acknowledge and agree that (a) the execution, delivery and ɔrmance of this Agreement by such Indemnitors, (b) the compliance with the terms and provisions hereof, and (c) the carrying out

of the obligations contemplated herein, do not, and will not, conflict with and will not result in a breach or violation of any terms, conditions or provisions of the charter documents or bylaws of such Indemnitors, or any law, governmental rule or regulation, or any applicable order, writ, injunction, judgment or decree of any court or governmental authority against Indemnitors, or any other agreement binding upon Indemnitors, or constitute a Default hereunder.

Indemnitors shall include, but may not be limited to, the following entities and or individuals.

DRISCOLL LIMITED                                    2)  PATRICK POWER CORPORATION

3)  DRISCOLL ELECTRIC COMPANY, INC.                4)

5)

**WE HAVE READ THIS INDEMNITY AGREEMENT CAREFULLY. THERE ARE NO SEPARATE AGREEMENTS OR UNDERSTANDINGS, WHICH IN ANY WAY LESSEN OUR OBLIGATIONS AS ABOVE SET FORTH.**

IN TESTIMONY HEREOF, the Indemnitors have hereunto set their hands and fixed their seals this

29th day of ___June___, 2004.

IMPORTANT:    1.  PRINT OR TYPE NAMES UNDER EACH SIGNATURE.
             2.  ALL PERSONAL INDEMNITORS MUST PROVIDE A RESIDENTIAL ADDRESS AND SOCIAL SECURITY NUMBER AND EACH SIGNATURE MUST BE NOTARIZED.
             3.  ALL CORPORATE INDEMNITORS MUST PROVIDE AN ADDRESS AND FEDERAL TAX IDENTIFICATION NUMBER. TWO SIGNATURES ARE REQUIRED; THAT OF A SECRETARY AND AN AUTHORIZED OFFICER. EACH SIGNAT____ MUST BE NOTARIZED.

_____

**If Indemnitor a Corporation, Limited Liability Company, Partnership, or Trust sign below:**

Instructions: All signatures must be notarized. If the company is: 1) a Corporation, the Secretary and an Authorized Officer should ' on behalf of the Corporation, 2) a **Limited Liability Corporation**, the Manager or Member(s) should sign on behalf of the LLC, 3) artnership, the **Partner(s)** should sign on behalf of the partnership, or 4) a Trust, all Trustees should sign. Two signatures are lired for all companies except where otherwise instructed by Travelers.

..ch of the undersigned hereby affirms to the Company that he or she is a secretary or a duly authorized officer, manager or official of each of the business entities which enters into the foregoing Agreement as an Indemnitor. In such capacity the undersigned is familiar with all of the documents set forth and establishes the rights which govern the affairs, power and authority of such business entity including, to the extent applicable, the certificate or articles of incorporation, bylaws, corporate resolutions, partnership, and operating or limited liability agreements of such business entity. Having reviewed all such applicable documents and instruments and such other facts as deemed appropriate, the undersigned hereby affirms that such entity has the power and authority to enter into such Agreement and that the individual _____ _____ _____ _____ on behalf of such entity is duly authorized to do so.

DRISCOLL LIMITED
Indemnitor - Corporation Limited Liability Company, Partnership, or Trust
(circle one)

By _____ (Seal)
              (Signature of Authorized Officer)

s P. Driscoll, President
              (Print or Type Name and Title)

NE 14th Avenue, Ft. Lauderdale, FL 33334
              (Address)

36-3927449
(Federal Tax ID)

By _____ (Seal)
              (Signature of Authorized Officer)

James P. Driscoll, Secretary
              (Print or Type Name and Title)

5691 NE 14th Avenue, Ft. Lauderdale, FL 33334
              (Address)

S-5007 2-2002                                    Page 3

ACKNOWLEDGEMENT
STATE OF <u>FLORIDA</u>          County of   <u>Broward</u>

On this <u>29</u> day of ___<u>June</u>___, 2004, before me personally appeared <u>James P. Driscoll</u> known or proven to me to be the <u>President and</u>
<u>Secretary</u> of the (Corporation, Limited Liability Company, Partnership, or Trust (circle one); hereinafter referred to as the Entity executing the
above instrument, and acknowledged said instrument to be the free and voluntary act and deed of said Entity, for the uses and purposes therein
mentioned and on oath stated that the seal affixed is the seal of said Entity and that it was affixed and that they executed said instrument by
authority of the Board of Directors of said Entity. IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day
and year first above written.

_____   _____
Notary Public                     (signature)

June J. Stone
_____   _____
Notary Public                     (print or type)

June J. Stone
Commission # DD 070190
Expires Dec. 8, 2005
Bonded Thru
Atlantic Bonding Co., Inc.

Notary Public residing at: Pembroke Pines, Fl
June J. Stone
Commission # DD 07019.
Expires Dec. 8, 2005
Bonded Thru
Atlantic Bonding Co., Inc.

Commission expires: _____

---

**PATRICK POWER CORPORATION**                    59-2339160
Indemnitor – (Corporation) Limited Liability Company, Partnership, or    (Federal Tax ID)
Trust
(circle one)

By _____ (Seal)    By _____ (Seal)
     (Signature of Authorized Officer)              (Signature of Authorized Officer)

**Martin K. Driscoll, President**              **Martin K. Driscoll, Secretary**
          (Print or Type Name and Title)                    (Print or Type Name and Title)
5691 NE 14th Avenue, Ft. Lauderdale, FL  33334    5691 NE 14th Avenue, Ft. Lauderdale, FL  33334
          (Address)                                          (Address)

ACKNOWLEDGEMENT
STATE OF <u>FLORIDA</u>          County of   <u>Broward</u>

this <u>29</u> day of ___<u>June</u>___, 2004 before me personally appeared <u>Martin K. Driscoll</u> known or proven to me to be the <u>President and</u>
<u>Secretary</u> of the (Corporation, Limited Liability Company, Partnership, or Trust (circle one); hereinafter referred to as the Entity executing the above
instrument, and acknowledged said instrument to be the free and voluntary act and deed of said Entity, for the uses and purposes therein
mentioned and on oath stated that the seal affixed is the seal of said Entity and that it was affixed and that they executed said instrument by
authority of the Board of Directors of said Entity. IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day
and year first above written.

_____   _____
Notary Public                     (signature)

June J. Stone
_____   _____
Notary Public                     (print or type)

Notary Public residing at: Pembroke Pines, Fl
June J. Stone
Commission # DD 070190
Expires Dec. 8, 2005
Bonded Thru
Atlantic Bonding Co., Inc.

Commission expires: _____

---

**DRISCOLL ELECTRIC COMPANY, INC.**              36-3477658
Indemnitor – Corporation, Limited Liability Company, Partnership, or    (Federal Tax ID)
Trust
(circle one)

By _____ (Seal)    By _____ (Seal)
     (Signature of Authorized Officer)              (Signature of Authorized Officer)

**?es P. Driscoll, President**                 **James P. Driscoll, Secretary**
          (Print or Type Name and Title)                    (Print or Type Name and Title)
?ago, IL                                       Chicago, IL
          (Address)                                          (Address)

ACKNOWLEDGEMENT
STATE OF Florida          County of Broward

On this 29 day of __June__ , 2004, before me personally appeared James P. Driscoll known or proven to me to be the President and Secretary of the (Corporation, Limited Liability Company, Partnership, or Trust (circle one); hereinafter referred to as the Entity executing the above ˈrument, and acknowledged said instrument to be the free and voluntary act and deed of said Entity, for the uses and purposes therein ˈtioned and on oath stated that the seal affixed is the seal of said Entity and that it was affixed and that they executed said instrument by ˈhority of the Board of Directors of said Entity. IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day ˈnd year first above written.

_____     _____
Notary Public                (signature)

June J. Stone
Notary Public                (print or type)

Notary Public residing at: Pembroke Pines, FL

Commission expires:

June J. Stone
Commission # DD 070190
Expires Dec. 8, 2005
Bonded Thru
Atlantic Bonding Co., Inc.

CondenseIt!™

**Page 1**

```
 1        UNITED STATES BANKRUPTCY COURT
           SOUTHERN DISTRICT OF FLORIDA
 2            FORT LAUDERDALE DIVISION

 3   In re:        Case No. 06-12420-BKC-JKO
     JAMES P. DRISCOLL,
 4
         Debtor.
 5                                    /
     UNITED STATES OF AMERICA,
 6
         Plaintiff,
 7
     vs.               Adv. No. 10-3653-BKC-JKO
 8
     ROBERT C. FURR, Chapter 7
 9   Trustee and JAMES P. DRISCOLL,

10       Defendants.
                                      /
11   ROBERT C. FURR, SUCCESS TRUSTEE
     and THE UNITED STATES OF AMERICA
12   ex rel. ROBERT C. FURR,
     SUCCESSOR TRUSTEE,
13
         Third Party Plaintiffs,
14
     vs.
15
     LIBERTY MUTUAL INSURANCE COMPANY
16   AND MARIKA TOLZ,

17       Third Party Defendants.
                                      /
18

19           FURR & COHEN, P.A.
             2255 Glades Road, Suite 337W
20           Boca Raton, Florida 33431
             Thursday, April 28, 2011
21           9:45 a.m. to 2:45 p.m.

22               DEPOSITION
                     OF
23              MARIKA TOLZ

24           taken pursuant to notice
             on behalf of Robert C. Furr.
25
```

**Page 2**

```
 1   APPEARANCES:

 2   FURR & COHEN, P.A., by
         MARC P. BARMAT, ESQUIRE
 3   on behalf of Robert C. Furr,
     Defendant/Third Party Plaintiff.
 4
 5   RICHMAN GREER, P.A., by
         MANUEL FARACH, ESQUIRE
 6   On behalf of Marika Tolz,
     Third Party Defendant.
 7
 8   U.S. ATTORNEY'S OFFICE, by
         GRISEL ALONSO, AUSA
 9   On behalf of The United States of America,
     Plaintiff/Third Party Plaintiff.
10
11   GRAY ROBINSON, P.A., by
         MICHAEL D. LESSNE, ESQUIRE
12   On behalf of Barry Mukamal, Interim Trustee of the
     Involuntary Chapter 7 Estate of Marika Tolz,
13
14   Via Telephone:

15   MILLS PASKERT DIVERS, P.A., by
         BRANDON J. HELD, ESQUIRE
16   On behalf of Liberty Mutual Insurance Company,
     Third Party Defendant.
17
18       - - - - - -
19
20
21
22
23
24
25
```

**Page 3**

```
 1                  INDEX
 2
     WITNESS    DIRECT CROSS REDIRECT RECROSS
 3
     MARIKA TOLZ
 4     By Mr. Barmat    4        70
       By Ms. Alonso        65            72
 5     By Mr. Held          73
       By Mr. Lessne        --
 6     By Mr. Farach            --
 7
         EXHIBITS MARKED FOR IDENTIFICATION
 8
     Number                    Page
 9
       1, Answer to Adversary Complaint   6
10     2, Marika Tolz's answer            6
       3, Trustee's interim report        7
11     4, Docket Entry 785, Form 2        34
       5, Wire transfer instructions      65
12     6, Wire transfer confirmation      66
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1   Thereupon:
 2              MARIKA TOLZ,
 3   after first being duly sworn, was examined and
 4   testified under oath as follows:
 5              DIRECT EXAMINATION
 6   BY MR. BARMAT:
 7     Q  Good morning, Ms. Tolz.  You're here today on
 8   the renotice of Rule 7030 examination in the Adversary
 9   10-3653, which was originally the United States versus
10   Furr, and then there's a third-party complaint, Furr
11   versus Liberty, as well as you.
12         We took your deposition just two days ago in
13   the Kivi South adversary, and I asked you a bunch of
14   introductory questions.  In an effort to save time, I
15   guess would you agree that any of your testimony in
16   the Kivi South case, as well as in the deposition in
17   aid of execution which was taken by Joel Tabas's
18   offices, that your responses -- first of all, would
19   they be the same to the general introductory questions
20   today, if I ask you the same questions?
21     A  Yes.
22     Q  And you would agree that those responses
23   would be equally admissible in this adversary
24   proceeding?
25     A  Yes.
```

CondenseIt!™

Page 5

1  Q Part of the notice of examination, there was
2 a duces tecum that basically just asked you if you had
3 any documents that supported any denials in the answer
4 that you served, which was at Docket Entry 18 or any
5 documents that showed any defenses you would have.
6     Did you bring any documents today in response
7 to the duces tecum?
8  A No, I don't have any documents.
9  Q Okay. Now, and we discussed this previously
10 with regard to the Kivi South case, but you've
11 previously admitted, twice in deposition, to
12 misappropriating and stealing funds from various
13 bankruptcy estates, correct?
14  A Correct.
15  Q Generally speaking, part of the
16 misappropriations and stealing included the money
17 that's -- the funds that are alleged in the adversary
18 proceeding that's the subject of today's deposition,
19 correct?
20  A The Driscoll case.
21  Q The Driscoll case?
22  A Yes.
23  Q Okay. I want to go over, similar to what we
24 did the other day, the third-party complaint that Furr
25 filed against you, as well as your answer. Various of

Page 6

1 the allegations contained in the third-party complaint
2 were denied by you, and I want to go through those and
3 see if your responses or your denials remain the same
4 or if you're going to change those.
5     So let's go ahead and mark as Exhibit 1,
6 Docket Entry 10, which is entitled Answer to Adversary
7 Complaint and Third-party Complaint, and then we'll
8 mark as Exhibit 2, Docket Entry 18, which is the
9 Third-party Defendant Marika Tolz's Answer.
10     (Thereupon, the documents referred to were
11 marked as Exhibits No. 1 and 2 for identification.)
12 BY MR. BARMAT:
13  Q And I will present those two documents to
14 you. And are you familiar with those documents?
15  A Yes.
16  Q Did you assist in the preparation of Docket
17 Entry 18, which is Exhibit 2?
18  A In some case there was discussion.
19  Q Let's go ahead and turn to -- on Docket Entry
20 10, Exhibit 1, it's Page 6 of 71, and let's look at
21 Paragraph 45, and let me know when you're there.
22  A Okay.
23  Q Page 45 -- or, I'm sorry, Paragraph 45 says,
24 "Tolz misappropriated various funds from the Driscoll
25 estate." That was denied in your answer.

Page 7

1     Is it safe to say that if you were going to
2 file an amended answer that it would be admitted
3 today?
4  A Yes.
5  Q Let's skip over to Paragraph 48 on the same
6 page, which is another paragraph which you denied, and
7 we'll look at the exhibits that are referenced in
8 Paragraph 48, which say -- it says that on April 12,
9 2009, you transferred $300,000 from Bankruptcy Estate
10 Account No. 3321 to what we've referred to before as
11 the 4401 account. Is that in fact true?
12  A Yes.
13  Q So you would now admit the allegations
14 contained in Paragraph 48?
15  A Yes.
16  Q I now want to attach or mark as Exhibit 3,
17 Docket Entry 756 from the Driscoll case, 06-12420,
18 which is a 28-page document, and I'll present that to
19 you.
20     (Thereupon, the document referred to was
21 marked as Exhibit No. 3 for identification.)
22 BY MR. BARMAT:
23  Q Can you identify that document?
24  A It's an interim report for the period ending
25 3/31/2010.

Page 8

1  Q Is that a document that's commonly referred
2 to as the trustee's interim report?
3  A Yes.
4  Q Now, let's turn on Exhibit 1 to Page 20 of
5 71.
6  A What's Exhibit 1?
7  Q The complaint and the exhibits to the
8 complaint.
9  A Okay.
10  Q All right. And Page 20 of 71 is a check made
11 from the Driscoll estate, 3321; is that correct?
12  A Yes.
13  Q And who is the check made payable to?
14  A James Driscoll Investment Account.
15  Q What is the James Driscoll Investment
16 Account?
17  A It was just a method of transferring the
18 money. There wasn't an account. It went into my
19 trust account.
20  Q So there is no such James Driscoll Investment
21 Account, correct?
22  A Correct.
23  Q Please turn to Page 8 of 28 on the trustee's
24 interim report. Are you there?
25  A Yes.

CondenseIt!™

| Page 17 | Page 19 |
|---|---|
| 1 BY MR. BARMAT: | 1    A Correct. |
| 2    Q Now, let's look at composite Exhibit D, which | 2    Q You created this fraudulent Form 2 to cover |
| 3 begins at Page 28 of 71 in the third-party complaint. | 3 up that transfer of the million dollars to the 4401 |
| 4 That makes reference to -- that's page -- well, if we | 4 account, correct? |
| 5 look at Page 28 of 71 of the third-party complaint, | 5       MR. FARACH: Object to form. |
| 6 that makes reference to the trustee interim report, | 6       MR. HELD: Object to form. |
| 7 Page 27 of 28. Do you see that? | 7       THE WITNESS: I don't remember what I did |
| 8    A Yes. | 8 with this. |
| 9    Q And the reference there on the Form 2 is to a | 9 BY MR. BARMAT: |
| 10 high-yield certificate of account at Bank of America | 10    Q Okay. Well, in fact, there is no 9774 |
| 11 with Account No. 9774, correct? | 11 account? |
| 12    A Yes. | 12    A I don't think so. |
| 13    Q There was no such 9774 account; is that | 13    Q Well, you're sure that there's no 9774 |
| 14 correct? | 14 account, aren't you? |
| 15    A I don't believe there was. | 15    A No. |
| 16    Q Well, let's look at Page 29 of 71 in the | 16    Q Well, we know for a fact that the million |
| 17 third-party complaint, the next page. | 17 dollars, the 700,000 plus the 300,000, went to your |
| 18       That's a copy of a Bank of America statement | 18 4401 account? |
| 19 that purports to reference the Account No. 9774. Do | 19    A Yes. |
| 20 you see that? | 20    Q And we know for a fact that you fraudulently |
| 21    A Yes. | 21 represented in your Form 2 that that money went to |
| 22    Q Was there ever a Bank of America account with | 22 purchase high-yield CD's, correct? |
| 23 that account number, last 4 digits 9774? | 23    A Yes. |
| 24    A I don't think so. | 24    Q We know for a fact, don't we, that the 9774 |
| 25    Q Okay. This is the account, the alleged | 25 account didn't exist, because the million dollars went |

| Page 18 | Page 20 |
|---|---|
| 1 account, that the $1 million that was, in fact, | 1 to the 4401 account? |
| 2 transferred to the 4401 account -- this is the fraud, | 2       MR. FARACH: Object to the form. |
| 3 so to speak, the fraudulent account, where you | 3       MR. HELD: Join. |
| 4 indicated in your Form 2 the $1 million was | 4       THE WITNESS: I would assume it didn't exist. |
| 5 transferred, correct? | 5 BY MR. BARMAT: |
| 6       MR. FARACH: Object to the form. | 6    Q You have no reason to believe that it did |
| 7       MR. HELD: Object to the form. | 7 exist, correct? |
| 8       THE WITNESS: I'm not sure I even understand | 8    A I don't remember exactly what went on. |
| 9 the question. Could you just -- | 9    Q Well, let's look at Page 29 of 71, which is |
| 10       MR. BARMAT: Sure, I'll rephrase. I'll | 10 the alleged Bank of America account, and it references |
| 11 rephrase. | 11 that there's a million dollars in the account. |
| 12 BY MR. BARMAT: | 12       Was a million dollars ever transferred from |
| 13    Q If we look at your trustee's interim report | 13 the Driscoll estate into a Bank of America account |
| 14 at Page 27 of 28 -- | 14 9774? |
| 15    A Yes. | 15    A I don't think so. |
| 16    Q -- it references that the $300,000 that we | 16    Q Where did this bank statement come from? |
| 17 previously talked about and the $700,000 that we | 17       MR. FARACH: Object to the form. |
| 18 previously talked about, it went to purchase -- | 18       Page 29 of 71, Marc? |
| 19 allegedly purchase a high-yield CD. | 19       MR. BARMAT: Yes, sir. |
| 20       We've already established that that $1 | 20       THE WITNESS: It probably came out of my |
| 21 million was, in fact, was not used to purchase a | 21 computer system. |
| 22 high-yield CD, correct? | 22 BY MR. BARMAT: |
| 23    A Correct. | 23    Q Okay. What do you mean by that? |
| 24    Q In fact, that million dollars went to your | 24    A The computer has some data in there from Bank |
| 25 4401 account? | 25 of America, and you can print information on it. |

CondenseIt!™

Page 45

1 America was closed. I put the money in cash into my
2 account, and the next day I put it back into the
3 Driscoll account.
4   Q Okay. When you say "my" account, you're
5 making reference to the State Wide Realty account?
6   A Yes.
7   Q Is that consistent with your responsibilities
8 and obligations under the trustee's handbook to take
9 cash and put it into a non-estate account?
10   A No, you're --
11   MR. FARACH: Object to the form.
12   MR. HELD: Object to the form.
13   THE WITNESS: You are supposed to put it into
14 a safe, and we did not have a safe on that day in the
15 office, and I was not comfortable leaving the cash in
16 the office.
17 BY MR. BARMAT:
18   Q Did you have a safe in your office on other
19 days?
20   A I had access to a safe next door.
21   Q What is next door?
22   A Another office building.
23   Q Did you own that office building?
24   A Yes.
25   Q Why would you have had access to that safe

Page 46

1 that day?
2   A It was a weekend, and I couldn't get in, and
3 I don't even know the full combination of that safe.
4   Q Well, who else --
5   A There's two people that are needed to open
6 it, and I didn't have the second person there.
7   Q What does the UTC code 1129 mean? And I'm
8 looking at Page 5 of 28 on the Form 2.
9   A I'm not sure. It's probably a code that
10 deals with sales of items or receipt of money from
11 outside sources.
12   Q Are you supposed to reference on the Form 2
13 that the money actually came from your 4401 account --
14 I'm sorry, not the 4401 account, the State Wide Realty
15 account?
16   A I could have, but didn't seem to have any
17 reason to.
18   Q Other than --
19   A All of the paperwork was signed by Mary
20 Tiffany. She's really a real person. There were ten
21 people at the sale that saw it.
22   Q Under the rules of the United States Trustee
23 handbook, are you supposed to take cash from a sale?
24   A You're supposed to try not to.
25   Q Did you try not to in this case?

Page 47

1   A Yes, and sometimes you can't help it.
2   Q All right. So factually you would agree with
3 the allegations of Paragraph 60, correct?
4   A Not completely.
5   Q What do you disagree with?
6   A State Wide Realty was just a conduit for Mary
7 Tiffany's deposit. She really put up the cash and got
8 a cash receipt for it.
9   Q Well, that line says, "The deposit on October
10 31, 2006 in the amount of $4,410 is from Check 1100,
11 written by Tolz from her State Wide Realty trust
12 account." That's true, right?
13   A Where I deposited her cash.
14   Q Okay. The statements contained in Paragraph
15 60 are factually correct?
16   A Except for what my --
17   MR. FARACH: Object to form.
18   Go ahead.
19   THE WITNESS: Except for my comments, yes.
20 BY MR. BARMAT:
21   Q Let's look at Paragraph 61, based on what
22 we've gone over with regard to the 300,000, the
23 700,000, and the $500,000 misappropriations, you
24 agree, do you not, that if that $1-1/2 million was in
25 estate accounts as opposed to the 4401 account, there

Page 48

1 would have been interest income for the benefit of the
2 creditors of the Driscoll estate, true?
3   MR. FARACH: Object to form.
4   MR. HELD: Join.
5   THE WITNESS: Yes, but there was interest
6 income computed.
7 BY MR. BARMAT:
8   Q Where is that?
9   A In the ultimate amount that the estate got,
10 the 800 and some -- the 900 and some thousand dollars,
11 the end amount, I believe that included interest.
12   Q Well, during the time that that $1-1/2
13 million was not in the estate because it was in 4401,
14 it was collecting interest in 4401, right?
15   A Right.
16   Q Did the interest from the 4401 account ever
17 get transferred back into the Driscoll accounts?
18   A I think it's in the total.
19   What page is that on, that end transaction?
20   Q How about --
21   A There we go.
22   Q You're looking at Docket Entry 785, Page 30
23 of 32?
24   A Yeah, that's one of them.
25   Ultimately the 968,104.66 was the check that

CondenseIt!™

**Page 121**

1  MR. LESSNE: I thank you all. I'm going to

2  drop off the call at this time.

3  MR. BARMAT: Is that Mike? Okay. Thanks.

4  MR. LESSNE: Thanks again.

5  (Thereupon, a brief recess was taken.)

6  MR. BARMAT: Brandon, you're done?

7  MR. HELD: We are.

8  MR. BARMAT: We're done too, so I guess,

9  Manny, you'll tell her about reading and waiving.

10  MR. FARACH: Yes. We are going to read.

11  (Whereupon, the Deposition was concluded.)

12

13  _____

         MARIKA TOLZ

14  _____

   STATE OF FLORIDA:

15  COUNTY OF PALM BEACH:

16  The foregoing instrument was acknowledged before me

   this _____ day of _____, 2011, by

17  _____, who is personally known

   to me or who has produced _____ as

18  identification and who did (did not) take an oath.

   _____, Notary Public

19  My commission expires:

   Commission #:

20

21

22

23

24

25

**Page 122**

1              CERTIFICATE

   STATE OF FLORIDA:

2  COUNTY OF PALM BEACH:

3

4      I, Anna M. Meagher, Shorthand Reporter and

5  Notary Public for the State of Florida at Large, do

6  hereby certify that the foregoing Deposition of MARIKA

7  TOLZ was taken before me, in the cause, at the time

8  and place, and in the presence of counsel as stated in

9  the caption hereto; that the said witness was first

10  duly sworn by me; and that the foregoing pages,

11  numbered 1 through 123, constitute a true record

12  thereof; and that the reading and signing was not

13  waived by said witness and said witness was notified

14  to read.

15      I further certify that I am not of counsel, I

16  am not related to nor employed by any attorney in this

17  case.

18      Dated this 11th day of May 2011.

19

20  _____

   My Commission Expires:  Anna M. Meagher,

21  January 8, 2013      Notary Public

22  Commission #DD850415    State of Florida at Large

23

24

25

**Page 123**

1      OUELLETTE & MAULDIN COURT REPORTERS

2          28 West Flagler Street, Suite 808

              Miami, Florida 33130

                (305)358-8875

3

4              May 11, 2011

5

   MS. MARIKA TOLZ

6  c/o RICHMAN GREER, P.A.

     201 South Biscayne Boulevard

7  Suite 1000

   Miami, Florida 33131

8

   Re: JAMES P. DRISCOLL, DEBTOR

9     CASE NO. 06-12420-BKC-JKO

10

   Dear Ms. Tolz,

11

12      Please be advised that your Deposition taken by

13  our offices on April 28, 2011 has been transcribed and

   is ready to be read and signed by you.

14      The transcript will be filed with or without your

15  signature in 30 (thirty) days or at the time of trial,

   whichever comes first.

16      Our office hours are 9:00 a.m. to 4:30 p.m. Monday

17  through Friday.

18      If you have any questions regarding this letter,

   please feel free to contact us at the above number.

19

20          Yours very truly,

21

              Anna M. Meagher

22            Court Reporter

23  cc: MARC P. BARMAT, ESQUIRE

24

25